

# EXHIBIT 1

**Copyright Office fees are subject to change. For current fees, check the Copyright Office website at *www.copyright.gov*, write the Copyright Office, or call (202) 707-3000.**



**Form TX**
For a Nondramatic Literary Work
UNITED STATES COPYRIGHT OFFICE

REGISTRATION NUMBER

TX _____ TXU

EFFECTIVE DATE OF REGISTRATION

Month _____ Day _____ Year _____

---

**DO NOT WRITE ABOVE THIS LINE. IF YOU NEED MORE SPACE, USE A SEPARATE CONTINUATION SHEET.**

---

**1**

TITLE OF THIS WORK ▼
Mac OS X Snow Leopard Version 10.6

PREVIOUS OR ALTERNATIVE TITLES ▼
Mac OS X Snow Leopard v10.6; Mac OS X v10.6 Snow Leopard

PUBLICATION AS A CONTRIBUTION If this work was published as a contribution to a periodical, serial, or collection, give information about the collective work in which the contribution appeared.   Title of Collective Work ▼

If published in a periodical or serial give:   Volume ▼     Number ▼     Issue Date ▼     On Pages ▼

---

**2**

**a**

NAME OF AUTHOR ▼
Apple Inc.

DATES OF BIRTH AND DEATH
Year Born ▼     Year Died ▼

Was this contribution to the work a "work made for hire"?
☑ Yes
☐ No

AUTHOR'S NATIONALITY OR DOMICILE
Name of Country
OR { Citizen of ▶
Domiciled in ▶ USA

WAS THIS AUTHOR'S CONTRIBUTION TO THE WORK
Anonymous?   ☐ Yes  ☑ No
Pseudonymous?   ☐ Yes  ☑ No
If the answer to either of these questions is "Yes," see detailed instructions.

**NOTE**
Under the law, the "author" of a "work made for hire" is generally the employer, not the employee (see instructions). For any part of this work that was "made for hire" check "Yes" in the space provided, give the employer (or other person for whom the work was prepared) as "Author" of that part, and leave the space for dates of birth and death blank.

NATURE OF AUTHORSHIP Briefly describe nature of material created by this author in which copyright is claimed. ▼
New and revised text, illustrations and compilation; new and revised computer program.

**b**

NAME OF AUTHOR ▼

DATES OF BIRTH AND DEATH
Year Born ▼     Year Died ▼

Was this contribution to the work a "work made for hire"?
☐ Yes
☐ No

AUTHOR'S NATIONALITY OR DOMICILE
Name of Country
OR { Citizen of ▶
Domiciled in ▶

WAS THIS AUTHOR'S CONTRIBUTION TO THE WORK
Anonymous?   ☐ Yes  ☐ No
Pseudonymous?   ☐ Yes  ☐ No
If the answer to either of these questions is "Yes," see detailed instructions.

NATURE OF AUTHORSHIP Briefly describe nature of material created by this author in which copyright is claimed. ▼

**c**

NAME OF AUTHOR ▼

DATES OF BIRTH AND DEATH
Year Born ▼     Year Died ▼

Was this contribution to the work a "work made for hire"?
☐ Yes
☐ No

AUTHOR'S NATIONALITY OR DOMICILE
Name of Country
OR { Citizen of ▶
Domiciled in ▶

WAS THIS AUTHOR'S CONTRIBUTION TO THE WORK
Anonymous?   ☐ Yes  ☐ No
Pseudonymous?   ☐ Yes  ☐ No
If the answer to either of these questions is "Yes," see detailed instructions.

NATURE OF AUTHORSHIP Briefly describe nature of material created by this author in which copyright is claimed. ▼

---

**3**

**a** YEAR IN WHICH CREATION OF THIS WORK WAS COMPLETED This information must be given in all cases.
2009 ◀Year

**b** DATE AND NATION OF FIRST PUBLICATION OF THIS PARTICULAR WORK Complete this information ONLY if this work has been published.
Month ▶ August   Day ▶ 28   Year ▶ 2009
USA ◀ Nation

---

**4**

COPYRIGHT CLAIMANT(S) Name and address must be given even if the claimant is the same as the author given in space 2. ▼
Apple Inc.
1 Infinite Loop, MS: 3-TM, Cupertino, CA 95104

See instructions before completing this space

TRANSFER If the claimant(s) named here in space 4 is (are) different from the author(s) named in space 2, give a brief statement of how the claimant(s) obtained ownership of the copyright. ▼

DO NOT WRITE HERE OFFICE USE ONLY

APPLICATION RECEIVED

ONE DEPOSIT RECEIVED

TWO DEPOSITS RECEIVED

FUNDS RECEIVED

---

MORE ON BACK ▶   • Complete all applicable spaces (numbers 5-9) on the reverse side of this page.
• See detailed instructions.   • Sign the form at line 8.

DO NOT WRITE HERE

Page 1 of ____ pages

| | |
|---|---|
| EXAMINED BY | FORM TX |
| CHECKED BY | |

☐ CORRESPONDENCE
Yes

**FOR COPYRIGHT OFFICE USE ONLY**

**DO NOT WRITE ABOVE THIS LINE. IF YOU NEED MORE SPACE, USE A SEPARATE CONTINUATION SHEET.**

**5**

**PREVIOUS REGISTRATION** Has registration for this work, or for an earlier version of this work, already been made in the Copyright Office?
☑ Yes  ☐ No  If your answer is "Yes," why is another registration being sought? (Check appropriate box.) ▼
a. ☐ This is the first published edition of a work previously registered in unpublished form.
b. ☐ This is the first application submitted by this author as copyright claimant.
c. ☑ This is a changed version of the work, as shown by space 6 on this application.
If your answer is "Yes," give: **Previous Registration Number** ▶  TX 6849489, TX6325148     **Year of Registration** ▶  2008,2006

**6**
**a**

**DERIVATIVE WORK OR COMPILATION**
**Preexisting Material** Identify any preexisting work or works that this work is based on or incorporates. ▼

Previous versions of "Mac OS" and "Mac OS X" operating system software code.

See instructions before completing this space

**b**

**Material Added to This Work** Give a brief, general statement of the material that has been added to this work and in which copyright is claimed. ▼

This is a changed version of the work. New and revised text, illustrations and compilation; new and revised computer program.

**7**
**a**

**DEPOSIT ACCOUNT** If the registration fee is to be charged to a Deposit Account established in the Copyright Office, give name and number of Account.
**Name** ▼                          **Account Number** ▼

Apple Inc.                          DA 064823

**b**

**CORRESPONDENCE** Give name and address to which correspondence about this application should be sent.   Name/Address/Apt/City/State/Zip ▼

Sue Carroll, Copyright Specialist
Apple Inc.
1 Infinite Loop, MS:3-TM; Cupertino, CA 95104

Area code and daytime telephone number ▶ 408-974-9994          Fax number ▶ 408-253-0186
Email ▶  carroll@apple.com

**8**

**CERTIFICATION*** I, the undersigned, hereby certify that I am the
Check only one ▶
☐ author
☐ other copyright claimant
☐ owner of exclusive right(s)
☑ authorized agent of  **Apple Inc.**
Name of author or other copyright claimant, or owner of exclusive right(s) ▲

of the work identified in this application and that the statements made by me in this application are correct to the best of my knowledge.

**Typed or printed name and date** ▼ If this application gives a date of publication in space 3, do not sign and submit it before that date.

Sue Carroll                                                    Date ▶

Handwritten signature ▼

**9**

Certificate will be mailed in window envelope to this address:

Name ▼
Apple Inc.          Attention: Sue Carroll, Copyright Specialist
Number/Street/Apt ▼
1 Infinite Loop, MS: 3-TM
City/State/Zip ▼
Cupertino, CA 95104

**YOU MUST:**
• Complete all necessary spaces
• Sign your application in space 8
**SEND ALL 3 ELEMENTS IN THE SAME PACKAGE:**
1. Application form
2. Nonrefundable filing fee in check or money order payable to *Register of Copyrights*
3. Deposit material
**MAIL TO**
Library of Congress
Copyright Office
101 Independence Avenue SE
Washington, DC 20559-6222

*17 USC §506(e): Any person who knowingly makes a false representation of a material fact in the application for copyright registration provided for by section 409, or in any written statement filed in connection with the application, shall be fined not more than $2,500.

Form TX – Full  Rev: 11/2006  Print: 11/2006 —30,000  Printed on recycled paper          U.S. Government Printing Office: 2006-xx-xxx/60,xxx

# Certificate of Registration



This Certificate issued under the seal of the Copyright
Office in accordance with title 17, *United States Code*,
attests that registration has been made for the work
identified below. The information on this certificate has
been made a part of the Copyright Office records.

*Marybeth Peters*

Register of Copyrights, United States of America

**Registration Number:**
**TX 6-973-319**

**Effective date of
registration:**
September 17, 2009

## Title

**Title of Work:** Mac OS X Snow Leopard Version 10.6

**Previous or Alternative Title:** Mac OS X Snow Leopard v10.6; Mac OS X v10.6 Snow Leopard

## Completion/Publication

**Year of Completion:** 2009

**Date of 1st Publication:** August 28, 2009          **Nation of 1st Publication:** United States

## Author

**Author:** Apple Inc.

**Author Created:** Entire audiovisual work.

**Work made for hire:** Yes

**Domiciled in:** United States

## Copyright claimant

**Copyright Claimant:** Apple Inc.

1 Infinite Loop, MS: 3-TM, Cupertino, CA, 95104, United States

## Limitation of copyright claim

**Material excluded from this claim:** text, computer program

**Previous registration and year:** TX 6-849-489   2008

TX 6-325-148   2006

**New material included in claim:** text, photographs, compilation, computer program, artwork

## Certification

**Name:** Sue Carroll

**Date:** September 16, 2009

Registration #:   TX0006973319

Service Request #:   1-245373513

Apple Inc.
Sue Carroll
1 Infinite Loop
MS: 3-TM
Cupertino, CA 95104  United States

# EXHIBIT 2

TOWNSEND AND TOWNSEND AND CREW LLP
JAMES G. GILLILAND, JR. (State Bar No. 107988)
MEHRNAZ BOROUMAND SMITH (State Bar No. 197271)
MEGAN M. CHUNG (State Bar No. 232044)
J. JEB B. OBLAK (State Bar No. 241384)
Two Embarcadero Center Eighth Floor
San Francisco, CA  94111
Telephone:  (415) 576-0200
Facsimile:  (415) 576-0300
Email: jggilliland@townsend.com
        mboroumand@townsend.com
        mmchung@townsend.com
        jboblak@townsend.com

O'MELVENY & MYERS LLP
GEORGE RILEY (State Bar No. 118304)
Two Embarcadero Center, 28th Floor
San Francisco, CA  94111
Telephone:  (415) 984-8700
Facsimile:  (415) 984-8701
Email: griley@omm.com

Attorneys for Plaintiff and Counterdefendant
APPLE INC.

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| APPLE INC.,<br><br>           Plaintiff,<br><br>      v.<br><br>PSYSTAR CORPORATION, a Florida corporation,<br><br>           Defendant.<br><br>AND RELATED COUNTERCLAIMS. | Case No. 08-3251 WHA<br><br>**DECLARATION OF JOHN P. J. KELLY IN SUPPORT OF APPLE INC.'S MOTION FOR A PERMANENT INJUNCTION, STATUTORY DAMAGES AND REASONABLE ATTORNEYS' FEES AND COSTS**<br><br>Date:        December 14, 2009<br>Time:        8:00 a.m.<br>Courtroom:  9<br>Judge:      Hon. William Alsup<br>Trial Date:  January 11, 2010 |

townsend.

DECLARATION OF JOHN P. J. KELLY IN SUPPORT OF APPLE INC.'S MOTION FOR A PERMANENT INJUNCTION,
STATUTORY DAMAGES AND REASONABLE ATTORNEYS' FEES AND COSTS, CASE NO. 08-3251 WHA

I, JOHN P. J. KELLY, declare as follows:

1.      I make this declaration on personal knowledge and if called as a witness, could and would competently testify with respect to the matters stated herein.  I am the principal of Kelly Computing Incorporated in Santa Barbara, California.  I have been retained by the law firm of Townsend and Townsend and Crew LLP on behalf of Apple Inc. ("Apple") to provide testimony and expert opinion in the above-captioned matter.  I have submitted an expert report in this matter as well as a Declaration in Support of Apple's Motion for Summary Judgment dated October 8, 2009 (the "October 8 Declaration").  My background and credentials are set forth in that declaration.

2.      As part of my analysis, I studied several Psystar computers, which are listed in my expert report, my October 8 Declaration, and set forth in Table 1 below:

Table 1.  Psystar computers examined and the dates that the computers were either ordered by Apple or produced in discovery by Psystar.

|   | Computer | Date ordered by Apple | Date produced by Psystar |
|---|----------|-----------------------|--------------------------|
| A | Open | 5/6/2008 | — |
| B | OpenPro | 7/21/2008 | — |
| C | OpenPro | 9/26/2008 | — |
| D | Open | 3/5/2009 | — |
| E | OpenPro | 3/5/2009 | — |
| F | Open | — | 4/21/2009 |
| G | OpenPro | — | 4/21/2009 |
| H | Open(3) | — | 4/21/2009 |
| I | Open(7) | — | 8/17/2009 |

3.      As shown in Table 1, Psystar Computers A-E were purchased from Psystar by Apple or its agents.  Psystar Computers F-H were made available for inspection at the offices of Psystar's former counsel, and Computer I was produced by Psystar during discovery.

4.      Psystar Computers A-I all have a hard drive installed with a modified version of Mac OS X.  In my report, I included Table 2 (reproduced below) to show the version and build of Mac OS X installed on each Psystar computer I studied and the version and build of the Mac OS X DVD shipped with that computer.  Table 2 was also included in my October 8 Declaration.

townsend.

DECLARATION OF JOHN P. J. KELLY IN SUPPORT OF APPLE INC.'S MOTION FOR A PERMANENT INJUNCTION, STATUTORY DAMAGES AND REASONABLE ATTORNEYS' FEES AND COSTS
CASE NO. 08-3251 WHA

1

Table 2. Version of Mac OS X installed on each Psystar Computer.

| | Computer | Mac OS X version & build installed on hard drive | Mac OS X version & build on Mac OS X DVD shipped |
|---|---|---|---|
| A | Open | 10.5.2 (9C7010) | 10.5.0 (9A581) |
| B | OpenPro | 10.5.4 (9E17) | 10.5.1 (9B21) |
| C | OpenPro | 10.5.5 (9F33) | 10.5.4 (9E25) |
| D | Open | 10.5.6 (9G55) | 10.5.6 (9G66) |
| E | OpenPro | 10.5.6 (9G55) | 10.5.6 (9G66) |
| F | Open | 10.5.6 (9G55) | — |
| G | OpenPro | 10.5.6 (9G55) | — |
| H | Open(3) | 10.5.6 (9G55) | — |
| I | Open(7) | 10.5.6 (9G66) | 10.5.6 (9G66) |

5.      As can be seen from Table 2 above, Psystar has copied and installed at least five (5) different versions or builds of Mac OS X onto its computers' hard drives between May, 2008 and August, 2009: (i) version 10.5.2 (Computer A); (ii) version 10.5.4 (Computer B); (iii) version 10.5.5 (Computer C); (iv) version 10.5.6, build 9G55 (Computers D-H); and (v) version 10.5.6, build 9G66 (Computer I).  I have been informed that Apple first released version 10.5.2 on February 11, 2008, version 10.5.4 on June 30, 2008, version 10.5.5 on September 15, 2008, and version 10.5.6 on December 15, 2008.  As can be discerned from this data, Psystar repeatedly created modified versions of Mac OS X and shipped them to customers shortly after Apple released each new version of Mac OS X.

6.      Following the release of Apple's Mac OS X version 10.6 Snow Leopard ("Snow Leopard"), I examined a Psystar computer installed with Snow Leopard.  I also examined Psystar's newest product, called Rebel EFI, which is software that Psystar distributes to enable

townsend.

DECLARATION OF JOHN P. J. KELLY IN SUPPORT OF APPLE INC.'S MOTION FOR A PERMANENT INJUNCTION, STATUTORY DAMAGES AND REASONABLE ATTORNEYS' FEES AND COSTS
CASE NO. 08-3251 WHA

2

third parties to run Snow Leopard on non-Apple computers even if the computers were not purchased from Psystar. In both instances, I found that to force Snow Leopard to run on non-Apple computers, Psystar does not use the bootloader in Mac OS X. Instead, Psystar substitutes its own bootloader. (A bootloader is the initial set of code used to start the operation of Mac OS X. Further details regarding bootloaders are set forth at paragraphs 16-17 of my October 8 Declaration.) And, as with the circumvention software used by Psystar to run Mac OS X version 10.5 Leopard on Psystar computers, the circumvention software used by Psystar to run Snow Leopard (or enable others to do so) generates Apple's decryption key and uses it to access the encrypted files in Snow Leopard.

7.       In sum, Psystar takes the following steps to enable Mac OS X to run on non-Apple hardware: (a) Psystar uses Apple's decryption key to circumvent Apple's technological protection measures and gain access to the encrypted files in Mac OS X; and (b) Psystar modifies Mac OS X by, at a minimum, using a different bootloader. Psystar took both of these steps with respect to every Psystar computer that I inspected, whether that computer was running Leopard or Snow Leopard. In my opinion, Psystar must take both of those steps to enable any retail DVD version of Mac OS X Leopard or Snow Leopard to run on non-Apple hardware.

8.       The key used by Apple to decrypt the encrypted files in Mac OS X version 10.6 Snow Leopard is the same key used by Apple to protect the encrypted files within Mac OS X version 10.5 Leopard and is stored in the hardware of a genuine Apple computer. Because of the importance of compatibility between new versions of Mac OS X and existing Apple hardware, it is not surprising that Apple uses the same key. If Apple had required use of a different hardware-stored key to decrypt and access the encrypted files in Snow Leopard, owners of existing Apple computers with Intel processors would have had to purchase new computers or modify their existing hardware in order to upgrade to Snow Leopard. Apple has never released a version of Snow Leopard that runs on anything other than an Intel processor.

///

///

townsend.

///

    I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

    Executed this 23rd day of November, 2009 at Santa Barbara, California.



_____

John P.J. Kelly, Ph.D.

DECLARATION OF JOHN P. J. KELLY IN SUPPORT OF APPLE INC.'S MOTION FOR A PERMANENT INJUNCTION,
STATUTORY DAMAGES AND REASONABLE ATTORNEYS' FEES AND COSTS
CASE NO. 08-3251 WHA

townsend.    4

Registration #:   TX0006973319

Service Request #:   1-245373513

Apple Inc.
Sue Carroll
1 Infinite Loop
MS: 3-TM
Cupertino, CA 95104 United States

# EXHIBIT 3

ENGLISH

APPLE INC.
SOFTWARE LICENSE AGREEMENT FOR MAC OS X
Single Use and Family Pack License for use on Apple-labeled Systems

PLEASE READ THIS SOFTWARE LICENSE AGREEMENT ("LICENSE") CAREFULLY BEFORE USING THE APPLE SOFTWARE.  BY USING THE APPLE SOFTWARE, YOU ARE
AGREEING TO BE BOUND BY THE TERMS OF THIS LICENSE. IF YOU DO NOT AGREE TO THE TERMS OF THIS LICENSE, DO NOT USE THE SOFTWARE. IF YOU DO NOT
AGREE TO THE TERMS OF THE LICENSE, YOU MAY RETURN THE APPLE SOFTWARE TO THE PLACE WHERE YOU OBTAINED IT FOR A REFUND.  IF THE APPLE
SOFTWARE WAS ACCESSED ELECTRONICALLY, CLICK "DISAGREE/DECLINE". FOR APPLE SOFTWARE INCLUDED WITH YOUR PURCHASE OF HARDWARE, YOU MUST
RETURN THE ENTIRE HARDWARE/SOFTWARE PACKAGE IN ORDER TO OBTAIN A REFUND.

IMPORTANT NOTE: This software may be used to reproduce, modify, publish and distribute materials.  It is licensed to you only for reproduction, modification,
publication and distribution of non-copyrighted materials, materials in which you own the copyright, or materials you are authorized or legally permitted to
reproduce, modify, publish or distribute. If you are uncertain about your right to copy, modify, publish or distribute any material, you should contact your legal
advisor.

1. General. The software (including Boot ROM code), documentation and any fonts accompanying this License whether preinstalled on Apple-labeled hardware, on disk, in
read only memory, on any other media or in any other form (collectively the "Apple Software") are licensed, not sold, to you by Apple Inc. ("Apple") for use only under the
terms of this License, and Apple reserves all rights not expressly granted to you. The rights granted herein are limited to Apple's and its licensors' intellectual property
rights in the Apple Software as licensed hereunder and do not include any other patents or intellectual property rights. You own the media on which the Apple Software is
recorded but Apple and/or Apple's licensor(s) retain ownership of the Apple Software itself. The terms of this License will govern any software upgrades provided by Apple
that replace and/or supplement the original Apple Software product, unless such upgrade is accompanied by a separate license in which case the terms of that license will
govern.

Title and intellectual property rights in and to any content displayed by or accessed through the Apple Software belongs to the respective content owner. Such content
may be protected by copyright or other intellectual property laws and treaties, and may be subject to terms of use of the third party providing such content. This License
does not grant you any rights to use such content nor does it guarantee that such content will continue to be available to you.

2. Permitted License Uses and Restrictions.
A. Single Use. This License allows you to install, use and run one (1) copy of the Apple Software on a single Apple-labeled computer at a time. You agree not to install, use
or run the Apple Software on any non-Apple-labeled computer, or to enable others to do so. This License does not allow the Apple Software to exist on more than one
computer at a time, and you may not make the Apple Software available over a network where it could be used by multiple computers at the same time.

B. Family Pack. If you have purchased a Mac OS X Family Pack, this License allows you to install and use one (1) copy of the Apple Software on up to a maximum of five (5)
Apple-labeled computers at a time as long as those computers are located in the same household and used by persons who occupy that same household. By "household"
we mean a person or persons who share the same housing unit such as a home, apartment, mobile home or condominium, but shall also extend to student members who
are primary residents of that household but residing at a separate on-campus location. The Family Pack License does not extend to business or commercial users.

C. You may make one copy of the Apple Software (excluding the Boot ROM code and other Apple firmware that is embedded or otherwise contained in Apple-labeled
hardware) in machine-readable form for backup purposes only; provided that the backup copy must include all copyright or other proprietary notices contained on the
original. Apple Boot ROM code and firmware is provided only for use on Apple-labeled hardware and you may not copy, modify or redistribute the Apple Boot ROM code or
firmware, or any portions thereof.

D. Certain components of the Apple Software, and third party open source programs included with the Apple Software, have been or may be made available by Apple on
its Open Source web site (http://www.opensource.apple.com/) (collectively the "Open-Sourced Components"). You may modify or replace only these Open-Sourced
Components; provided that: (i) the resultant modified Apple Software is used, in place of the unmodified Apple Software, on a single Apple-labeled computer; and (ii) you
otherwise comply with the terms of this License and any applicable licensing terms governing use of the Open-Sourced Components. Apple is not obligated to provide any
updates, maintenance, warranty, technical or other support, or services for the resultant modified Apple Software.

You expressly acknowledge that if failure or damage to Apple hardware results from modification of the Open-Sourced Components of the Apple Software, such failure or
damage is excluded from the terms of the Apple hardware warranty.

E. Apple has provided, as part of the Apple Software package, access to certain third party software as a convenience. To the extent that the Apple Software contains third
party software, Apple has no express or implied obligation to provide any technical or other support for such software. Please contact the appropriate software vendor or
manufacturer directly for technical support and customer service related to its software and products.

F. Except as and only to the extent permitted by applicable licensing terms governing use of the Open-Sourced Components, or by applicable law, you may not copy,
decompile, reverse engineer, disassemble, modify, or create derivative works of the Apple Software or any part thereof. THE APPLE SOFTWARE IS NOT INTENDED FOR USE
IN THE OPERATION OF NUCLEAR FACILITIES, AIRCRAFT NAVIGATION OR COMMUNICATION SYSTEMS, AIR TRAFFIC CONTROL SYSTEMS, LIFE SUPPORT MACHINES OR OTHER
EQUIPMENT IN WHICH THE FAILURE OF THE APPLE SOFTWARE COULD LEAD TO DEATH, PERSONAL INJURY, OR SEVERE PHYSICAL OR ENVIRONMENTAL DAMAGE.

G. If you use Setup/Migration Assistant to transfer software from one Apple-labeled computer to another Apple-labeled computer, please remember that continued use of
the original copy of the software may be prohibited once a copy has been transferred to another computer, unless you already have a licensed copy of such software on
both computers. You should check the relevant software license agreements for applicable terms and conditions.

3. Transfer. You may not rent, lease, lend, redistribute or sublicense the Apple Software.  Subject to the restrictions set forth below, you may, however, make a one-time
permanent transfer of all of your license rights to the Apple Software (in its original form as provided by Apple) to another party, provided that: (a) the transfer must
include all of the Apple Software, including all its component parts (excluding Apple Boot ROM code and firmware), original media, printed materials and this License; (b)
you do not retain any copies of the Apple Software, full or partial, including copies stored on a computer or other storage device; and (c) the party receiving the Apple
Software reads and agrees to accept the terms and conditions of this License.  You may not rent, lease, lend, redistribute, sublicense or transfer any Apple Software that
has been modified or replaced under Section 2D above. All components of the Apple Software are provided as part of a bundle and may not be separated from the bundle
and distributed as standalone applications. Apple Software provided with a particular Apple-labeled hardware product may not run on other models of Apple-labeled
hardware.

Updates: If an Apple Software update completely replaces (full install) a previously licensed version of the Apple Software, you may not both versions of the Apple
Software at the same time nor may you transfer them separately.

NFR (Not for Resale) and Evaluation Copies: Notwithstanding other sections of this License, Apple Software labeled or otherwise provided to you on a promotional or
not-for-resale basis may only be used for demonstration, testing and evaluation purposes and may not be resold or transferred.

Apple System Restore Copies: Restore CDs or DVDs that may accompany an Apple hardware bundle, or are otherwise provided by Apple in connection with an Apple
hardware bundle, contain a copy of the Apple Software that is to be used for diagnostic and restorative purposes only.  These CDs and DVDs may be resold or transferred
only as part of the Apple hardware bundle.

Academic Copies: If the Apple Software package has an academic label or if you acquired the Apple Software at an academic discount, you must be an Eligible Educational
End User to use the Apple Software. "Eligible Educational End Users" means students, faculty, staff and administration attending and/or working at an educational
institutional facility (i.e., college campus, public or private K-12 schools).

4. Consent to Use of Data. You agree that Apple and its subsidiaries may collect and use technical and related information, including but not limited to technical
information about your computer, system and application software, and peripherals, that is gathered periodically to facilitate the provision of software updates, product
support and other services to you (if any) related to the Apple Software, and to verify compliance with the terms of this License. Apple may use this information, as long as
it is in a form that does not personally identify you, to improve our products or to provide services or technologies to you.

5. Termination. This License is effective until terminated. Your rights under this License will terminate automatically without notice from Apple if you fail to comply with
any term(s) of this License. Upon the termination of this License, you shall cease all use of the Apple Software and destroy all copies, full or partial, of the Apple Software.

6. Limited Warranty on Media. Apple warrants the media on which the Apple Software is recorded and delivered by Apple to be free from defects in materials and workmanship under normal use for a period of ninety (90) days from the date of original retail purchase. Your exclusive remedy under this Section shall be, at Apple's option, a refund of the purchase price of the product containing the Apple Software or replacement of the Apple Software which is returned to Apple or an Apple authorized representative with a copy of the receipt. THIS LIMITED WARRANTY AND ANY IMPLIED WARRANTIES ON THE MEDIA INCLUDING, BUT NOT LIMITED TO, THE IMPLIED WARRANTIES OF MERCHANTABILITY, OF SATISFACTORY QUALITY, AND OF FITNESS FOR A PARTICULAR PURPOSE, ARE LIMITED IN DURATION TO NINETY (90) DAYS FROM THE DATE OF ORIGINAL RETAIL PURCHASE. SOME JURISDICTIONS DO NOT ALLOW LIMITATIONS ON HOW LONG AN IMPLIED WARRANTY LASTS, SO THE ABOVE LIMITATION MAY NOT APPLY TO YOU. THE LIMITED WARRANTY SET FORTH HEREIN IS THE ONLY WARRANTY MADE TO YOU AND IS PROVIDED IN LIEU OF ANY OTHER WARRANTIES (IF ANY) CREATED BY ANY DOCUMENTATION, PACKAGING OR OTHERWISE. THIS LIMITED WARRANTY GIVES YOU SPECIFIC LEGAL RIGHTS, AND YOU MAY ALSO HAVE OTHER RIGHTS WHICH VARY BY JURISDICTION.

7. Disclaimer of Warranties. YOU EXPRESSLY ACKNOWLEDGE AND AGREE THAT USE OF THE APPLE SOFTWARE IS AT YOUR SOLE RISK AND THAT THE ENTIRE RISK AS TO SATISFACTORY QUALITY, PERFORMANCE, ACCURACY AND EFFORT IS WITH YOU. EXCEPT FOR THE LIMITED WARRANTY ON MEDIA SET FORTH ABOVE AND TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, THE APPLE SOFTWARE AND ANY SERVICES PERFORMED OR PROVIDED BY THE APPLE SOFTWARE ("SERVICES") ARE PROVIDED "AS IS", WITH ALL FAULTS AND WITHOUT WARRANTY OF ANY KIND, AND APPLE AND APPLE'S LICENSORS (COLLECTIVELY REFERRED TO AS "APPLE" FOR THE PURPOSES OF SECTIONS 7 and 8) HEREBY DISCLAIM ALL WARRANTIES AND CONDITIONS WITH RESPECT TO THE APPLE SOFTWARE AND ANY SERVICES, EITHER EXPRESS, IMPLIED OR STATUTORY, INCLUDING, BUT NOT LIMITED TO, THE IMPLIED WARRANTIES AND/OR CONDITIONS OF MERCHANTABILITY, OF SATISFACTORY QUALITY, OF FITNESS FOR A PARTICULAR PURPOSE, OF ACCURACY, OF QUIET ENJOYMENT, AND NON-INFRINGEMENT OF THIRD PARTY RIGHTS. APPLE DOES NOT WARRANT AGAINST INTERFERENCE WITH YOUR ENJOYMENT OF THE APPLE SOFTWARE, THAT THE FUNCTIONS CONTAINED IN, OR SERVICES PERFORMED OR PROVIDED BY, THE APPLE SOFTWARE WILL MEET YOUR REQUIREMENTS, THAT THE OPERATION OF THE APPLE SOFTWARE OR SERVICES WILL BE UNINTERRUPTED OR ERROR-FREE, THAT THE APPLE SOFTWARE OR SERVICES WILL BE COMPATIBLE WITH THIRD PARTY SOFTWARE, OR THAT DEFECTS IN THE APPLE SOFTWARE OR SERVICES WILL BE CORRECTED. NO ORAL OR WRITTEN INFORMATION OR ADVICE GIVEN BY APPLE OR AN APPLE AUTHORIZED REPRESENTATIVE SHALL CREATE A WARRANTY. SHOULD THE APPLE SOFTWARE OR SERVICES PROVE DEFECTIVE, YOU ASSUME THE ENTIRE COST OF ALL NECESSARY SERVICING, REPAIR OR CORRECTION. SOME JURISDICTIONS DO NOT ALLOW THE EXCLUSION OF IMPLIED WARRANTIES OR LIMITATIONS ON APPLICABLE STATUTORY RIGHTS OF A CONSUMER, SO THE ABOVE EXCLUSION AND LIMITATIONS MAY NOT APPLY TO YOU.

The Apple Software automatically references, displays, links to, and provides web services related to, sites and information located worldwide throughout the Internet. Because Apple has no control over such sites and information, Apple makes no guarantees as to such sites and information, including but not limited to: (a) the accuracy, availability, sequence, completeness, currency, content, validity or quality of any such sites and information, or (b) whether an Apple search completed through the Apple Software may locate unintended or objectionable content. Because some of the content on the Internet consists of material that is adult-oriented or otherwise objectionable to some people or viewers under the age of 18, the results of any search or entering of a particular URL using the Apple Software may automatically and unintentionally generate links or references to objectionable material. By using the Apple Software, you acknowledge that Apple makes no representations or warranties with regard to any sites or information displayed by or accessed through the Apple Software, or any web services performed by the Apple Software in relation to such sites or information. Apple, its officers, affiliates and subsidiaries shall not, directly or indirectly, be liable, in any way, to you or any other person for the content you receive using the Apple Software or for any inaccuracies, errors or omissions from the content. Financial information displayed by the Apple Software is for general informational purposes only and is not intended to be relied upon as investment advice. Before executing any securities transaction based upon information obtained through the Apple Software, you should consult with a financial professional. Neither Apple nor any of its relevant providers guarantees the accuracy, completeness, or timeliness of stock information appearing within the Apple Software. The Apple Software may be used to conduct automated translations. As automated translations are performed by software tools and do not involve any human intervention or verification, it is not advisable to rely upon such translations where absolute accuracy is required. Backup functions performed by the Apple Software are only carried out at certain times and are subject to hardware limitations such as drive storage capacity.

Apple and its licensors reserve the right to change, suspend, remove, or disable access to any Services at any time without notice. In no event will Apple be liable for the removal of or disabling access to any such Services. Apple may also impose limits on the use of or access to certain Services, in any case and without notice or liability.

8. Limitation of Liability. TO THE EXTENT NOT PROHIBITED BY LAW, IN NO EVENT SHALL APPLE BE LIABLE FOR PERSONAL INJURY, OR ANY INCIDENTAL, SPECIAL, INDIRECT OR CONSEQUENTIAL DAMAGES WHATSOEVER, INCLUDING, WITHOUT LIMITATION, DAMAGES FOR LOSS OF PROFITS, LOSS OF DATA, BUSINESS INTERRUPTION OR ANY OTHER COMMERCIAL DAMAGES OR LOSSES, ARISING OUT OF OR RELATED TO YOUR USE OR INABILITY TO USE THE APPLE SOFTWARE, HOWEVER CAUSED, REGARDLESS OF THE THEORY OF LIABILITY (CONTRACT, TORT OR OTHERWISE) AND EVEN IF APPLE HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. SOME JURISDICTIONS DO NOT ALLOW THE LIMITATION OF LIABILITY FOR PERSONAL INJURY, OR OF INCIDENTAL OR CONSEQUENTIAL DAMAGES, SO THIS LIMITATION MAY NOT APPLY TO YOU. In no event shall Apple's total liability to you for all damages (other than as may be required by applicable law in cases involving personal injury) exceed the amount of fifty dollars ($50.00). The foregoing limitations will apply even if the above stated remedy fails of its essential purpose.

9. Digital Certificates.
General. The Apple Software contains functionality that allows it to accept digital certificates either issued from Apple or from third parties. YOU ARE SOLELY RESPONSIBLE FOR DECIDING WHETHER OR NOT TO RELY ON A CERTIFICATE WHETHER ISSUED BY APPLE OR A THIRD PARTY. YOUR USE OF DIGITAL CERTIFICATES IS AT YOUR SOLE RISK. APPLE MAKES NO WARRANTIES OR REPRESENTATIONS, EXPRESS OR IMPLIED, AS TO MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE, ACCURACY, SECURITY, OR NON-INFRINGEMENT OF THIRD PARTY RIGHTS WITH RESPECT TO DIGITAL CERTIFICATES. You agree that (a) you will not falsify or misuse any certificate; (b) you will use Digital Certificates for legal purposes only and in accordance with any applicable Certificate Policy, Certificate Practice Statement or other Certificate Authority business practice disclosures; (c) you are solely responsible for preventing any unauthorized user from making use of your Digital Certificates; and (d) you will revoke any certificate that you have reason to believe has been compromised.

Use of Digital Certificates in iChat. The Apple Software allows you to encrypt your iChat communications. This feature uses digital certificates to verify that the iChat is coming from the iChat screen name that appears in the iChat window and to encrypt and decrypt the chat. It does not verify the identity of the person using that screen name. Apple does not guarantee that there will be no hacking or intrusions into the chat. YOUR USE OF THIS FEATURE IN CONNECTION WITH ICHAT IS AT YOUR SOLE RISK. APPLE MAKES NO WARRANTIES OR REPRESENTATIONS, EXPRESS OR IMPLIED, AS TO MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE, ACCURACY, SECURITY, OR NON-INFRINGEMENT OF THIRD PARTY RIGHTS WITH RESPECT TO THE USE OF DIGITAL CERTIFICATES AND/OR ENCRYPTION IN ICHAT. By using the Apple Software, you agree that (a) you will take no action that interferes with the normal operation of digital certificates or encryption used in an iChat session or otherwise falsify the digital certificate used to validate a screen name; (b) you will use the encrypted iChat function solely for legal purposes; (c) you are solely responsible for preventing any unauthorized user from having access to any certificate or private key stored on your computer; and (d) you will revoke any certificate that you have reason to believe is compromised. Apple's Certificate Policy and Certificate Practice Statements may be found at: http://www.apple.com/certificateauthority.

10. Export Control. You may not use or otherwise export or reexport the Apple Product except as authorized by United States law and the laws of the jurisdiction in which the Apple Product was obtained. In particular, but without limitation, the Apple Product may not be exported or re-exported (a) into any U.S. embargoed countries or (b) to anyone on the U.S. Treasury Department's list of Specially Designated Nationals or the U.S. Department of Commerce Denied Person's List or Entity List. By using the Apple Product, you represent and warrant that you are not located in any such country or on any such list.

11. Government End Users. The Apple Software and related documentation are "Commercial Items", as that term is defined at 48 C.F.R. §2.101, consisting of "Commercial Computer Software" and "Commercial Computer Software Documentation", as such terms are used in 48 C.F.R. §12.212 or 48 C.F.R. §227.7202, as applicable. Consistent with 48 C.F.R. §12.212 or 48 C.F.R. §227.7202-1 through 227.7202-4, as applicable, the Commercial Computer Software and Commercial Computer Software Documentation are being licensed to U.S. Government end users (a) only as Commercial Items and (b) with only those rights as are granted to all other end users pursuant to the terms and conditions herein. Unpublished-rights reserved under the copyright laws of the United States.

12. Controlling Law and Severability. This License will be governed by and construed in accordance with the laws of the State of California, as applied to agreements entered into and to be performed entirely within California between California residents. This License shall not be governed by the United Nations Convention on Contracts for the International Sale of Goods, the application of which is expressly excluded. If for any reason a court of competent jurisdiction finds any provision, or portion thereof, to be unenforceable, the remainder of this License shall continue in full force and effect.

13. Complete Agreement; Governing Language. This License constitutes the entire agreement between the parties with respect to the use of the Apple Software licensed hereunder and supersedes all prior or contemporaneous understandings regarding such subject matter. No amendment to or modification of this License will be binding unless in writing and signed by Apple. Any translation of this License is done for local requirements and in the event of a dispute between the English and any non-English versions, the English version of this License shall govern.

14. Third Party Acknowledgements.
A. Portions of the Apple Software utilize or include third party software and other copyrighted material. Acknowledgements, licensing terms and disclaimers for such material are contained in the "online" electronic documentation for the Apple Software, and your use of such material is governed by their respective terms.

B. Certain software libraries and other third party software included with the Apple Software are free software and licensed under the terms of the GNU General Public License (GPL) or the GNU Library/Lesser General Public License (LGPL), as the case may be. You may obtain a complete machine-readable copy of the source code for such free software under the terms of the GPL or LGPL, as the case may be, without charge except for the cost of media, shipping, and handling, upon written request to Apple.

The GPL/LGPL software is distributed in the hope that it will be useful, but WITHOUT ANY WARRANTY, without even the implied warranty of MERCHANTABILITY or FITNESS FOR A PARTICULAR PURPOSE. A copy of the GPL and LGPL is included with the Apple Software.

C. The Apple Software includes certain software licensed under the IBM Public License Version 1.0 (IPL) or the Common Public License Version 1.0 (CPL). A copy of the source code for the IPL and CPL licensed software may be found in Apple's Open Source repository. See Apple's Open Source web site (http://www.opensource.apple.com/) for information on how to obtain the source code. THE IPL AND CPL SOFTWARE IS PROVIDED ON AN "AS IS" BASIS, WITHOUT WARRANTIES OR CONDITIONS OF ANY KIND, EITHER EXPRESS OR IMPLIED INCLUDING, WITHOUT LIMITATION, ANY  WARRANTIES OR CONDITIONS OR TITLE, NON-INFRINGEMENT, MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE.  NEITHER APPLE, IBM NOR ANY OTHER CONTRIBUTOR TO THE IPL AND CPL SOFTWARE SHALL HAVE ANY LIABILITY FOR ANY DIRECT, INDIRECT, INCIDENTAL, SPECIAL, EXEMPLARY, OR CONSEQUENTIAL DAMAGES (INCLUDING, WITHOUT LIMITATION, LOST PROFITS), HOWEVER CAUSED AND ON ANY THEORY OF LIABILITY, WHETHER IN CONTRACT, STRICT LIABILITY, OR TORT (INCLUDING NEGLIGENCE OR OTHERWISE) ARISING IN ANY WAY OUT OF THE USE OR DISTRIBUTION OF THE IPL AND CPL SOFTWARE OR THE EXERCISE OF ANY RIGHTS GRANTED HEREUNDER, EVEN IF ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

D. MPEG-2 Notice. To the extent that the Apple Software contains MPEG-2 functionality, the following provision applies: ANY USE OF THIS PRODUCT OTHER THAN CONSUMER PERSONAL USE IN ANY MANNER THAT COMPLIES WITH THE MPEG-2 STANDARD FOR ENCODING VIDEO INFORMATION FOR PACKAGED MEDIA IS EXPRESSLY PROHIBITED WITHOUT A LICENSE UNDER APPLICABLE PATENTS IN THE MPEG-2 PATENT PORTFOLIO, WHICH LICENSE IS AVAILABLE FROM MPEG LA, L.L.C, 250 STEELE STREET, SUITE 300, DENVER, COLORADO 80206.

E. Use of MPEG-4. This product is licensed under the MPEG-4 Systems Patent Portfolio License for encoding in compliance with the MPEG-4 Systems Standard, except that an additional license and payment of royalties are necessary for encoding in connection with (i) data stored or replicated in physical media which is paid for on a title by title basis and/or (ii) data which is paid for on a title by title basis and is transmitted to an end user for permanent storage and/or use. Such additional license may be obtained from MPEG LA, LLC. See http://www.mpegla.com for additional details.

This product is licensed under the MPEG-4 Visual Patent Portfolio License for the personal and non-commercial use of a consumer for (i) encoding video in compliance with the MPEG-4 Visual Standard ("MPEG-4 Video") and/or (ii) decoding MPEG-4 video that was encoded by a consumer engaged in a personal and non-commercial activity and/or was obtained from a video provider licensed by MPEG LA to provide MPEG-4 video. No license is granted or shall be implied for any other use.

Additional information including that relating to promotional, internal and commercial uses and licensing may be obtained from MPEG LA, LLC. See http://www.mpegla.com For answers to frequently asked questions regarding use fees under the MPEG LA Visual Patent Portfolio License see www.apple.com/mpeg4 or www.apple.com/quicktime/products/qt/faq.html.

F. H.264/AVC Notice. To the extent that the Apple Software contains AVC encoding and/or decoding functionality, commercial use of H.264/AVC requires additional licensing and the following provision applies: THE AVC FUNCTIONALITY IN THIS PRODUCT IS LICENSED HEREIN ONLY FOR THE PERSONAL AND NON-COMMERCIAL USE OF A CONSUMER TO (i) ENCODE VIDEO IN COMPLIANCE WITH THE AVC STANDARD ("AVC VIDEO") AND/OR (ii) DECODE AVC VIDEO THAT WAS ENCODED BY A CONSUMER ENGAGED IN A PERSONAL AND NON-COMMERCIAL ACTIVITY AND/OR AVC VIDEO THAT WAS OBTAINED FROM A VIDEO PROVIDER LICENSED TO PROVIDE AVC VIDEO. INFORMATION REGARDING OTHER USES AND LICENSES MAY BE OBTAINED FROM MPEG LA L.L.C. SEE HTTP://WWW.MPEGLA.COM.

G. AMR Notice. The Adaptive Multi-Rate ("AMR") encoding and decoding functionality in this product is not licensed to perform cellular voice calls, or for use in any telephony products built on the QuickTime architecture for the Windows platform. The AMR encoding and decoding functionality in this product is also not licensed for use in a cellular communications infrastructure including: base stations, base station controllers/radio network controllers, switching centers, and gateways to and from the public switched network.

H. FAA Notice. Aircraft Situation Display and National Airspace System Status Information data (collectively "Flight Data") displayed through the Apple Software is generated by the Federal Aviation Administration. You agree not to redistribute Flight Data without the prior written consent of the FAA. The FAA and Apple disclaim all warranties, expressed or implied (including the implied warranties of merchantability and fitness for a particular purpose), regarding the use and accuracy of the Flight Data. You agree that the FAA and Apple shall not be liable, either collectively or individually, for any loss, damage, claim, liability, expense, or penalty, or for any indirect, special, secondary, incidental, or consequential damages deriving from the use of the Flight Data. The Apple Software is not sponsored or endorsed by the FAA. The FAA is not responsible for technical or system problems, and you should not contact the FAA regarding such problems or regarding operational traffic flow issues.

I. Use of Adobe Color Profiles. You may use the Adobe Color Profile software included with the Apple Software pursuant to this License, but Adobe is under no obligation to provide any support for the Color Profiles hereunder, including upgrades or future versions of the Profiles or other items. In addition to the provisions of Sections 7 and 8 above, IN NO EVENT WILL ADOBE BE LIABLE TO YOU FOR ANY DAMAGES, CLAIMS OR COSTS WHATSOEVER.  The Adobe Color Profile software distributed with the Apple Software is also available for download from Adobe at www.adobe.com.

EA0390
Rev. 8-14-07



# EXHIBIT 4

ENGLISH

APPLE INC.
SOFTWARE LICENSE AGREEMENT FOR MAC OS X
Single Use, Family Pack and Leopard Upgrade Licenses for use on Apple-branded Systems

PLEASE READ THIS SOFTWARE LICENSE AGREEMENT ("LICENSE") CAREFULLY BEFORE USING THE APPLE SOFTWARE. BY USING THE APPLE SOFTWARE, YOU ARE AGREEING TO BE BOUND BY THE TERMS OF THIS LICENSE. UNLESS YOU RETURN THE APPLE SOFTWARE IN ACCORDANCE WITH APPLE'S RETURN POLICY. IF YOU ARE ACCESSING THE APPLE SOFTWARE ELECTRONICALLY, SIGNIFY YOUR AGREEMENT TO BE BOUND BY THE TERMS OF THIS LICENSE BY CLICKING THE "AGREE " BUTTON. IF YOU DO NOT AGREE TO THE TERMS OF THIS LICENSE, DO NOT USE THE APPLE SOFTWARE AND CLICK "DISAGREE". IF YOU DO NOT AGREE TO THE TERMS OF THE LICENSE, YOU MAY RETURN THE APPLE SOFTWARE WITHIN THE RETURN PERIOD TO THE APPLE STORE OR AUTHORIZED DISTRIBUTOR WHERE YOU OBTAINED IT FOR A REFUND, SUBJECT TO APPLE'S RETURN POLICY FOUND AT http://www.apple.com/legal/ sales_policies/. FOR APPLE SOFTWARE INCLUDED WITH YOUR PURCHASE OF HARDWARE, YOU MUST RETURN THE ENTIRE HARDWARE/SOFTWARE PACKAGE IN ORDER TO OBTAIN A REFUND.

IMPORTANT NOTE: This software may be used to reproduce, modify, publish and distribute materials. It is licensed to you only for reproduction, modification, publication and distribution of non-copyrighted materials, materials in which you own the copyright, or materials you are authorized or legally permitted to reproduce, modify, publish or distribute. If you are uncertain about your right to copy, modify, publish or distribute any material, you should contact your legal advisor.

1. General. The Apple software (including Boot ROM code), any third party software, documentation, interfaces, content, fonts and any data accompanying this License whether preinstalled on Apple-branded hardware, on disk, in read only memory, on any other media or in any other form (collectively the "Apple Software") are licensed, not sold, to you by Apple Inc. ("Apple") for use only under the terms of this License. Apple and/or Apple's licensors retain ownership of the Apple Software itself and reserve all rights not expressly granted to you. The terms of this License will govern any software upgrades provided by Apple that replace and/or supplement the original Apple Software product, unless such upgrade is accompanied by a separate license in which case the terms of that license will govern.

Title and intellectual property rights in and to any content displayed by or accessed through the Apple Software belongs to the respective content owner. Such content may be protected by copyright or other intellectual property laws and treaties, and may be subject to terms of use of the third party providing such content. This License does not grant you any rights to use such content nor does it guarantee that such content will continue to be available to you.

2. Permitted License Uses and Restrictions.
A. Single Use License. Subject to the terms and conditions of this License, unless you have purchased a Family Pack or Upgrade license for the Apple Software, you are granted a limited non-exclusive license to install, use and run one (1) copy of the Apple Software on a single Apple-branded computer at a time. You agree not to install, use or run the Apple Software on any non-Apple-branded computer, or to enable others to do so. This License does not allow the Apple Software to exist on more than one computer at a time, and you may not make the Apple Software available over a network where it could be used by multiple computers at the same time.

B. Family Pack License. If you have purchased a Family Pack license, then subject to the terms and conditions of this License, you are granted a limited non-exclusive license to install, use and run one (1) copy of the Apple Software on up to a maximum of five (5) Apple-branded computers at a time as long as those computers are located in the same household and used by persons who occupy that same household. By "household" we mean a person or persons who share the same housing unit such as a home, apartment, mobile home or condominium, but shall also extend to student members who are primary residents of that household but residing at a separate on-campus location. The Family Pack License does not extend to business or commercial users.

C. Leopard Upgrade Licenses. If you have purchased an Upgrade for Mac OS X Leopard license, then subject to the terms and conditions of this License, you are granted a limited non-exclusive license to install, use and run one (1) copy of the Apple Software on a single Apple-branded computer as long as that computer has a properly licensed copy of Mac OS X Leopard already installed on it. If you have purchased a Family Pack Upgrade for Mac OS X Leopard license, then subject to the terms and conditions of this License, you are granted a limited non-exclusive license to install, use and run one (1) copy of the Apple Software on up to a maximum of five (5) Apple-branded computers at a time as long as those computers are located in the same household (as defined above), are used by persons who occupy that same household, and each such computer has a properly licensed copy of Mac OS X Leopard already installed on it. The Family Pack Upgrade for Mac OS X Leopard License does not extend to business or commercial users.

D. Fonts. Subject to the terms and conditions of this License, you may use the fonts included with the Apple Software to display and print content while running the Apple Software; however, you may only embed fonts in content if that is permitted by the embedding restrictions accompanying the font in question. These embedding restrictions can be found in the Font Book/Preview/Show Font Info panel.

E. Voices. Subject to the terms and conditions of this License, you may use the system voices included in the Apple Software ("System Voices") (i) while running the Apple Software and (ii) to create your own original content and projects for your personal, non-commercial use. No other use of the System Voices is permitted by this License, including but not limited to the use, reproduction, display, performance, recording, publishing or redistribution of any of the System Voices in a profit, non-profit, public sharing or commercial context.

F. You may make one copy of the Apple Software (excluding the Boot ROM code and other Apple firmware that is embedded or otherwise contained in Apple-branded hardware) in machine-readable form for backup purposes only; provided that the backup copy must include all copyright or other proprietary notices contained on the original. Apple Boot ROM code and firmware is provided only for use on Apple-branded hardware and you may not copy, modify or redistribute the Apple Boot ROM code or firmware, or any portions thereof.

G. If you use Setup/Migration Assistant to transfer software from one Apple-branded computer to another Apple-branded computer, please remember that continued use of the original copy of the software may be prohibited once a copy has been transferred to another computer, unless you already have a licensed copy of such software on both computers. You should check the relevant software license agreements for applicable terms and conditions. Third party software and services may not be compatible with this Apple Software and installation of this Apple Software may affect the availability and usability of such third party software or services.

H. Certain components of the Apple Software, and third party open source programs included with the Apple Software, have been or may be made available by Apple on its Open Source web site (http://www.opensource.apple.com/) (collectively the "Open-Sourced Components"). You may modify or replace only these Open-Sourced Components; provided that: (i) the resultant modified Apple Software is used, in place of the unmodified Apple Software, on a single Apple-branded computer; and (ii) you otherwise comply with the terms of this License and any applicable licensing terms governing use of the Open-Sourced Components. Apple is not obligated to provide any updates, maintenance, warranty, technical or other support, or services for the resultant modified Apple Software.

You expressly acknowledge that if failure or damage to Apple hardware results from modification of the Open-Sourced Components of the Apple Software, such failure or damage is excluded from the terms of the Apple hardware warranty.

I. You may not and you agree not to, or to enable others to, copy (except as expressly permitted by this License), decompile, reverse engineer, disassemble, attempt to derive the source code of, decrypt, modify, or create derivative works of the Apple Software or any services provided by the Apple Software, or any part thereof (except as and only to the extent any foregoing restriction is prohibited by applicable law or to the extent as may be permitted by licensing terms governing use of Open-Sourced Components). You agree to use the Apple Software and the Services (as defined in Section 5 below) in compliance with all applicable laws, including local laws of the country or region in which you reside or in which you download or use the Apple Software and Services.

J. Apple has provided as part of the Apple Software package, and may provide as an upgrade, update or supplement to the Apple Software, access to certain third party software or services as a convenience. To the extent that the Apple Software contains or provides access to any third party software or services, Apple has no express or implied obligation to provide any technical or other support for such software or services. Please contact the appropriate software vendor, manufacturer or service provider directly for technical support and customer service related to its software, service and/or products.

3. Transfer. You may not rent, lease, lend, sell, redistribute or sublicense the Apple Software. Subject to the restrictions set forth below, you may, however, make a one-time permanent transfer of all of your license rights to the Apple Software (in its original form as provided by Apple) to another party, provided that: (a) the transfer must include all of the Apple Software, including all its component parts (excluding Apple Boot ROM code and firmware), original media, printed materials and this License; (b) you do not retain any copies of the Apple Software, full or partial, including copies stored on a computer or other storage device; and (c) the party receiving the Apple Software reads and agrees to accept the terms and conditions of this License. You may not rent, lease, lend, redistribute, sublicense or transfer any Apple Software that has been modified or replaced under Section 2H above. All components of the Apple Software are provided as part of a bundle and may not be separated from the bundle and distributed as standalone applications. Apple Software provided with a particular Apple-branded hardware product may not run on other models of Apple-branded hardware.

Updates: If an Apple Software update completely replaces (full install) a previously licensed version of the Apple Software, you may not use both versions of the Apple Software at the same time nor may you transfer them separately.

NFR (Not for Resale) and Evaluation Copies: Notwithstanding other sections of this License, Apple Software labeled or otherwise provided to you on a promotional or not-for-resale basis may only be used for demonstration, testing and evaluation purposes and may not be resold or transferred.

Apple System Restore Copies: Restore CDs or DVDs that may accompany an Apple hardware bundle, or are otherwise provided by Apple in connection with an Apple hardware bundle, contain a copy of the Apple Software that is to be used for diagnostic and restorative purposes only. These CDs and DVDs may be resold or transferred only as part of the Apple hardware bundle.

Academic Copies: If the Apple Software package has an academic label or if you acquired the Apple Software at an academic discount, you must be an Eligible Educational End User to use the Apple Software. "Eligible Educational End Users" means students, faculty, staff and administration attending and/or working at an educational institutional facility (i.e., college campus, public or private K-12 schools).

4. Consent to Use of Data.

A. Diagnostic Data. You agree that Apple and its subsidiaries and agents may collect, maintain, process and use diagnostic, technical and related information, including but not limited to information about your computer, system and application software, and peripherals, that is gathered periodically to facilitate the provision of software updates, product support and other services to you (if any) related to the Apple Software, and to verify compliance with the terms of this License. Apple may use this information, as long as it is in a form that does not personally identify you, to improve our products or to provide services or technologies to you.

B. Location Data. Apple and its partners and licensees may provide certain services through the Apple Software that rely upon location information. To provide these services, where available, Apple and its partners, licensees and third party developers may transmit, collect, maintain, process and use your location data, including the real-time geographic location of your computer. The location data collected by Apple is collected in a form that does not personally identify you and may be used by Apple and its partners, licensees and third party developers to provide location-based products and services. By using any location-based services provided by or through the Apple Software, you agree and consent to Apple's and its partners', licensees' and third party developers' transmission, collection, maintenance, processing and use of your location data to provide such products and services. You may withdraw this consent at any time by not using the location-based features or by disabling the Location Services setting in the Apple Software. The Location Services setting is found in Security preferences within System Preferences. Not using these features will not impact the non location-based functionality of the Apple Software. When using third party applications or services on your computer that use or provide location data, you are subject to and should review such third party's terms and privacy policy on use of location data by such third party applications or services.

At all times your information will be treated in accordance with Apple's Customer Privacy Policy which can be viewed at: www.apple.com/legal/privacy/.

5. Services and Third Party Materials.

A. The Apple Software may enable access to Apple's iTunes Store and other Apple and third party services and web sites (collectively and individually, "Services"). Use of these Services requires Internet access and use of certain Services requires you to accept additional terms and may be subject to additional fees. By using this software in connection with an iTunes Store account, you agree to the latest iTunes Store Terms and Conditions, which you may access and review at http://www.apple.com/legal/itunes/ww/.

B. You understand that by using any of the Services, you may encounter content that may be deemed offensive, indecent, or objectionable, which content may or may not be identified as having explicit language, and that the results of any search or entering of a particular URL may automatically and unintentionally generate links or references to objectionable material. Nevertheless, you agree to use the Services at your sole risk and that Apple shall have no liability to you for content that may be found to be offensive, indecent, or objectionable.

C. Certain Services may display, include or make available content, data, information, applications or materials from third parties ("Third Party Materials") or provide links to certain third party web sites. By using the Services, you acknowledge and agree that Apple is not responsible for examining or evaluating the content, accuracy, completeness, timeliness, validity, copyright compliance, legality, decency, quality or any other aspect of such Third Party Materials or web sites. Apple, its officers, affiliates and subsidiaries do not warrant or endorse and do not assume and will not have any liability or responsibility to you or any other person for any third-party Services, Third Party Materials or web sites, or for any other materials, products, or services of third parties. Third Party Materials and links to other web sites are provided solely as a convenience to you.

D. Financial information displayed by any Services is for general informational purposes only and should not be relied upon as investment advice. Before executing any securities transaction based upon information obtained through the Services, you should consult with a financial or securities professional who is legally qualified to give financial or securities advice in your country or region. Location data provided by any Services is for basic navigational purposes only and is not intended to be relied upon in situations where precise location information is needed or where erroneous, inaccurate, time-delayed or incomplete location data may lead to death, personal injury, property or environmental damage. Neither Apple nor any of its content providers guarantees the availability, accuracy, completeness, reliability, or timeliness of stock information, location data or any other data displayed by any Services.

E. You agree that the Services contain proprietary content, information and material that is owned by Apple and/or its licensors, and is protected by applicable intellectual property and other laws, including but not limited to copyright, and that you will not use such proprietary content, information or materials in any way whatsoever except for permitted use of the Services or in any manner that is inconsistent with the terms of this License or that infringes any intellectual property rights of a third party or Apple. No portion of the Services may be reproduced in any form or by any means. You agree not to modify, rent, lease, loan, sell, distribute, or create derivative works based on the Services, in any manner, and you shall not exploit the Services in any unauthorized way whatsoever, including but not limited to, using the Services to transmit any computer viruses, worms, trojan horses or other malware, or by trespass or burdening network capacity. You further agree not to use the Services in any manner to harass, abuse, stalk, threaten, defame or otherwise infringe or violate the rights of any other party, and that Apple is not in any way responsible for any such use by you, nor for any harassing, threatening, defamatory, offensive, infringing or illegal messages or transmissions that you may receive as a result of using any of the Services.

F. In addition, Services and Third Party Materials that may be accessed, linked to or displayed through the Apple Software are not available in all languages or in all countries. Apple makes no representation that such Services and Materials are appropriate or available for use in any particular location. To the extent you choose to access such Services or Materials, you do so at your own initiative and are responsible for compliance with any applicable laws, including but not limited to applicable local laws. Apple and its licensors reserve the right to change, suspend, remove, or disable access to any Services at any time without notice. In no event will Apple be liable for the removal of or disabling of access to any such Services. Apple may also impose limits on the use of or access to certain

Services, in any case and without notice or liability.

6. **Termination.** This License is effective until terminated. Your rights under this License will terminate automatically or otherwise cease to be effective without notice from Apple if you fail to comply with any term(s) of this License. Upon the termination of this License, you shall cease all use of the Apple Software and destroy all copies, full or partial, of the Apple Software. Sections 7, 8, 9, 10, 13 and 14 of this License shall survive any such termination.

7. **Limited Warranty on Media.** Apple warrants the media on which the Apple Software is recorded and delivered by Apple to be free from defects in materials and workmanship under normal use for a period of ninety (90) days from the date of original retail purchase. Your exclusive remedy under this Section shall be, at Apple's option, a refund of the purchase price of the product containing the Apple Software or replacement of the Apple Software which is returned to Apple or an Apple authorized representative with a copy of the receipt. THIS LIMITED WARRANTY AND ANY IMPLIED WARRANTIES ON THE MEDIA INCLUDING, BUT NOT LIMITED TO, THE IMPLIED WARRANTIES OF MERCHANTABILITY, OF SATISFACTORY QUALITY, AND OF FITNESS FOR A PARTICULAR PURPOSE, ARE LIMITED IN DURATION TO NINETY (90) DAYS FROM THE DATE OF ORIGINAL RETAIL PURCHASE. SOME JURISDICTIONS DO NOT ALLOW LIMITATIONS ON HOW LONG AN IMPLIED WARRANTY LASTS, SO THE ABOVE LIMITATION MAY NOT APPLY TO YOU. THE LIMITED WARRANTY SET FORTH HEREIN IS THE ONLY WARRANTY MADE TO YOU AND IS PROVIDED IN LIEU OF ANY OTHER WARRANTIES (IF ANY) CREATED BY ANY DOCUMENTATION, PACKAGING OR OTHERWISE. THIS LIMITED WARRANTY GIVES YOU SPECIFIC LEGAL RIGHTS, AND YOU MAY ALSO HAVE OTHER RIGHTS WHICH VARY BY JURISDICTION.

8. **Disclaimer of Warranties.** YOU EXPRESSLY ACKNOWLEDGE AND AGREE THAT, TO THE EXTENT PERMITTED BY APPLICABLE LAW, USE OF THE APPLE SOFTWARE AND ANY SERVICES PERFORMED BY OR THROUGH THE APPLE SOFTWARE (COLLECTIVELY "SERVICES") IS AT YOUR SOLE RISK AND THAT THE ENTIRE RISK AS TO SATISFACTORY QUALITY, PERFORMANCE, ACCURACY AND EFFORT IS WITH YOU. EXCEPT FOR THE LIMITED WARRANTY ON MEDIA SET FORTH ABOVE AND TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, THE APPLE SOFTWARE AND SERVICES ARE PROVIDED "AS IS" AND "AS AVAILABLE", WITH ALL FAULTS AND WITHOUT WARRANTY OF ANY KIND, AND APPLE AND APPLE'S LICENSORS (COLLECTIVELY REFERRED TO AS "APPLE" FOR THE PURPOSES OF SECTIONS 8 and 9) HEREBY DISCLAIM ALL WARRANTIES AND CONDITIONS WITH RESPECT TO THE APPLE SOFTWARE AND SERVICES, EITHER EXPRESS, IMPLIED OR STATUTORY, INCLUDING, BUT NOT LIMITED TO, THE IMPLIED WARRANTIES AND/OR CONDITIONS OF MERCHANTABILITY, OF SATISFACTORY QUALITY, OF FITNESS FOR A PARTICULAR PURPOSE, OF ACCURACY, OF QUIET ENJOYMENT, AND NON-INFRINGEMENT OF THIRD PARTY RIGHTS. APPLE DOES NOT WARRANT AGAINST INTERFERENCE WITH YOUR ENJOYMENT OF THE APPLE SOFTWARE AND SERVICES, THAT THE FUNCTIONS CONTAINED IN, OR SERVICES PERFORMED OR PROVIDED BY, THE APPLE SOFTWARE WILL MEET YOUR REQUIREMENTS, THAT THE OPERATION OF THE APPLE SOFTWARE OR SERVICES WILL BE UNINTERRUPTED OR ERROR-FREE, THAT ANY SERVICES WILL CONTINUE TO BE MADE AVAILABLE, THAT THE APPLE SOFTWARE OR SERVICES WILL BE COMPATIBLE OR WORK WITH ANY THIRD PARTY SOFTWARE, APPLICATIONS OR THIRD PARTY SERVICES, OR THAT DEFECTS IN THE APPLE SOFTWARE OR SERVICES WILL BE CORRECTED. INSTALLATION OF THIS SOFTWARE MAY AFFECT THE USABILITY OF THIRD PARTY SOFTWARE, APPLICATIONS OR THIRD PARTY SERVICES. YOU FURTHER ACKNOWLEDGE THAT THE APPLE SOFTWARE AND SERVICES ARE NOT INTENDED OR SUITABLE FOR USE IN SITUATIONS OR ENVIRONMENTS WHERE THE FAILURE OR TIME DELAYS OF, OR ERRORS OR INACCURACIES IN THE CONTENT, DATA OR INFORMATION PROVIDED BY, THE APPLE SOFTWARE OR SERVICES COULD LEAD TO DEATH, PERSONAL INJURY, OR SEVERE PHYSICAL OR ENVIRONMENTAL DAMAGE, INCLUDING WITHOUT LIMITATION THE OPERATION OF NUCLEAR FACILITIES, AIRCRAFT NAVIGATION OR COMMUNICATION SYSTEMS, AIR TRAFFIC CONTROL, LIFE SUPPORT OR WEAPONS SYSTEMS. NO ORAL OR WRITTEN INFORMATION OR ADVICE GIVEN BY APPLE OR AN APPLE AUTHORIZED REPRESENTATIVE SHALL CREATE A WARRANTY. SHOULD THE APPLE SOFTWARE OR SERVICES PROVE DEFECTIVE, YOU ASSUME THE ENTIRE COST OF ALL NECESSARY SERVICING, REPAIR OR CORRECTION. SOME JURISDICTIONS DO NOT ALLOW THE EXCLUSION OF IMPLIED WARRANTIES OR LIMITATIONS ON APPLICABLE STATUTORY RIGHTS OF A CONSUMER, SO THE ABOVE EXCLUSION AND LIMITATIONS MAY NOT APPLY TO YOU.

9. **Limitation of Liability.** TO THE EXTENT NOT PROHIBITED BY APPLICABLE LAW, IN NO EVENT SHALL APPLE BE LIABLE FOR PERSONAL INJURY, OR ANY INCIDENTAL, SPECIAL, INDIRECT OR CONSEQUENTIAL DAMAGES WHATSOEVER, INCLUDING, WITHOUT LIMITATION, DAMAGES FOR LOSS OF PROFITS, LOSS OF DATA, BUSINESS INTERRUPTION OR ANY OTHER COMMERCIAL DAMAGES OR LOSSES, ARISING OUT OF OR RELATED TO YOUR USE OR INABILITY TO USE THE APPLE SOFTWARE AND SERVICES OR ANY THIRD PARTY SOFTWARE OR APPLICATIONS IN CONJUNCTION WITH THE APPLE SOFTWARE, HOWEVER CAUSED, REGARDLESS OF THE THEORY OF LIABILITY (CONTRACT, TORT OR OTHERWISE) AND EVEN IF APPLE HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. SOME JURISDICTIONS DO NOT ALLOW THE LIMITATION OF LIABILITY FOR PERSONAL INJURY, OR OF INCIDENTAL OR CONSEQUENTIAL DAMAGES, SO THIS LIMITATION MAY NOT APPLY TO YOU. In no event shall Apple's total liability to you for all damages (other than as may be required by applicable law in cases involving personal injury) exceed the amount of fifty dollars ($50.00). The foregoing limitations will apply even if the above stated remedy fails of its essential purpose.

10. **Digital Certificates.**
A. _General_. The Apple Software contains functionality that allows it to accept digital certificates either issued from Apple or from third parties. YOU ARE SOLELY RESPONSIBLE FOR DECIDING WHETHER OR NOT TO RELY ON A CERTIFICATE WHETHER ISSUED BY APPLE OR A THIRD PARTY. YOUR USE OF DIGITAL CERTIFICATES IS AT YOUR SOLE RISK. TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, APPLE MAKES NO WARRANTIES OR REPRESENTATIONS, EXPRESS OR IMPLIED, AS TO MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE, ACCURACY, SECURITY, OR NON-INFRINGEMENT OF THIRD PARTY RIGHTS WITH RESPECT TO DIGITAL CERTIFICATES. You agree that (a) you will not falsify or misuse any certificate; (b) you will use Digital Certificates for legal purposes only and in accordance with any applicable Certificate Policy, Certificate Practice Statement or other Certificate Authority business practice disclosures; (c) you are solely responsible for preventing any unauthorized user from making use of your Digital Certificates; and (d) you will revoke any certificate that you have reason to believe has been compromised.

B. _Use of Digital Certificates in iChat_. The Apple Software allows you to encrypt your iChat communications. This feature uses digital certificates to verify that the iChat is coming from the iChat screen name that appears in the iChat window and to encrypt and decrypt the chat. It does not verify the identity of the person using that screen name. Apple does not guarantee that there will be no hacking or intrusions into the chat. YOUR USE OF THIS FEATURE IN CONNECTION WITH ICHAT IS AT YOUR SOLE RISK. APPLE MAKES NO WARRANTIES OR REPRESENTATIONS, EXPRESS OR IMPLIED, AS TO MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE, ACCURACY, SECURITY, OR NON-INFRINGEMENT OF THIRD PARTY RIGHTS WITH RESPECT TO THE USE OF DIGITAL CERTIFICATES AND/OR ENCRYPTION IN ICHAT. By using the Apple Software, you agree that (a) you will take no action that interferes with the normal operation of digital certificates or encryption used in an iChat session or otherwise falsify the digital certificate used to validate a screen name; (b) you will use the encrypted iChat function solely for legal purposes; (c) you are solely responsible for preventing any unauthorized user from having access to any certificate or private key stored on your computer; and (d) you will revoke any certificate that you have reason to believe is compromised. Apple's Certificate Policy and Certificate Practice Statements may be found at: http://www.apple.com/certificateauthority.

11. **Export Control.** You may not use or otherwise export or reexport the Apple Software except as authorized by United States law and the laws of the jurisdiction in which the Apple Software was obtained. In particular, but without limitation, the Apple Software may not be exported or re-exported (a) into any U.S. embargoed countries or (b) to anyone on the U.S. Treasury Department's list of Specially Designated Nationals or the U.S. Department of Commerce Denied Person's List or Entity List. By using the Apple Software, you represent and warrant that you are not located in any such country or on any such list. You also agree that you will not use the Apple Software for any purposes prohibited by United States law, including, without limitation, the development, design, manufacture or production of missiles, nuclear, chemical or biological weapons.

12. **Government End Users.** The Apple Software and related documentation are "Commercial Items", as that term is defined at 48 C.F.R. §2.101, consisting of "Commercial Computer Software" and "Commercial Computer Software Documentation", as such terms are used in 48 C.F.R. §12.212 or 48 C.F.R. §227.7202, as applicable. Consistent with 48 C.F.R. §12.212 or 48 C.F.R. §227.7202-1 through 227.7202-4, as applicable, the Commercial Computer Software and Commercial Computer Software Documentation are being licensed to U.S. Government end users (a) only as Commercial Items and (b) with only those rights as are granted to all other end users pursuant to the terms and conditions herein. Unpublished-rights reserved under the copyright laws of the United States.

13. **Controlling Law and Severability.** This License will be governed by and construed in accordance with the laws of the State of California, excluding its conflict of law principles. This License shall not be governed by the United Nations Convention on Contracts for the International Sale of Goods, the application of which is expressly excluded. If for any reason a court of competent jurisdiction finds any provision, or portion thereof, to be unenforceable, the remainder of this License shall continue in full force and effect.

14. **Complete Agreement; Governing Language.** This License constitutes the entire agreement between you and Apple relating to the use of the Apple Software and supersedes all prior or contemporaneous understandings regarding such subject matter. No amendment to or modification of this License will be binding unless in writing and signed by Apple. Any translation of this License is done for local requirements and in the event of a dispute between the English and any

non-English versions, the English version of this License shall govern, to the extent not prohibited by local law in your jurisdiction.

15. Third Party Acknowledgements.
A. Portions of the Apple Software utilize or include third party software and other copyrighted material. Acknowledgements, licensing terms and disclaimers for such material are contained in the electronic documentation for the Apple Software, and your use of such material is governed by their respective terms. Use of the Google Safe Browsing Service is subject to the Google Terms of Service (http://www.google.com/terms_of_service.html) and to Google's Privacy Policy (http://www.google.com/privacypolicy.html).

B. Certain software libraries and other third party software included with the Apple Software are free software and licensed under the terms of the GNU General Public License (GPL) or the GNU Library/Lesser General Public License (LGPL), as the case may be. You may obtain a complete machine-readable copy of the source code for such free software under the terms of the GPL or LGPL, as the case may be, without charge except for the cost of media, shipping, and handling, upon written request to Apple. The GPL/LGPL software is distributed in the hope that it will be useful, but WITHOUT ANY WARRANTY, without even the implied warranty of MERCHANTABILITY or FITNESS FOR A PARTICULAR PURPOSE. A copy of the GPL and LGPL is included with the Apple Software.

C. The Apple Software includes certain software licensed under the IBM Public License Version 1.0 (IPL) or the Common Public License Version 1.0 (CPL). A copy of the source code for the IPL and CPL licensed software may be found in Apple's Open Source repository. See Apple's Open Source web site (http://www.opensource.apple.com/) for information on how to obtain the source code. THE IPL AND CPL SOFTWARE IS PROVIDED ON AN "AS IS" BASIS, WITHOUT WARRANTIES OR CONDITIONS OF ANY KIND, EITHER EXPRESS OR IMPLIED INCLUDING, WITHOUT LIMITATION, ANY WARRANTIES OR CONDITIONS OF TITLE, NON-INFRINGEMENT, MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE. NEITHER APPLE, IBM NOR ANY OTHER CONTRIBUTOR TO THE IPL AND CPL SOFTWARE SHALL HAVE ANY LIABILITY FOR ANY DIRECT, INDIRECT, INCIDENTAL, SPECIAL, EXEMPLARY, OR CONSEQUENTIAL DAMAGES (INCLUDING, WITHOUT LIMITATION, LOST PROFITS) HOWEVER CAUSED AND ON ANY THEORY OF LIABILITY, WHETHER IN CONTRACT, STRICT LIABILITY, OR TORT (INCLUDING NEGLIGENCE OR OTHERWISE) ARISING IN ANY WAY OUT OF THE USE OR DISTRIBUTION OF THE IPL AND CPL SOFTWARE OR THE EXERCISE OF ANY RIGHTS GRANTED HEREUNDER, EVEN IF ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

D. MPEG-2 Notice. To the extent that the Apple Software contains MPEG-2 functionality, the following provision applies: ANY USE OF THIS PRODUCT OTHER THAN CONSUMER PERSONAL USE IN ANY MANNER THAT COMPLIES WITH THE MPEG-2 STANDARD FOR ENCODING VIDEO INFORMATION FOR PACKAGED MEDIA IS EXPRESSLY PROHIBITED WITHOUT A LICENSE UNDER APPLICABLE PATENTS IN THE MPEG-2 PATENT PORTFOLIO, WHICH LICENSE IS AVAILABLE FROM MPEG LA, L.L.C, 250 STEELE STREET, SUITE 300, DENVER, COLORADO 80206.

E. Use of MPEG-4. This product is licensed under the MPEG-4 Visual Patent Portfolio License for the personal and non-commercial use of a consumer for (i) encoding video in compliance with the MPEG-4 Visual Standard ("MPEG-4 Video") and/or (ii) decoding MPEG-4 video that was encoded by a consumer engaged in a personal and non-commercial activity and/or was obtained from a video provider licensed by MPEG LA to provide MPEG-4 video. No license is granted or shall be implied for any other use. Additional information including that relating to promotional, internal and commercial uses and licensing may be obtained from MPEG LA, LLC. See http://www.mpegla.com.

F. H.264/AVC Notice. To the extent that the Apple Software contains AVC encoding and/or decoding functionality, commercial use of H.264/AVC requires additional licensing and the following provision applies: THE AVC FUNCTIONALITY IN THIS PRODUCT IS LICENSED HEREIN ONLY FOR THE PERSONAL AND NON-COMMERCIAL USE OF A CONSUMER TO (i) ENCODE VIDEO IN COMPLIANCE WITH THE AVC STANDARD ("AVC VIDEO") AND/OR (ii) DECODE AVC VIDEO THAT WAS ENCODED BY A CONSUMER ENGAGED IN A PERSONAL AND NON-COMMERCIAL ACTIVITY AND/OR AVC VIDEO THAT WAS OBTAINED FROM A VIDEO PROVIDER LICENSED TO PROVIDE AVC VIDEO. INFORMATION REGARDING OTHER USES AND LICENSES MAY BE OBTAINED FROM MPEG LA L.L.C. SEE HTTP://WWW.MPEGLA.COM.

G. AMR Notice. The Adaptive Multi-Rate ("AMR") encoding and decoding functionality in this product is not licensed to perform cellular voice calls, or for use in any telephony products built on the QuickTime architecture for the Windows platform. The AMR encoding and decoding functionality in this product is also not licensed for use in a cellular communications infrastructure including: base stations, base station controllers/radio network controllers, switching centers, and gateways to and from the public switched network.

H. FAA Notice. Aircraft Situation Display and National Airspace System Status Information data (collectively "Flight Data") displayed through the Apple Software is generated by the Federal Aviation Administration. You agree not to redistribute Flight Data without the prior written consent of the FAA. The FAA and Apple disclaim all warranties, expressed or implied (including the implied warranties of merchantability and fitness for a particular purpose), regarding the use and accuracy of the Flight Data. You agree that the FAA and Apple shall not be liable, either collectively or individually, for any loss, damage, claim, liability, expense, or penalty, or for any indirect, special, secondary, incidental, or consequential damages deriving from the use of the Flight Data. The Apple Software is not sponsored or endorsed by the FAA. The FAA is not responsible for technical or system problems, and you should not contact the FAA regarding such problems or regarding operational traffic flow issues.

I. Use of Adobe Color Profiles. You may use the Adobe Color Profile software included with the Apple Software pursuant to this License, but Adobe is under no obligation to provide any support for the Color Profiles hereunder, including upgrades or future versions of the Profiles or other items. In addition to the provisions of Sections 7 and 8 above, IN NO EVENT WILL ADOBE BE LIABLE TO YOU FOR ANY DAMAGES, CLAIMS OR COSTS WHATSOEVER. The Adobe Color Profile software distributed with the Apple Software is also available for download from Adobe at www.adobe.com.

16. Yahoo Search Service Restrictions. The Yahoo Search Service available through Safari is licensed for use only in the following countries and regions: Argentina, Aruba, Australia, Austria, Barbados, Belgium, Bermuda, Brazil, Bulgaria, Canada, Cayman Islands, Chile, Colombia, Cyprus, Czech Republic, Denmark, Dominican Republic, Ecuador, El Salvador, Finland, France, Germany, Greece, Grenada, Guatemala, Hong Kong, Hungary, Iceland, India, Indonesia, Ireland, Italy, Jamaica, Latvia, Lithuania, Luxembourg, Malaysia, Malta, Mexico, Netherlands, New Zealand, Nicaragua, Norway, Panama, Peru, Philippines, Poland, Portugal, Puerto Rico, Romania, Singapore, Slovakia, Slovenia, South Korea, Spain, St. Lucia, St. Vincent, Sweden, Switzerland, Taiwan, Thailand, The Bahamas, Trinidad and Tobago, Turkey, UK, Uruguay, US and Venezuela.

EA0S60
Rev. 2-15-09

# EXHIBIT 5

**1190**          **586 FEDERAL SUPPLEMENT, 2d SERIES**

Second, the trial judge's implicit finding that the jurors' ability to deliberate impartially was not impaired by Petitioner's outburst and its consequences was not unreasonable. He conducted a thorough examination of every juror, asking the jurors whether they could put aside what they had seen in open court and deliberate fairly and according to the law. (*See, e.g.,* 11/22/99 RT at 14.) The judge took pains to confirm that even those jurors who had expressed fears for their safety could continue to deliberate fairly. (*See, e.g., id.* at 20–21 (confirming that Juror No. 4 could "absolutely" follow the law and deliberate fairly and impartially).) He had an opportunity to observe their demeanor. The judge's assessment of juror partiality is entitled to special deference, *Perez,* 119 F.3d at 1426 (citing *Patton v. Yount,* 467 U.S. at 1036–38 & n. 12, 104 S.Ct. 2885; *Rushen,* 464 U.S. at 120, 104 S.Ct. 453). Petitioner has not produced clear and convincing evidence that this factual determination was unreasonable.

### CONCLUSION

In light of the foregoing, the petition for a writ of habeas corpus is hereby GRANTED. Respondent shall release Petitioner from custody, unless, with thirty days of the filing of this order and entry of judgment thereon, respondent has filed an appeal with the United States Court of Appeals for the Ninth Circuit or the State has set a date for a new trial.

**IT IS SO ORDERED.**



**APPLE INC., a California corporation, Plaintiff,**

v.

**PSYSTAR CORPORATION, a Florida corporation, Defendant.**

**No. C 08–03251 WHA.**

United States District Court,
N.D. California.

Nov. 18, 2008.

**Background:** Defendant in computer manufacturer's lawsuit asserting copyright and trademark violations related to its alleged use of plaintiff's operating system (OS) filed counterclaims alleging violation of federal and state antitrust laws. Plaintiff moved to dismiss counterclaims.

**Holdings:** The District Court, William Alsup, J., held that:

(1) for purposes of defining the relevant market for tying, monopoly maintenance and exclusive dealing claims, counterclaim did not plausibly allege that plaintiff's OS was an independent, single-product market;

(2) plaintiff's OS-compatible computer hardware systems did not constitute a distinct submarket or aftermarket;

(3) counterclaim alleging violation of California's Cartwright Act failed to plead relevant antitrust market and alleged only unilateral anticompetitive conduct;

(4) defendant failed to state counterclaim arising under California's unfair competition statute; and

(5) counterclaim failed to state elements of cause of action under California common law of unfair competition.

Motion granted.

**1. Federal Civil Procedure ⟷1771**

Motion to dismiss for failure to state a claim tests legal sufficiency of claims alleged in complaint. Fed.Rules Civ.Proc. Rule 12(b)(6), 28 U.S.C.A.

**2. Federal Civil Procedure ⟷1772**

Only short and plain statement of plaintiff's entitlement to relief is necessary to avoid motion to dismiss for failure to state a claim; however, plaintiff's obligation to provide grounds of his entitlement to relief requires more than labels and conclusions, and formulaic recitation of elements of cause of action will not do. Fed. Rules Civ.Proc.Rules 8(a)(2), 12(b)(6), 28 U.S.C.A.

**3. Antitrust and Trade Regulation ⟷564, 569, 644**

Tying, monopoly maintenance, and exclusive dealing claims each require antitrust plaintiff to establish market power in a "relevant market," and the inquiry does not differ for the three claims in any material respect. Sherman Act, §§ 1, 2, 15 U.S.C.A. §§ 1. 2; Clayton Act, § 3, 15 U.S.C.A. § 14.

**4. Antitrust and Trade Regulation ⟷557**

Whether products are part of the same or different markets under antitrust law depends on whether consumers view those products as reasonable substitutes for each other and would switch among them in response to changes in relative prices; outer boundaries of product market are determined by reasonable interchangeability of use or "cross-elasticity of demand" between product itself and substitutes for it. Sherman Act, § 1 et seq., 15 U.S.C.A. § 1 et seq.

See publication Words and Phrases for other judicial constructions and definitions.

**5. Antitrust and Trade Regulation ⟷556**

"Relevant market" must include group or groups of sellers or producers who have actual or potential ability to deprive each other of significant levels of business. Sherman Act, § 1 et seq., 15 U.S.C.A. § 1 et seq.

See publication Words and Phrases for other judicial constructions and definitions.

**6. Antitrust and Trade Regulation ⟷557**

In general, manufacturer's own products do not themselves comprise a relevant product market; company does not violate Sherman Act by virtue of natural monopoly it holds over its own product. Sherman Act, § 1 et seq., 15 U.S.C.A. § 1 et seq.

**7. Antitrust and Trade Regulation ⟷554**

While price differential between two products may reflect a low cross-elasticity of demand, if higher priced product offers additional service for which consumers are willing to pay a premium, mere existence of price differential does not necessarily mean that product is unconstrained by competition. Sherman Act, § 1 et seq., 15 U.S.C.A. § 1 et seq.

**8. Antitrust and Trade Regulation ⟷972(3)**

For purposes of defining relevant product market for tying, monopoly maintenance and exclusive dealing counterclaims, pleading as whole did not allege facts that, if true, plausibly indicated that computer manufacturer's operating system was an independent, single-product market. Sherman Act, §§ 1, 2, 15 U.S.C.A. §§ 1, 2; Clayton Act, § 3, 15 U.S.C.A. § 14.

**1192**          **586 FEDERAL SUPPLEMENT, 2d SERIES**

**9. Antitrust and Trade Regulation**
⟞571

"Tying" theory requires plausible allegation that manufacturer tied sale of one market in which it enjoys market power, the "tying market," to product in second, distinct market, the "tied market." Sherman Act, § 1, 15 U.S.C.A. § 1.

> See publication Words and Phrases for other judicial constructions and definitions.

**10. Antitrust and Trade Regulation**
⟞577, 672

For purposes of defining relevant product market for tying, monopoly maintenance and exclusive dealing counterclaims, computer manufacturer's operating system (OS)-compatible computer hardware systems did not constitute a distinct submarket or aftermarket. Sherman Act, §§ 1, 2, 15 U.S.C.A. §§ 1, 2; Clayton Act, § 3, 15 U.S.C.A. § 14.

**11. Antitrust and Trade Regulation**
⟞556

Although law permits antitrust claimant to restrict the relevant market to single-brand aftermarkets, law prohibits antitrust claimant from resting on market power that arises solely from contractual rights that customers knowingly and voluntarily gave to defendant. Sherman Act, § 1 et seq., 15 U.S.C.A. § 1 et seq.

**12. Antitrust and Trade Regulation**
⟞537, 972(1)

California's Cartwright Act was patterned after Sherman Act section prohibiting contracts, combinations or conspiracies in restraint of trade and pleading requirements under the two statutes are similar; moreover, Cartwright Act does not address unilateral conduct. Sherman Act, § 1, 15 U.S.C.A. § 1; West's Ann.Cal.Bus. & Prof.Code § 16700 et seq.

**13. Antitrust and Trade Regulation**
⟞135(2)

If the same conduct is alleged to be both antitrust violation and unfair business act or practice under California's unfair competition statute for the same reason, because it unreasonably restrains competition and harms consumers, then determination that conduct is not an unreasonable restraint of trade necessarily implies that conduct is not unfair toward consumers. West's Ann.Cal.Bus. & Prof.Code § 17200.

**14. Antitrust and Trade Regulation**
⟞16

While cause of action under common law of unfair competition exists in California, its elements have not been delineated.

———————

James G. Gilliland, Jeb Bacon Oblak, Megan M. Chung, Mehrnaz Boroumand Smith, Townsend and Townsend and Crew LLP, San Francisco, CA, for Plaintiff.

Christine S. Watson, Robert Joseph Yorio, Christopher Paul Grewe, Colby B. Sringer, Carr & Ferrell LLP, Palo Alto, CA, for Defendant.

**ORDER GRANTING MOTION TO DISMISS COUNTERCLAIMS**

WILLIAM ALSUP, District Judge.

**INTRODUCTION**

Plaintiff Apple Inc. brought this lawsuit against defendant Psystar Corporation asserting copyright and trademark violations related to Psystar's alleged use of Apple's operating system. Psystar filed counterclaims against Apple alleging violations of federal and state antitrust laws. Apple moved to dismiss Psystar's antitrust counterclaims. For the reasons stated below,

APPLE, INC. v. PSYSTAR CORP.    **1193**
Cite as 586 F.Supp.2d 1190 (N.D.Cal. 2008)

Apple's motion to dismiss the counterclaims is GRANTED.

## STATEMENT

Apple Inc. manufacturers and markets the Macintosh Computer and the OS X Operating System ("Mac OS"). Operating systems like Mac OS control and direct the interaction between software applications such as word processors and internet browsers, and the central processing unit and the various hardware in a computer. Apple is the exclusive manufacturer and master licensor of Mac OS (Countercl. ¶ 14, 18, 21).

Psystar manufacturers and distributes a tailored line of computers called Open Computers. Psystar's Open Computers support a wide range of operating systems including Mac OS, Microsoft Windows XP and XP 64–bit, Windows Vista and Vista 64–bit and Linux 32 and 64–bit kernels. Psystar allows its customers to choose the operating system on the computers they purchase (Countercl. ¶ 15).

Numerous companies manufacturer entire computer hardware systems, including (but not limited to) Dell, Acer, Lenovo, Sony and Hewlett–Packard. In addition, numerous companies manufacture and sell components—such as hard drives, processors and graphics processing cards—used by those computer manufacturers (Countercl. ¶ 22–25).

The counterclaim, however, identifies no companies other than Apple and Psystar that currently sell computers compatible with Mac OS. Apple manufacturers an exclusive line of hardware systems that support Mac OS, including the Mac Pro, the Mac Mini, the MacBook the MacBook Air, the MacBook Pro, and the iMac. The counterclaim alleges that, by virtue of Apple's End User License Agreement and other anti-competitive conduct, consumers wishing to use Mac OS have no alternative to the Apple-label computer hardware systems. The counterclaim alleges that there is no compelling technological reason why other manufacturers could not produce computer hardware systems capable of hosting, executing and running MAC OS, and that, but for the exclusionary conduct of Apple, such third parties could and would assemble hardware components capable of running Mac OS (Countercl. ¶¶ 25–28).

The counterclaim avers that there exist two relevant markets. The first alleged market consists of one product: Mac OS. The complaint asserts that Apple's Mac OS is not reasonably interchangeable with other operating systems such as Microsoft Windows and therefore comprises its own market. The second alleged market consists of computer hardware systems capable of executing Mac OS. The counterclaim avers that, through its anti-competitive conduct, Apple's exclusive line of computer hardware systems dominate the market for Mac OS-capable computer hardware systems (Countercl. ¶ 17).

Psystar offers several (related) allegations in support of its claim that Mac OS constitutes an independent market. *First*, Psystar alleges that Apple has undertaken extensive advertising campaigns—including the "think different" campaign and the "get a Mac" campaign—to define the Mac OS as a product separate and distinct from other operating systems, and that through those efforts customers and merchants have come to recognize Mac OS as a separate and distinct market (Compl. ¶¶ 30–35). *Second*, the counterclaim avers that, across the spectrum of the Apple-label computer line, Apple computers with traditional computer components are significantly more expensive than similarly configured computers with comparable (or superior) hardware sold by other computer companies utilizing operating systems other than Mac OS, such as Windows.

The counterclaim further asserts that "[n]otwithstanding the consistent upward differentiation in price across a broad spectrum . . . Apple is known for its 'market performance and brand leadership' . . . [and] is 'well known for its passionate and dedicated consumer base.'" Psystar avers that Apple "has made a conscious and successful effort to create inelasticity of demand through product differentiation in its Mac OS," and that there in fact exists an "insufficient" cross-elasticity of demand. Psystar alleges that Apple's customers would not consider any other operating system to be a reasonably interchangeable alternative (Countercl. ¶¶ 36–43). *Third*, the counterclaim alleges that a "small but significant non-transitory increase in price" ("SSNIP") would not result in a change in demand for Mac OS (Countercl. ¶ 44).

Psystar claims that Apple has utilized its monopoly power in the alleged "Mac OS market"—in which Apple is, by definition, the only participant—in order to dominate the market for Mac OS-capable computer hardware systems. Psystar alleges that Apple has engaged in various forms of anti-competitive conduct in order to "protect its valuable monopoly in the Mac OS market and, by extension, Apple–Labeled Computer Hardware Systems from potential threats.'" The counterclaim asserts that the following actions constitute the illegal tying of Mac OS to Apple-labeled computer systems, monopoly maintenance or other unlawful behavior (Countercl. ¶¶ 47, 63–64, 67, 72–73).

*First*, Psystar avers that Apple's End User License Agreement for the Mac OS specifically prohibits customers from installing the operating system on non-Apple computers. The license agreement states (Countercl. ¶ 61):

    2. Permitted License Uses and Restrictions.

A. *Single Use.* This license allows you to install, use and run (1) copy of the Apple Software on a single Apple-labeled computer at a time. You agree not to install, use or run the Apple Software on any non-Apple-Labeled computer or enable another to do so.

Customers, therefore, are contractually precluded from utilizing Mac OS on any computer hardware system that is not an Apple-labeled computer system (Countercl. ¶¶ 61–62, 65–66).

*Second*, Psystar avers that Apple has erected technical barriers that prevent Mac OS from operating on non-Apple computers. Apple, the counterclaim alleges, intentionally embeds code in Mac OS that causes the operating system to recognize any computer hardware system that is not an Apple computer. If Mac OS recognizes a non-Apple computer, Mac OS will not operate properly. The Mac OS will enter "kernel panic," meaning that the operating system believes that it has detected an internal and fatal error from which it can not recover, and discontinues operation. This renders the computer non-functional (Countercl. ¶¶ 58–59).

*Finally*, Psystar asserts that Apple had experimented with licensing its system software to other computer makers but has since abandoned the practice. In 1995, Apple launched a "Clone Program" under which it licensed Macintosh ROMs and system software to other computer makers, but Apple ended the program in 1997. Apple also purchased a computer hardware manufacturer capable of running Mac OS. Apple has since announced that it will not allow the use of Mac OS on anything other than an Apple computer (Compl. ¶¶ 49–57).

Psystar alleges that this conduct has caused harmful and anti-competitive effects in the marketplace (Compl. ¶¶ 68–77). Psystar asserts six claims for relief: (1)

unlawful tying in violation of Section 1 of the Sherman Act, 15 U.S.C. 1; (2) monopoly maintenance in violation of Section 2 of the Sherman Act; (3) exclusive dealing in violation of Section 3 of the Clayton Act, 15 U.S.C. 14; (4) violations of California's Cartwright Act, Cal. Bus. & Prof.Code § 16700; (5) violations of California's unfair competition law, Cal. Bus. & Prof. Code § 17200, and (6) violations of the common law of unfair competition. Apple moved to dismiss all claims.[1]

## ANALYSIS

[1, 2] A motion to dismiss under Rule 12(b)(6) tests the legal sufficiency of the claims alleged in the complaint. "All allegations of material fact are taken as true and construed in the light most favorable to plaintiff. However, conclusory allegations of law and unwarranted inferences are insufficient to defeat a motion to dismiss for failure to state a claim." *Epstein v. Wash. Energy Co.*, 83 F.3d 1136, 1140 (9th Cir.1996). The Supreme Court recently clarified the pleading standard for Sherman Act Section 1 claims. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 127 S.Ct. 1955, 1964–65, 167 L.Ed.2d 929 (2007). It reiterated that under Rule 8(a)(2), only a short and plain statement of the plaintiff's entitlement to relief is necessary. *Twombly*, 127 S.Ct. at 1964. It also acknowledged, however, that "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* at 1964–1965 (citing *Papasan v. Allain*, 478 U.S. 265, 286, 106

S.Ct. 2932, 92 L.Ed.2d 209 (1986)). The decision explained,

> stating such a claim requires a complaint with enough factual matter (taken as true) to suggest that an agreement was made. Asking for plausible grounds to infer an agreement does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement.

*Id.* at 1965. *Twombly* did not require that pleadings prove the asserted claims or establish a probable violation, but it did require that pleadings set forth factual allegations sufficient to establish *plausible* grounds for an entitlement to relief.

### 1. FEDERAL CLAIMS.

Psystar asserted claims under Sections 1 and 2 of the Sherman Act and Section 3 of the Clayton Act. Apple contends (1) that the relevant markets alleged in the counterclaim are neither legally nor factually plausible, and (2) that the antitrust laws do not require Apple to help its competitors compete by forcing it to enter unwanted licensing agreements with them.

### A. Market definition: Alleged "Mac OS" market.

[3] As stated, Psystar asserted three federal claims: a tying claim under Section 1 of the Sherman Act, a monopoly-maintenance claim under Section 2 of the Sherman act, and an exclusive-dealing claim under Section 3 of the Clayton Act.[2] Each of these claims requires plaintiff to establish market power in a "relevant market."

---

1. Apple requests that the Court take judicial notice of several documents. For the reasons that follow, this order resolves Apple's motion without recourse to those documents. The request is therefore moot.

2. Psystar's tying claim arises under Section 1 of the Sherman Act. It is unclear how Section

1 is applicable, as Psystar alleges only single-firm anticompetitive conduct. Apple, however, does not challenge the counterclaim on this basis. In any event, courts also allow tying theories under Section 2, at least where there is monopolization or attempted monopolization.

**1196**          **586 FEDERAL SUPPLEMENT, 2d SERIES**

*See Illinois Tool Works Inc. v. Independent Ink, Inc.,* 547 U.S. 28, 42–43, 126 S.Ct. 1281, 164 L.Ed.2d 26 (2006) (tying). *Spectrum Sports, Inc. v. McQuillan,* 506 U.S. 447, 456, 113 S.Ct. 884, 122 L.Ed.2d 247 (1993) (monopolization); *Omega Environmental, Inc. v. Gilbarco, Inc.,* 127 F.3d 1157, 1169 (9th Cir.1997) (exclusive dealing). The relevant-market inquiry does not differ for the three claims in any material respect. *See Newcal Industries, Inc. v. Ikon Office Solution,* 513 F.3d 1038, 1044 n. 3 (9th Cir.2008) (standards the same under Sections 1 and 2); *Jefferson Parish Hosp. Dist. No. 2 v. Hyde,* 466 U.S. 2, 23 n. 39, 104 S.Ct. 1551, 80 L.Ed.2d 2 (1984) (standards the same under Sherman Act Section 1 and Clayton Act Section 3). "Failure to identify a relevant market is a proper ground for dismissing a Sherman Act claim." *Tanaka v. University of Southern California,* 252 F.3d 1059, 1063 (9th Cir.2001) (citation omitted).

The parties dispute whether Psystar may rely on a relevant market comprised of a single brand of a product—a market consisting only of Apple's Mac OS but excluding other operating systems such as Microsoft's Windows. Apple asserts that the relevant markets alleged in the counterclaim are neither legally nor factually plausible. Psystar responds that market definition is normally a factual question, not to be decided at the pleading stage, and that single-brand markets are permissible.

**[4, 5]** The definition of an antitrust "relevant market" is typically a factual rather than a legal inquiry, but certain legal principles govern the definition. *Newcal Industries, Inc.,* 513 F.3d at 1045. Whether products are part of the same or different markets under antitrust law depends on whether consumers view those products as reasonable substitutes for each other and would switch among them in response to changes in relative prices:

As the Supreme Court has instructed, "The outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it." [*Brown Shoe v. United States,* 370 U.S. 294, 325, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962) ]. As such, the relevant market must include "the group or groups of sellers or producers who have actual or potential ability to deprive each other of significant levels of business." *Thurman Industries, Inc. v. Pay 'N Pak Stores, Inc.,* 875 F.2d 1369, 1374 (9th Cir.1989).

*Newcal Industries, Inc. v. Ikon Office Solution,* 513 F.3d 1038, 1045 (9th Cir.2008).

Psystar relies on *Newcal Industries.* That decision, plaintiff emphasizes, stated that "the law permits an antitrust claimant to restrict the relevant market to a single brand of the product at issue (as in *Eastman Kodak* )." *Id.* at 1048. *Newcal Industries,* however, merely held that a market may be comprised of a single brand in the situation the Supreme Court addressed in *Kodak*: a derivative aftermarket for products related to or dependent on a specific company's products. As in *Kodak,* the *Newcal Industries* plaintiffs had, the decision explained,

allege[d] the existence of two separate but related markets in intrabrand copier equipment and service. The first market [was] an initial market for copier leases and copier service, which (as the district court correctly found) is a competitive market in which IKON has no significant market power. The second market [was] a derivative aftermarket for replacement equipment, which include[d] markets for lease "buy outs" and for "lease-end service." *As in all three of the cited cases, the relevant market here [was] not the indisputably competitive market in which the consumers first shop for the primary prod-*

*uct. It [was] an aftermarket in which the consumers claim that they should be able to shop for a secondary product* .... The complaint allege[d] that suppliers go through a different economic calculus when competing for consumers of replacement equipment and lease-end service than they do when competing for consumers of initial equipment leases and service contracts.

*Id.* at 1049 (emphasis added). Plaintiff Newcal and defendant IKON were in the copier-equipment business. The two companies competed both in the primary market for equipment leases and in the aftermarket for equipment upgrades. Newcal challenged certain contracts and practices which "shield[ed] IKON customers from competition in the aftermarkets for upgrade equipment and for lease-end services." *Newcal Industries, Inc.*, 513 F.3d at 1043–44. As in *Kodak*, the decision found that these single-brand aftermarkets constituted relevant antitrust markets. *Id.* at 1050. The decision simply did not address the situation for which Psystar cites it—a primary or independent market alleged to be limited, by definition, to a single brand of a product.

Neither did *Kodak*. That decision, like this case, involved claims of tying and monopolization. *Eastman Kodak Company v. Image Technical Services, Inc.*, 504 U.S. 451, 459, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992). The Eastman Kodak Company, the decision explained, manufactured and sold photocopiers and micrographic equipment. Kodak also sold service and replacement parts for its equipment. Plaintiffs were a group of independent service organizations that serviced Kodak's equipment. Plaintiffs challenged Kodak policies that made it more difficult for them to compete with Kodak in servicing Kodak

equipment, including limiting the availability of Kodak parts. Plaintiffs alleged that Kodak unlawfully tied the sale of service for Kodak machines to the sale of Kodak-compatible parts, a market in which Kodak had monopoly power. *Id.* at 454–55, 112 S.Ct. 2072. Kodak parts, the decision explained, were not compatible with competitors' machines, and vice versa. *Id.* at 456–47, 112 S.Ct. 2072.

A principal issue was "whether a defendant's lack of market power in the primary equipment market precludes—as a matter of law—the possibility of market power in derivative aftermarkets." *Id.* at 455, 112 S.Ct. 2072. The Supreme Court held that it does not. *Id.* at 472–77, 112 S.Ct. 2072. The decision explained that, in some instances, a single brand of a product can constitute a separate market: "[b]ecause service and parts for Kodak equipment are not interchangeable with other manufacturers' service and parts, the relevant market from the Kodak equipment owner's perspective is composed of only those companies that service Kodak machines." *Id.* at 482, 112 S.Ct. 2072. Those single-brand markets, however, were "derivative aftermarkets." *Id.* at 455, 112 S.Ct. 2072. *Kodak* found that single-brand aftermarkets—markets for parts and service for Kodak equipment—arose once customers have purchased and are "locked in" to Kodak photocopiers or equipment.

Here, in contrast, Psystar alleges not a single-brand aftermarket dependent on and derivative of a specific company's primary product but instead that a single brand of primary product (Apple's operating system) constitutes an independent market. Neither *Newcal Industries* nor *Kodak* addressed such a situation. Psystar has cited no decision lending support to its single-brand product market theory.[3]

---

**3.** Psystar's only other example of a single-brand market is *Digidyne Corp. v. Data General Corp.*, 734 F.2d 1336 (9th Cir.1984).

There, Data General manufactured a computer system called NOVA, which included a

**1198**        **586 FEDERAL SUPPLEMENT, 2d SERIES**

[6] "In general, a manufacturer's own products do not themselves comprise a relevant product market.... [A] company does not violate the Sherman Act by virtue of the natural monopoly it holds over its own product." *Green Country Food Market, Inc. v. Bottling Group*, 371 F.3d 1275, 1282 (10th Cir.2004). *See also Lambtek Yogurt Machines v. Dreyer's Grand Ice Cream, Inc.*, 1997 WL 108718 at *3 (N.D.Cal.1997) (unpublished). Single-brand markets are, at a minimum, extremely rare. "Even where brand loyalty is intense, courts reject the argument that a single branded product constitutes a relevant market." *Green Country Food Market*, 371 F.3d at 1282. *See also, e.g., Hack v. President and Fellows of Yale College*, 237 F.3d 81, 86 (2d Cir.2000), *abrogated on other grounds by Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002); *Spahr v. Leegin Creative Leather Products, Inc.*, 2008 WL 3914461 at *9–10 (E.D.Tenn.2008); *Little Caesar Enterprises, Inc. v. Smith*, 34 F.Supp.2d 459, 477 and n. 30 (E.D.Mich. 1998); *Shaw v. Rolex Watch, U.S.A., Inc.*, 673 F.Supp. 674, 678–79 (S.D.N.Y.1987). Antitrust markets consisting of just a single brand, however, are not *per se* prohibited; as stated, markets are defined by the "reasonable interchangeability" of use or the cross-elasticity of demand among products. In theory, it may be possible that, in rare and unforeseen circumstances, a relevant market may consist of only one brand of a product. Psystar's factual contentions therefore must be examined under *Twom-*

*bly*'s pleading standards to determine if Psystar has pled such a situation. The pleadings, however, fail to allege facts plausibly supporting the counterintuitive claim that Apple's operating system is so unique that it suffers *no* actual or potential competitors.

[7] Psystar alleges that the "market economics" favor its cause and that a "small but significant non-transitory increase in price" ("SSNIP") would not result in a change in demand for Mac OS. These conclusory allegations offers no support for Psystar's claims; they merely restate a commonly used test for market definition without providing any factual basis for the claim. As stated, "a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 127 S.Ct. at 1964–65. Psystar also alleges that Apple computers, with Mac OS, cost more than similarly configured computers which utilize other operating systems. The import of the allegation is not self-evident. Although the *responsiveness* of one product to the price of another is at the heart of the market definition analysis, a mere price differential alone does not necessarily signal a distinct market. It is true that "[a] price differential between two products may reflect a low cross-elasticity of demand, if the higher priced product offers additional service for which consumers are willing to pay a premium." *Rebel Oil Co.*

---

copyrighted NOVA operating system called RDOS. Plaintiffs sued on various antitrust theories, alleging that the RDOS operating system constituted its own relevant market. The Ninth Circuit agreed. The decision relied on the *per se* rule in tying cases and a presumption of market power when the tying product is copyrighted or patented. *Id.* at 1339–41. It also emphasized the presence of market imperfections such switching costs and customer "lock in." *id.* at 1342–43. That

decision, however, was implicitly overruled by *Illinois Tool Works v. Independent Ink, Inc.*, 547 U.S. 28, 126 S.Ct. 1281, 164 L.Ed.2d 26 (2006), which rejected the *per se* rule in tying cases and the presumption of market power for copyrighted or patented products. Moreover, as explained below, unlike the situation addressed in *Digidyne*, Psystar's pleadings do not suggest market imperfections such as switching costs and customer "lock in."

*v. Atlantic Richfield Co.,* 51 F.3d 1421, 1436 (9th Cir.1995). The mere existence of a price differential, however, does not necessarily mean that a product is unconstrained by competition:

The 'market' which one must study to determine when a producer has monopoly power will vary with the part of commerce under consideration. The tests are constant. The market is composed of products that have reasonable interchangeability for the purpose for which they are produced—*price, use and qualities considered.*

*United States v. E.I. duPont de Nemours & Co.,* 351 U.S. 377, 406, 76 S.Ct. 994, 100 L.Ed. 1264 (1956) (emphasis added). In *duPont,* the Supreme Court concluded that cellophane was in the same market as other flexible packaging materials despite costing two or three times more, because the products were reasonably interchangeable despite the price difference. *Id.* at 401, 76 S.Ct. 994. *See also AD/SAT v. Associated Press,* 181 F.3d 216, 228 (2nd Cir.1999); *Nifty Foods Corp. v. Great Atlantic & Pacific Tea Co.,* 614 F.2d 832, 840 (2nd Cir.1980). The price-differential allegation, alone, is inconclusive and must be considered in the context of the pleading as a whole.

[8] The pleading as a whole does not allege facts that, if true, plausibly indicate that Mac OS is an independent, single-product market. The counterclaim itself explains that Mac OS performs the same functions as other operating systems (Countercl. ¶ 21):

Operating systems—like the Mac OS—manage the interaction between various pieces of hardware such as a monitor or printer. The operating system also manages various software applications running on a computer device.

The counterclaim further avers that "[a] seemingly infinite list of manufacturers ... construct entire hardware systems

(i.e., computers) marketed and sold to the consumer" (Countercl. ¶ 22). Psystar's business model is predicated on a degree of interchangeability between computers utilizing Mac OS and other operating systems (Countercl. ¶ 15):

Psystar manufactures and distributes computers tailored to customer choosing. As a part of its devotion to supporting customer choice, Psystar supports a wide range of operating systems including Microsoft Windows XP and XP 64–bit, Windows Vista and Vista 64–bit, Linux (32 and 64–bit kernels), and Mac OS. Psystar generally refers to this custom tailored line of computers as Open Computers.

The counterclaim admits that market studies indicate that, although Apple computers with Mac OS enjoy strong brand recognition and loyalty, they are not *wholly* lacking in competition (Countercl. ¶ 38):

[n]otwithstanding the consistent upward differentiation in price across a broad spectrum ... by and between a Computer Hardware System without a Mac OS and a Apple–Labeled Computer Hardware System with the Mac OS, studies by Satmetrix Systems found that Apple is known for its "market performance and brand leadership" and that APPLE "far outranks its closest competitor."

Psystar fails to explain why these "competitor[s]" should be excluded from the definition of the relevant market.

Psystar also points to Apple's extensive advertising campaigns. Those advertising campaigns more plausibly support an inference contrary to that asserted in the counterclaim—vigorous advertising is a sign of competition, not a lack thereof. If Mac OS simply had no reasonable substitute, Apple's vigorous advertising would be wasted money. The advertising campaigns suggest a need to enhance brand recognition and lure consumers from a

competitor. The "brand leadership" and brand loyalty Psystar alleges, if true, suggest that Apple's efforts have borne fruit.

Indeed, Psystar's allegations are internally contradictory. Psystar alleges that Mac OS is, by definition, an independent and unique market. That is, Mac OS, by definition, admits no reasonable substitutes. Psystar further avers, however, that Apple engages in the alleged anticompetitive conduct "in order to protect its valuable monopoly in the Mac OS market and, by extension, Apple–Labeled Computer Hardware *Systems from potential competitive threats,*" and that Apple's "unreasonable restraints on trade allow APPLE to maintain its monopoly position with respect to the Mac OS and Apple–Labeled Computer Hardware Systems submarket" (Countercl. ¶¶ 47, 72, 73, 75) (emphasis added). Apple must be "protect[ing] its valuable monopoly in the Mac OS market" from something; anticompetitive behavior may be constrained by potential competitive threats. Psystar admits that operating systems constitute a "market"—the counterclaim asserts that "there are substantial barriers to entry in the *market for operating systems,* including the Mac OS market" (Countercl. ¶ 20; emphasis added). If this order were to accept Psystar's proposed market definition, Apple would no doubt enjoy the protections of a "barrier to entry" into the alleged market far more daunting than the listed technical, financial and logistical barriers: Psystar's own definition of the relevant market. The circular nature of Psystar's market definition becomes unavoidable: Psystar "alleges that given the prevalence of the Mac OS in the Mac OS market, customers need a computer hardware system on which to operate the Mac OS," and that Apple leverages that "prevalence" to dominate the Mac OS compatible computer hardware market (Countercl. ¶ 96).

For the above-stated reasons, this order concludes that the counterclaim does not plausibly allege that Mac OS is an independent market.

**B. Market definition: Alleged "Mac OS-capable computers" market.**

**[9]** As stated, the complaint alleges two relevant markets: Mac OS, and computer hardware systems which utilize Mac OS. All of Psystar's federal claims require the existence of these two distinct markets. Psystar has alleged tying, monopoly maintenance and exclusive dealing. The tying theory requires a plausible allegation that Apple tied sale of one market in which it enjoys market power (the "tying market") to a product in a second, distinct market (the "tied market"). *Illinois Tool Works Inc. v. Independent Ink, Inc.,* 547 U.S. 28, 35, 126 S.Ct. 1281, 164 L.Ed.2d 26 (2006). Similarly, Psystar's Sherman Act Section 2 and Clayton Act Section 3 theories—if they differ from the tying theory—are also dependent on the existence of a distinct "submarket" or aftermarket because Psystar challenges only the maintenance of a monopoly in, or exclusion of competitors from, that alleged submarket or aftermarket.

**[10]** Psystar alleges that, by tying or other exclusionary behavior, Apple seeks to dominate a distinct *aftermarket,* the market for Mac OS-compatible computer hardware systems. Relying on *Newcal,* Psystar specifically asserts that this market is not an independent, stand-alone product but rather is a "submarket [ ] that 'would not exist' without the primary market for the Mac OS and is thus 'wholly derivative from and dependent' on that market" (Opp. at 7).

**[11]** *Newcal* found such a single-brand aftermarket to be properly pled. *Newcal,* however, distinguished two other appellate decisions which had found that *contractu-*

*ally created* aftermarkets could *not* be relevant antitrust markets. *Queen City Pizza, Inc. v. Domino's Pizza, Inc.,* 124 F.3d 430 (3d Cir.1997); *Forsyth v. Humana, Inc.,* 114 F.3d 1467 (9th Cir.1997). Applying *Kodak*'s reasoning, *Newcal* held that, although the law permits an antitrust claimant to restrict the relevant market to *Kodak*—style single-brand aftermarkets, "the law prohibits an antitrust claimant from resting on market *power* that arises solely from contractual rights that customers knowingly and voluntarily gave to the defendant (as in *Queen City Pizza* and *Forsyth* )." *Newcal Industries, Inc.,* 513 F.3d at 1048 (emphasis in original). Psystar rests on precisely such a claim: the counterclaim alleges that, by its End User License Agreement and other means, Apple specifically restricts the use of Mac OS to Apple-labeled computer hardware systems. Customers, therefore, knowingly agree to the challenged restraint.[4]

In *Kodak,* the single-brand aftermarkets were distinct antitrust markets because, the decision found, customers did not adequately consider the total—or lifecycle—cost of the equipment, parts and service in their initial equipment purchase. Only after they were "locked in" to Kodak equipment were they forced to evaluate costs in the parts and service markets. Market imperfections such as information costs and switching costs prevented customers from doing so at the time of the original purchase or from imposing market discipline in the aftermar-

kets by switching among participants in the primary equipment market. *Eastman Kodak Company,* 504 U.S. at 464–78, 112 S.Ct. 2072. The plaintiffs had also alleged that a market for the aftermarket service already existed (*i.e.,* firm other than Kodak already provided service for Kodak copiers) and that Kodak sought to restrain the participants in that market. Pre-existing markets and efforts to restrain or suppress that market both provide evidence that the tie is anticompetitive and offer courts guidance of what an efficient price may be. *See Verizon Communications, Inc. v. Trinko,* 540 U.S. 398, 409–10, 124 S.Ct. 872, 157 L.Ed.2d 823 (2004). Unlike in *Kodak*—where customers did not knowingly bind themselves to a single brand of the aftermarket and market imperfections (information costs and switching costs) prohibited customers from imposing market discipline in the *aftermarket* by switching among competitors in the *primary* market—here Apple asks its customers to purchase Mac OS knowing that it is to be used only with Apple computers (Compl. ¶ 28). It is certainly entitled to do so. *See Digital Equipment Corp. v. Uniq Digital Technologies, Inc.,* 73 F.3d 756, 762–63 (7th Cir.1996). Psystar also asks the Court to create a non-existent market. This order declines to do so.

The aftermarket alleged here is more analogous to that addressed in *Forsyth.* That decision "reject[ed] the plaintiffs' attempt to limit the relevant market to acute

---

**4.** *Newcal* further explained that "in determining whether the defendant's market power falls in the *Queen City Pizza* category of contractually-created market power or in the *Eastman Kodak* category of economic market power, the law permits an inquiry into whether a consumer's selection of a particular brand in the competitive market is the functional equivalent of a contractual commitment, giving that brand an agreed-upon right to monopolize its consumers in an aftermar-

ket. The law permits an inquiry into whether consumers entered into such 'contracts' knowing that they were agreeing to such a commitment." *Id.* at 1048–49. Here, no such functional-equivalent analysis is necessary: not only did customers purchase the alleged primary- and aftermarket-products at the same time, as a package, they entered and express agreement that the former could not be used beyond the latter.

**1202**          **586 FEDERAL SUPPLEMENT, 2d SERIES**

care hospitals used by Humana insureds. The plaintiffs used Sunrise Hospital and obtained medical care from few other hospitals because of contractual provisions in their insurance policies. This tie-in defeats the plaintiffs' argument for a submarket consisting only of those hospitals Humana insureds actually used." *Forsyth*, 114 F.3d at 1476. Here, similarly, Apple customers must utilize Mac OS only in Apple-labeled computers because they agreed to do so when they purchased the product. As *Queen City Pizza* explained, "[a] court making a relevant market determination looks not to the contractual restraints assumed by a particular plaintiff when determining whether a product is interchangeable, but to the uses to which the product is put by consumers in general." *Queen City Pizza, Inc.*, 124 F.3d at 438. In *Queen City Pizza*, therefore, the "plaintiffs' acceptance of a franchise package that included purchase requirements and contractual restrictions is consistent with the existence of a competitive market in which franchises are valued, in part, according to the terms of the proposed franchise agreement and the availability of alternative franchise opportunities." *Id.* at 442.

Psystar also relies on two recent Northern District decisions in other litigation involving Apple. *In re Apple & AT & TM Antitrust Litigation*, C. 07–5152 JW, Dkt. No. 144, 2008 WL 4810067 (N.D.Cal.2008) (Ware, J.) (slip op.); *Slattery v. Apple Computer, Inc.*, 2005 WL 2204981 (N.D.Cal.2005) (Ware, J.) (unpublished). The former explained that Apple sold the iPhone, a handheld device that acts as a cellular telephone, among other functions. AT & T Mobility provided cellular voice and data services over its cellular network. *In re Apple & AT & TM Antitrust Litigation* concerned a challenge to an agreement that made AT & T Mobile the exclusive cellular service provider for the iPhone for five years,

through 2012. As with other cellular service providers, customers who purchased an iPhone were required to sign a two-year service agreement with AT & TM. The plaintiffs alleged, *inter alia*, that due to the five-year exclusivity agreement (which was neither made public nor disclosed to customers, although parts of it had been revealed publicly), customers were effectively "locked in" to AT & TM and would be forced to renew with AT & TM beyond the agreed-upon two year contract. *In re Apple & AT & TM Antitrust Litigation*, C. 07–5152 at 2–3, 5. The plaintiffs alleged "an aftermarket for iPhone voice and data services that 'would not exist' without the primary market for iPhones, and is thus 'wholly derivative from and dependent on the primary market.'" *Id.* at 14. The decision concluded,

> [e]ven though Apple rightly contends that Plaintiffs entered into two-year [AT & TM] service contracts at the time of purchase, Plaintiffs allege that the aftermarket includes the full five-year period during which they are bound to use AT & TM voice and data services, including the three years after the initial contract expiration, which is enforced by both technological and contractual means.... Plaintiffs are alleging that at the point of purchase and initiation of service, Defendants involuntarily impose on consumers a contract exclusivity restriction ... for at least five years.

*Id.* at 15. The decision found that the undisclosed exclusivity agreement allowed the plaintiffs to plead a viable aftermarket. The decision is inapposite because Psystar does not allege any undisclosed exclusivity agreement; like the initial two-year service contract in *In re Apple & AT & TM Antitrust Litigation*, the aftermarket restriction in this case was fully disclosed and expressly agreed upon.

APPLE, INC. v. PSYSTAR CORP.                    **1203**
Cite as 586 F.Supp.2d 1190 (N.D.Cal. 2008)

Psystar also relies on *Slattery v. Apple Computer, Inc.*, 2005 WL 2204981 (N.D.Cal.2005) (Ware, J.) (unpublished). That decision was prior to *Newcal*, and it did not discuss the critical distinctions between *Newcal*, on the one hand, and decisions like *Queen City Pizza* and *Forsyth*, on the other, such as whether the market power in the alleged relevant market arose solely by contract or the functional equivalent thereof.

Finally, Psystar relies on *United States v. Microsoft Corp.*, 253 F.3d 34 (C.A.D.C. 2001). In *Microsoft*, the District Court had defined a relevant market consisting of "'the licensing of all Intel-compatible PC operating systems worldwide,' finding that there [were] 'currently no products—and . . . there [were] not likely to be any in the near future—that a significant percentage of computer users worldwide could substitute for [these operating systems] without incurring substantial costs.'" *Id.* at 52. The court of appeals affirmed the district court's factual findings. *Ibid.* Psystar argues that those findings aid its cause. Although some of those factual findings arguably support Psystar's claims,[5] others directly contradict it.[6] The district court made those factual findings nearly ten years ago and their continued applicability is far from certain. Moreover, although the decision found that Microsoft had attained a very large market share in the above-described operating system market, it did not limit the relevant market to a single brand or product, as Psystar seeks to do. The decision, similarly, did not address anticompetitive conduct targeted at a submarket or aftermarket defined with reference to a single brand of a product, as Psystar attempts to do. Rather, it addressed Microsoft's effort to utilize its operating system monopoly to gain monopoly power in "the browser market," a market that included Microsoft's Internet Explorer as well as competitors such as Netscape's Navigator. *United States v. Microsoft Corp.*, 87 F.Supp.2d 30, 45 (D.D.C. 2000). This order places no weight on the decision.

For the above-stated reasons, Psystar's claim that Mac OS-compatible computer hardware systems constitute a distinct submarket or aftermarket contravenes the pertinent legal standards, and Apple's motion to dismiss Psystar's federal counterclaims is therefore granted.

### 2. STATE CLAIMS.

[12] Psystar's fourth claim for relief arises under California's Cartwright Act, Cal. Bus. & Prof.Code §§ 16700–16760. The Cartwright Act was patterned after Section 1 of the Sherman Act, and the pleading requirements under the two statutes are similar. *See Dimidowich v. Bell & Howell*, 803 F.2d 1473, 1476–77 (9th Cir.1986). Moreover, the Cartwright Act "does not address unilateral conduct." *Ibid.* Psystar's complaint fails to allege any concerted action or inter-firm agreement. Psystar asserts that the standards under the Cartwright Act are not necessarily contemporaneous with those under federal antitrust laws, but Psystar points to no relevant distinction between the standards. As stated, Psystar's counterclaim fails to plead relevant antitrust markets, and the

---

**5.** For example, "[t]he District Court found that consumers would not switch from Windows to Mac OS in response to a substantial price increase because of the costs of acquiring the new hardware needed to run Mac OS (an Apple computer and peripherals) and compatible software applications, as well as because of the effort involved in learning the new system and transferring files to its format." *Id.* at 52.

**6.** For example, "[t]he court also found the Apple system less appealing to consumers because it costs considerably more and supports fewer applications." *Ibid.*

**1204**        **586 FEDERAL SUPPLEMENT, 2d SERIES**

counterclaim alleges only unilateral anti-competitive conduct. The Cartwright Act claim, therefore, must be dismissed.

[13] Psystar's fifth claim for relief arises under California's unfair competition statute, Cal. Bus. & Prof.Code § 17200. That statute proscribes "any unlawful, unfair or fraudulent business act or practice." *Ibid.* Psystar asserts that Section 17200 is broader than the federal antitrust laws and proscribes not only violations of those laws but also "conduct that threatens an incipient violation of an antitrust law, or violates the policy or spirit of one of those laws because its effects are comparable to or the same as a violation of the law, or otherwise significantly threatens or harms competition." *Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.,* 20 Cal.4th 163, 83 Cal.Rptr.2d 548, 973 P.2d 527 (1999). California courts, however, have held that "[i]f the same conduct is alleged to be both an antitrust violation and an 'unfair' business act or practice for the same reason—because it unreasonably restrains competition and harms consumers—the determination that the conduct is not an unreasonable restraint of trade necessarily implies that the conduct is not 'unfair' toward consumers." *Chavez v. Whirlpool Corp.,* 93 Cal.App.4th 363, 375, 113 Cal. Rptr.2d 175 (2001). *See also RLH Industries, Inc. v. SBC Communications, Inc.,* 133 Cal.App.4th 1277, 1286–87, 35 Cal. Rptr.3d 469 (2005) (similar). Apart from its conclusory allegations regarding the "sweeping nature of section 17200" (Opp. at 14), Psystar fails to explain a relevant distinction in the standards. Psystar's section 17200 claim, therefore, must be dismissed.

[14] Psystar's sixth claim for relief alleges violations of the common law of unfair competition. Psystar, however, fails to explain the pertinent standards for the cause of action or how its counterclaim satisfies them. Psystar cites, for example, *Aydin Corp. v. Loral Corp.,* 1981 WL 2178 (N.D.Cal.1981) (Patel, J.) (unreported). That decision stated,

> [s]uch a common law cause of action does apparently exist in California.... This court, however, does not locate any California decisions delineating the elements of such a cause of action, nor does plaintiff direct the court to any.... As with Count III, this court is unwilling to find a cause of action where plaintiff fails to demonstrate either the illegality of the contract with Moyes or the bad faith of the state action. Therefore the court finds no tortious unfair competition in this case.

The remaining cases Psystar cites are similarly unenlightening (Opp. at 14–15). Psystar's sixth claim, therefore, is dismissed.

## CONCLUSION

For all of the above-stated reasons, Apple's motion to dismiss Psystar's counterclaims is GRANTED. Psystar may move for leave to amend within twenty calendar days of the date of entry of this order. Any such motion should be accompanied by a proposed pleading and the motion should explain why the foregoing problems are overcome by the proposed pleading. Plaintiff must plead its best case. Failing such a motion, all inadequately pled claims will be dismissed without further leave to amend.

**IT IS SO ORDERED.**





# EXHIBIT 6

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

APPLE, INC., a California corporation,

       Plaintiff,

  v.

PSYSTAR CORPORATION, a Florida corporation,

       Defendant.

_____/

AND RELATED COUNTERCLAIMS.

_____/

No. C 08-03251 WHA

**ORDER RE CROSS MOTIONS FOR SUMMARY JUDGMENT**

## INTRODUCTION

In this copyright-infringement action, plaintiff Apple, Inc. and defendant Psystar Corporation have filed cross motions for summary judgment. For the following reasons, Apple's motion is **GRANTED** and Psystar's motion is **DENIED**.

## STATEMENT

Plaintiff Apple Inc. launched its Macintosh computer in 1984 and its Mac OS X operating system in 2001. Apple has manufactured an exclusive line of personal computers, including the Mac Pro, iMac, Mac mini, MacBook, MacBook Air, and MacBook Pro. Mac computers have been sold with Mac OS X preinstalled. Mac OS X has also been sold as a DVD so customers can upgrade their Mac computers to another version of the operating system.

United States District Court

For the Northern District of California

**United States District Court**
For the Northern District of California

1    Mac OS X on both Mac computers and the DVD are covered by software license

2    agreements that provided that the software is "licensed, not sold to [the user] by Apple Inc.

3    ("Apple") for use only under the terms of this License" (Chung Exh. 26 at ¶ 1). Apple's license

4    agreements restricted the use of Mac OS X to Apple computers, and specifically prohibited

5    customers from installing the operating system on non-Apple computers. The license

6    agreement stated (*id.* at ¶ 2):

7    　　　　2. **Permitted License Uses and Restrictions.**

8    　　　　A. <u>Single Use</u>. This license allows you to install, use and run (1)
9    　　　　copy of the Apple Software on a single Apple-labeled computer at
　　　　　　a time. You agree not to install, use or run the Apple Software on
10   　　　　any non-Apple-Labeled computer or enable another to do so.

11   　　　　　　　　　　*　　　　　　*　　　　　　*

12   　　　　C. You may make one copy of the Apple Software (excluding the
　　　　　　Boot ROM code and other Apple firmware that is embedded or
13   　　　　otherwise contained in Apple-labeled hardware) in machine-
　　　　　　readable form for backup purposes only . . . . Apple Boot ROM
14   　　　　code and firmware is provided only for use on Apple-labeled
　　　　　　hardware and you many not copy, modify or redistribute the
15   　　　　Apple Boot ROM code or firmware, or any portions thereof.

16   　　　　　　　　　　*　　　　　　*　　　　　　*

17   　　　　F. Except as and only to the extent permitted by applicable
　　　　　　licensing terms governing use of the Open Sourced Components,
18   　　　　or by applicable law, you may not copy, decompile, reverse
　　　　　　engineer, disassemble, modify or create derivative works of the
19   　　　　Apple Software or any part thereof.

20   It also restricted redistribution and modifications to the software (*id.* at ¶ 3):

21   　　　　3. **Transfer.** You may not rent, lease, lend, redistribute, or
　　　　　　sublicense the Apple Software. Subject to the restrictions set
22   　　　　forth below, you may, however make a one-time permanent
　　　　　　transfer of all of your license rights to the Apple Software (in its
23   　　　　original form as provided by Apple) to another party, provided
　　　　　　that: (a) the transfer must include all of the Apple Software,
24   　　　　including all its component parts (excluding Apple Boot ROM
　　　　　　code and firmware), original media, printed materials and this
25   　　　　License; (b) you do not retain any copies of the Apple Software,
　　　　　　full or partial, including copies stored on a computer or other
26   　　　　storage device; and (c) the party receiving the Apple Software
　　　　　　reads and agrees to accept the terms and conditions of this
27   　　　　License. You may not rent, lease, redistribute, sublicense or
　　　　　　transfer any Apple Software that has been modified or replaced
28   　　　　under Section 2D above.

2

United States District Court
For the Northern District of California

1   In brief, customers were contractually precluded from utilizing Mac OS X on any computer

2   hardware system that was not an Apple computer system.

3        Besides the license agreement, Apple has obtained three copyright registrations for Mac

4   OS X.  It has used lock-and-key technological measures to prevent Mac OS X from operating

5   on non-Apple computers.  This involved the use of a "kernel" extension, which is software that

6   is executed and becomes part of the operating system on an Apple computer.  The kernel

7   extension would communicate with other kernel extensions to locate the decryption keys in the

8   hardware, which then would unlock the encrypted files.

9        Defendant Psystar Corporation has made a line of computers called Open Computers

10  (formally known as Open Mac and OpenPro).  Psystar has modified Mac OS X to run on its

11  computers and has sold them to the public.  The following briefly describes the conduct at issue.

12  Psystar first bought a copy of Mac OS X and then installed it on an Apple Mac mini.  Next,

13  Psystar copied Mac OS X from the Mac mini onto a non-Apple computer.  This non-Apple

14  computer was used as an "imaging station."  Once on the imaging station, Mac OS X was

15  modified.  Psystar then replaced the Mac OS X "bootloader."  The bootloader runs when a

16  computer first comes on and locates and loads portions of the operating system into random

17  access memory.  Without a bootloader, Mac OS X would not operate.  Psystar also disabled

18  and/or removed Mac OS X kernel extension files and replaced them with other kernel extension

19  files.  Psystar's modifications enabled Mac OS X to run on non-Apple computers.  The

20  modified copy became the "master copy" that was used for mass reproduction and installation

21  onto other Psystar computers.  Apple also alleges that every time Psystar turned on Psystar

22  computers running Mac OS X then another copy was made in random access memory.

23       Apple contends that Psystar's reproduction, modification, and distribution of Mac OS X

24  on non-Apple computers constituted copyright infringement under the Copyright Act and a

25  violation of the Digital Millennium Copyright Act.  Psystar asserts a number of defenses.  Both

26  parties now move for summary judgment.

27

28

3

United States District Court
For the Northern District of California

# ANALYSIS

### 1.   LEGAL STANDARD.

Summary judgment must be granted under FRCP 56 when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." A district court must determine, viewing the evidence in the light most favorable to the nonmoving party, whether there is any genuine issue of material fact. *Giles v. General Motors Acceptance Corp.*, 494 F.3d 865, 872 (9th Cir. 2007). A genuine issue of fact is one that could reasonably be resolved, based on the factual record, in favor of either party. A dispute is "material" only if it could affect the outcome of the suit under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49 (1986).

### 2.   COPYRIGHT INFRINGEMENT.

Apple contends that Psystar is liable for copyright infringement. "Plaintiffs must satisfy two requirements to present a prima facie case of direct [copyright] infringement: (1) they must show ownership of the allegedly infringed material and (2) they must demonstrate that the alleged infringers violate at least one exclusive right granted to copyright holders under 17 U.S.C. § 106." *A&M Records v. Napster, Inc.*, 239 F.3d 1004, 1013 (9th Cir. 2001).

Apple has two federally registered copyrights in Mac OS X. The validity of these registered copyrights is not contested. Thus, Apple has established ownership of Mac OS X.[1]

Apple asserts that Psystar has violated three of its exclusive rights in Mac OS X: (1) its reproduction right; (2) its distribution right; and (3) its right to create derivative works. This order next addresses each of these.

### A.   Reproduction Right and Section 117.

According to Apple, Psystar has violated its exclusive right to copy Mac OS X. Psystar admits that it has made copies of Mac OS X and installed those copies on non-Apple computers

---

[1] Psystar also asserts that Apple claims copyright infringement as to its decryption key. In response, Apple clarifies that it "has never alleged that Psystar's copyright infringement is limited to Psystar's unauthorized use of the" decryption key (Pl. Opp. 15). Rather Apple's allegations are focused on copying of Mac OS X, not just a decryption key. In any event, Psystar has provided little support for this argument and its position is rejected.

4

1   (Def. Opp. 10).  In addition, when Psystar turns on its computers running Mac OS X, another

2   copy of the software is made to the random access memory.  Psystar has thus infringed Apple's

3   reproduction right.

4        Section 117(a) permits the owner of a copy of a computer program to copy or modify

5   the program for limited purposes without incurring liability for copyright infringement.  *See*

6   *Krause v. Titleserv, Inc.*, 402 F.3d 119, 121 (2nd Cir. 2005).  But the question is whether

7   Psystar can rely on Section 117 to escape liability.  It cannot.

8        As Apple pointed out, Psystar waived any Section 117 essential step defense when it

9   failed to plead it.  Psystar counters that it has not waived Section 117 because that provision is a

10  limitation on a copyright owner's exclusive rights rather than an affirmative defense.  An earlier

11  Ninth Circuit decision stated "Section 117 defines a narrow category of copying that is lawful

12  *per se*" and "Section 107, by contrast, establishes a defense to an otherwise valid claim of

13  copyright infringement." *Sega Enters. v. Accolade, Inc.*, 977 F.2d 1510, 1521 (9th Cir. 1992).

14  Since then, the Ninth Circuit has expressly referred to Section 117 as a defense. *See Wall Data*

15  *Inc. v. L.A. County Sheriff's Dep't*, 447 F.3d 769, 776 (9th Cir. 2006) (referring to Section 117

16  as an affirmative defense); *Asset Mktg. Sys. v. Gagnon*, 542 F.3d 748, 754 (9th Cir. 2008)

17  (referring to Section 117 as a defense).  As such, this order treats Section 117 as an affirmative

18  defense.

19       Alternatively, if Section 117 is considered an affirmative defense, then Psystar argues it

20  has pled it in its answer and raised the substance of its Section 117 argument in its interrogatory

21  responses.  Neither the answer nor interrogatory responses, however, refer to Section 117.  And

22  Psystar has not demonstrated any good cause for its failure to assert the defense after a year of

23  litigation.  Also, there has been no showing that its failure to do so will not prejudice Apple.  As

24  such, Psystar has waived the defense.  At all events, the assertion of Section 117 is so frivolous

25

26

27

28

1    in the true context of how Psystar has used Mac OS X that a belated attempt to amend the

2    pleadings would not be excused.[2]

3          Psystar briefly mentions a Section 107 fair use defense but does not even attempt to

4    address the four factors used to determine fair use. *See* 17 U.S.C. 107.  Psystar nonetheless

5    contends that its production process and hard drive imaging are fair use.  As stated, rather than

6    loading Mac OS X separately onto individual computers, Psystar uses a mass production

7    process.  Arguing this is for efficiency, Psystar contends that "[s]uch incidental infringement is

8    protected by the fair use doctrine to the extent that the infringement is not part of a greater

9    scheme of infringement" (Def. Reply 6).  To support this argument, Psystar cites the following

10   passage in *Wall Data Inc. v. L.A. County Sheriff's Dep't*, 447 F.3d 769, 779 (9th Cir. 2006):

> To be clear, we do not hold that a fair use defense is not available
> simply because the infringer uses technology to make efficient
> use of its licenses.  The problematic aspect of the Sheriff's
> Department's use is that it took in excess of what it bargained for,
> not that it was technologically efficient.  Thus, for example, if the
> Sheriff's Department had saved time and money by hard drive
> imaging RUMBA software onto the number of computers for
> which it had licenses, its "efficiency" would not create a problem.

Psystar's reliance on this quote is misplaced.  In *Wall Data*, the Sheriff Department purchased

3,663 licenses to plaintiff's software, but installed the software onto 6,007 computers.  To do

this, the Department used hard drive imaging — a single master hard drive containing the

software was used to copy the contents onto many other computers.  The Ninth Circuit held that

this was not fair use and was in excess of the licensed use of the copyright software bargained

for.  While the process used for "efficiency" was not the problem, the Sheriff Department's

unauthorized copying of the software beyond the number of licensed copies was problematic.

Similarly, Psystar's use of Mac OS X has been in excess and has violated Apple's copyrights.

---

[2] Trying to have it both ways, Psystar successfully opposed Apple's earlier attempt to reopen
discovery and extend deadlines to add an additional product — Snow Leopard — to this action.  Psystar now
seeks to add a very late affirmative defense.  This would not be fair.

**B.      Distribution Right and Section 109.**

Apple contends that Psystar has violated its distribution right by offering and selling Mac OS X on Psystar computers to the public.  Psystar admits that it has distributed Mac OS X (Chung Exh. 17 at 4).

But Psystar responds that its conduct is protected by the Section 109 first-sale doctrine. Section 109 provides that "the owner of a particular copy or phonorecord lawfully made under this title, or any person authorized by such owner, is entitled, without the authority of the copyright owner, to sell or otherwise dispose of the possession of that copy or phonorecord." 17 U.S.C. 109.  This provision is a limitation on the distribution right.  It applies only to an owner of a copy.

The parties spill much ink on whether Psystar was the owner or a licensee of the copy (*i.e.*, the tangible copy) of Mac OS X that it purchased.  Even assuming arguendo that Psystar was the owner of a copy, the first-sale defense fails here.  Section 109 provides immunity only when copies are "lawfully made."  The copies at issue here were not lawfully manufactured with the authorization of the copyright owner.  As stated, Psystar made an unauthorized copy of Mac OS X from a Mac mini that was placed onto an "imaging station" and then used a "master copy" to make many more unauthorized copies that were installed on individual Psystar computers.  The first-sale defense does not apply to those unauthorized copies. *See Microsoft Corp. v. Software Wholesale Club, Inc.*, 129 F. Supp. 2d 995, 1006 (S.D. Tex. 2000) ("the first-sale doctrine does not apply to an admittedly counterfeit unit"); *see also* 2-8 NIMMER ON COPYRIGHT § 8.12 ("if the manufacture of a copy or phonorecord constitutes an infringement of the reproduction or adaptation right, its distribution will infringe the distribution right, even if this is done by the owner of such copy or phonorecord").

Psystar asserts on its motion that it includes a Mac OS X DVD with every Psystar computer it sells.  There is no sworn evidentiary support for this assertion in Psystar's motion. This alone is dispositive.  It is true, as Psystar points out, that Apple's opening brief on its own separate motion stated "Psystar includes both a Mac OS X DVD . . . and a hard drive copy of Mac OS X on the Psystar computer" (Pl. Br. 7).  At oral argument, Psystar asserted that Apple

7

1   cited to paragraph 20 in the declaration of John Kelly, Apple's expert, to support this

2   proposition.  Paragraph 20 merely stated that Kelly observed Psystar's technician who did not

3   use a Mac OS X installation DVD for the hard drive imaging or assembly of Psystar's Open

4   Computer (Kelly Decl. ¶ 20).  At oral argument, Apple's counsel referred to paragraph 15 of the

5   Kelly declaration and a table therein.  There, Kelly stated that he had examined nine Psystar

6   computers that had Mac OS X installed on the hard drive (*id.* at ¶ 15).  He further stated that the

7   Mac OS X software for five of those computers was *not* the same as the software found on the

8   Mac OS X DVDs shipped with the computers.  Instead, those computers had a different version

9   of Mac OS X actually installed on hard drive than was found on the accompanying Mac OS X

10  DVD.  According to Table 2 in Kelly's declaration, three of the other nine computers did not

11  include a Mac OS X DVD at all (*ibid.*).  The Apple footnote invoked by Psystar at the hearing

12  did include citations to deposition testimony, but the cited testimony did not support the

13  proposition either.  Finally, for its own motion, Psystar was obligated to provide sworn support.

14  It may not cure evidentiary gaps for its own motion by invoking briefs filed separately and

15  simultaneously by its opponent.  It must lay out plainly and clearly the basis for its own

16  summary judgment motion at step one.

17        Furthermore, it is not the court's task "to scour the record in search of a genuine issue of

18  triable fact." *Keenan v. Allan*, 91 F.3d 1275, 1278 (9th Cir. 1996).  Counsel have an obligation

19  to lay out their support clearly.  In *Carmen v. San Francisco School District*, 237 F.3d 1026,

20  1031 (9th Cir. 2001), the court expressly held that "[t]he district court need not examine the

21  entire file for evidence establishing a genuine issue of fact, where the evidence is not set forth in

22  the opposition papers with adequate references so that it could conveniently be found."

23        Even if it were the case that a DVD was included with every computer, that did nothing

24  to cure the infringement as to the unauthorized copies discussed above.  Besides Apple does not

25  assert copyright infringement with respect to the sale of the DVD that Psystar allegedly

26  purchased.

27        **C.    Right to Create Derivative Works.**

28        Section 101 of the Copyright Act defines a derivative work as:

United States District Court
For the Northern District of California

[A] work based upon one or more preexisting works, such as a translation, musical arrangement, dramatization, fictionalization, motion picture version, sound recording, art reproduction, abridgment, condensation, or any other form in which a work may be recast, transformed, or adapted.  A work consisting of editorial revisions, annotations, elaborations, or other modifications which, as a whole, represent an original work of authorship, is a "derivative work."

17 U.S.C. 101.

Psystar infringed Apple's exclusive right to create derivative works of Mac OS X.  It did this by replacing original files in Mac OS X with unauthorized software files.  Specifically, it made three modifications:  (1) replacing the Mac OS X bootloader with a different bootloader to enable an unauthorized copy of Mac OS X to run on Psystar's computers; (2) disabling and removing Apple kernel extension files; and (3) adding non-Apple kernel extensions.  These modifications enabled Mac OS X to run on a non-Apple computer.  It is undisputed that Psystar made these modifications (Def. Opp. 6–7).[3]

But Psystar contends that this did not amount to creating a derivative work, because Apple's source code, object code, or kernel extensions were not modified.  This argument is unavailing.  Psystar admittedly replaced entire files within the software while copying other portions.  This resulted in a substantial variation from the underlying copyrighted work.  In fact, if the bootloader and kernel extensions added by Psystar were removed, then the operating system would not work on Psystar's computers.  The inclusion of the copyrighted Mac OS X with the above-described additions and modifications makes Psystar's product an infringing, derivative work.

Psystar cites no decisions to reasonably support its argument that its modifications do not amount to a derivative work; whereas, Apple points to decisions showing that such deletions, modifications, and additions to software result in an infringing derivative work.  *See, e.g., Dun & Bradstreet Software Servs. v. Grace Consulting, Inc.*, 307 F.3d 197, 208 (3rd Cir. 2002) (concluding that defendant's modification of a copy of plaintiff's software, including fixing bugs and adding features, created an infringing derivative work); *Midway Mfg. Co. v.*

---

[3] Psystar also asserts Section 117 as a defense to avoid liability for infringement of Apple's right to create derivative works.  But as stated above, Psystar has waived this defense.

*Arctic International, Inc.*, 704 F.2d 1009, 1014 (7th Cir. 1983) (finding defendant's addition of circuit boards created a speeded-up video game that was a substantially different product from the original game and thus a derivative work); *SAS Institute, Inc. v. S & H Computer Systems, Inc.*, 605 F. Supp. 816, 831 (M.D. Tenn. 1985) (finding defendant's duplication and conversion of software that would run on an IBM computer to run on a VAX computer constituted a derivative work).

In sum, Psystar has violated Apple's exclusive reproduction right, distribution right, and right to create derivative works. Accordingly, Apple's motion for summary judgment on copyright infringement must be granted.

### 2.   CONTRIBUTORY INFRINGEMENT.

Apple next asserts that Psystar is liable for contributory infringement. Psystar offers no opposition on this issue. "One infringes contributorily by intentionally inducing or encouraging direct infringement." *See MGM Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 930 (2005). Psystar is a contributory infringer through its sale of unauthorized copies of Mac OS X to the public. This is contributory infringement. Accordingly, summary judgment must be granted for Apple on contributory infringement.

### 3.   COPYRIGHT MISUSE.

Copyright misuse is a defense to copyright infringement. The copyright-misuse doctrine "forbids the use of the [copyright] to secure an exclusive right or limited monopoly not granted by the [Copyright] Office and which is contrary to public policy to grant." *Altera Corp. v. Clear Logic, Inc.*, 424 F.3d 1079, 1090 (9th Cir. 2005). "The misuse defense prevents copyright holders from leveraging their limited monopoly to allow them control of areas outside the monopoly." *A&M Records v. Napster, Inc.*, 239 F.3d 1004, 1026 (9th Cir. 2001).

Psystar argues that Apple misused its copyrights by continuing to prosecute allegedly "invalid" copyright infringement and DMCA claims against Psystar. This argument is unavailing. This order finds that Apple's claims are valid and has granted summary judgment in favor of Apple on those claims.

United States District Court
For the Northern District of California

1   Psystar next argues that Apple's attempt to use copyright to tie Mac OS X to Apple

2   hardware constituted copyright misuse. Put differently, Psystar argues that Apple cannot extend

3   its exclusive rights to control the computers on which Apple's customers run Mac OS X.

4   Psystar's antitrust allegations were dismissed in a prior order, and Psystar then chose not to

5   pursue any antitrust counterclaims. The prior order stated, "Apple asks its customers to

6   purchase Mac OS knowing that it is to be used only with Apple computers. It is certainly

7   entitled to do so" (Dkt. No. 33 at 14). That order previously rejected Psystar's theory and this

8   order does the same.

9   Psystar rightly points out that the Ninth Circuit has stated, "a defendant in a copyright

10   infringement suit need not prove an antitrust violation to prevail on a copyright misuse

11   defense." *Practice Management Info Corp. v. American Medical Ass'n*, 121 F.3d 516, 521 (9th

12   Cir. 1997). For this principle, the Ninth Circuit relied upon a Fourth Circuit decision, which

13   explained, "[t]he question is not whether the copyright is being used in a manner violative of

14   antitrust law (such as whether the licensing agreement is 'reasonable'), but whether the

15   copyright is being used in a manner violative of the public policy embodied in the grant of a

16   copyright." *Lasercomb America, Inc., v. Reynolds*, 911 F.2d 970, 978 (4th Cir. 1990). In the

17   present case, Apple has not prohibited others from independently developing and using their

18   own operating systems. Thus, Apple did not violate the public policy underlying copyright law

19   or engage in copyright misuse. In this way, *Practice Management Info Corp.* is distinguishable.

20   There, the Ninth Circuit invalidated the AMA's copyright on a coding system of medical

21   procedures requiring a contracting party (HCFA) to use *only* the AMA's coding system and

22   none other, stating:

23   What offends the copyright misuse doctrine is not HCFA's
     decision to use the AMA's coding system exclusively, but the
24   limitation imposed by the AMA licensing agreement on HCFA's
     rights to decide whether or not to use other forms as well.
25   Conditioning the license on HCFA's promise not to use
     competitors' products constituted a misuse of the copyright by the
26   AMA.

27   *Id.* at 521. But Apple has not prohibited purchasers of Mac OS X from *using* competitor's

28   products. Rather, Apple has simply prohibited purchasers from using Mac OS X *on*

11

competitor's products. The Ninth Circuit has likewise distinguished *Lasercomb America*, 911 F.2d at 978–79, on this ground. *See Triad Systems Corp. v. Southeastern Express Co.*, 64 F.3d 1330, 1337 (9th Cir. 1995), *overruled on other grounds by Gonzales v. Texaco Inc.*, No. 07-17123, 2009 U.S. App. LEXIS 18370, at *5 (9th Cir. Aug. 17, 2009) ("[U]nlike the case of *Lasercomb America, Inc. v. Reynolds*, 911 F.2d 970, 978–79 (4th Cir. 1990), Triad did not attempt to prohibit Southeastern or any other ISO from developing its own service software to compete with Triad").

Psystar cites *In re Napster, Inc., Copyright Litigation*, 191 F. Supp. 2d 1087, 1105 (N.D. Cal. 2004) (Patel, J.), for the proposition that "unduly restrictive copyright licensing agreements" can constitute misuse. But even Judge Patel acknowledged that "no court has thus far articulated the boundaries of 'unduly restrictive licensing' or when licensing or other conduct would violate the amorphous concept of public policy." *Ibid.* As explained above, Apple's licensing agreement is not unduly restrictive. Indeed, the egregious examples of copyright misuse in the decisions cited by Psystar provide further support for this order's determination that Apple has *not* engaged in copyright misuse. For example, in *Lasercomb America*, 911 F.2d at 978, the Fourth Circuit found copyright misuse in the following circumstance:

> The language employed in the Lasercomb agreement is extremely broad. Each time Lasercomb sells its Interact program to a company and obtains that company's agreement to the noncompete language, the company is required to forego utilization of the creative abilities of all its officers, directors and employees in the area of CAD/CAM die-making software. Of yet greater concern, these creative abilities are withdrawn from the public. The period for which this anticompetitive restraint exists is ninety-nine years, which could be longer than the life of the copyright itself.

*Lasercomb America* likewise stated that an anti-competitive restraint lasting even 20 years would constitute copyright misuse. *Id.* at 979. Ultimately, the problem in *Lasercomb America* was that the all-encompassing anticompetitive restraint attempted to "*control* competition in an area outside the copyright." *Ibid.* (emphasis added). But Apple's licensing agreement is not nearly as all-encompassing as those addressed in *Lasercomb America* — Apple's agreement does not seek to control *all competition* in an area outside the copyright. Rather, Apple's

1   agreement simply attempts to control the use of Apple's own software — an area that is the

2   *focus* of the copyright.

3         Therefore, Psystar's motion for summary judgment on copyright misuse must be denied.

4         **4.    DMCA.**

5         Apple contends that Psystar has violated the anti-circumvention and anti-trafficking

6   provisions of the DMCA.  Apple has used a decryption key as a technological protection

7   measure to prevent access to Apple's Mac OS X and to prevent Mac OS X from running on a

8   non-Apple computer.

9         Section 1201(a)(1)(A) provides that no person shall circumvent a technological measure

10  that effectively controls access to a work protected under this title.  Psystar has used decryption

11  software to obtain access to Mac OS X and to circumvent Apple's technological measure when

12  modifying Mac OS X in its production process.  This is a violation of the Section 1201

13  anti-circumvention provision of the DMCA.  17 U.S.C. 1201(a)(1).

14        Section 1201(a)(2) prohibits the manufacture, importation, offering to the public,

15  providing, or otherwise trafficking in any technology, product, service, device, component, or

16  part thereof, that meets one of three criteria, including the following:

17              (A)  is primarily designed or produced for the purpose of
                circumventing a technological measure that effectively controls
18              access to a work protected under this title;

19              (B)  has only limited commercially significant purpose or use
                other than to circumvent a technological measure that effectively
20              controls access to a work protected under this title; or

21              (C)  is marketed by that person or another acting in concert with
                that person with that person's knowledge for use in circumventing
22              a technological measure that effectively controls access to a work
                protected under this title.
23
    17 U.S.C. 1201(a)(2); *see also* 17 U.S.C. 1201(b).  Section 1201(b) is very similar to Section
24
    1201(a)(2).  But (a)(2) focuses on effectively controlling *access* and (b) focuses on effectively
25
    protecting a *right* of a copyright owner.
26
          Psystar's circumvention technology was installed on Psystar computers and sold with
27
    Mac OS X.  Psystar also marketed the computers as running Mac OS X.  This facilitation of
28
    circumvention was a violation under Section 1201(a)(2).

13

1    Section 1201(b)(1) was likewise violated.  When an end user turned on a Psystar

2    computer and ran Mac OS X, there was also an act of circumvention, as Psystar concedes (Def.

3    Reply 2).  As stated, running the modified Mac OS X results in an unauthorized copy to RAM.

4    Thus, Psystar's circumvention technology has not only provided access but also resulted in

5    copies in RAM.  Although Apple's technological measure may have been primarily aimed at

6    controlling access, it also effectively protected its right to copy, at least for the copy made in

7    RAM.  *Cf. 321 Studios v. MGM Studios, Inc.*, 307 F. Supp. 2d 1085, 1097 (N.D. Cal. 2004)

8    (Illston, J.) (finding that Section 1201(b)(1) applied when copying the encrypted DVDs was not

9    particularly useful, as any copy made without circumventing could not be accessed or viewed).

10    Psystar asserts, nonetheless, that it has not violated the DMCA and provides two

11    reasons:  (1) Psystar did not facilitate infringement; and (2) Apple's technological protection

12    measure was not effective.  Because unauthorized copying and access have been proven,

13    Psystar's first argument is rejected.  *See Chamberlain Group, Inc. v. Skylink Techs., Inc.*, 381

14    F.3d 1178, 1193 (Fed. Cir. 2004).  As to the second argument, Psystar contends that Apple's

15    anticircumvention technology was ineffective because the decryption key for circumvention is

16    publicly available on the internet.  This argument fails.  "The fact that circumvention devices

17    may be widely available does not mean that a technological measure is not, as the DMCA

18    provides, effectively protecting the rights of copyright owners in the ordinary course of its

19    operation."  *Sony Computer Entm't Am., Inc. v. Divineo, Inc.*, 457 F. Supp. 2d 957, 965 (N.D.

20    Cal. 2006).  Generally, measures based on encryption "effectively control" access to

21    copyrighted works.  Here, when the decryption key was not employed, the encryption

22    effectively worked to prevent access to Mac OS X.  And that is all that is required.  *See*

23    *Universal City Studios v. Reimerdes*, 111 F. Supp. 2d 294, 318 (S.D.N.Y. 2000) (noting that

24    when a decryption program was not employed, the encryption worked to control access to the

25    protected work).  Accordingly, Psystar has violated the DMCA by circumventing Apple's

26

27

28

United States District Court
For the Northern District of California

14

1    protection barrier and trafficking devices designed for circumvention. Apple's motion for

2    summary judgment on its DMCA claim must be granted.[4]

3    **5.    TRADEMARK INFRINGEMENT AND TRADE-DRESS INFRINGEMENT.**

4         The summary of argument section of Psystar's motion introduces an argument that its

5    use of Apple's trademarks and trade dress is a nominative fair use. But the motion never fully

6    addresses this issue. For example, no evidentiary cites or legal cites are provided. Psystar

7    failed to even mention nominative fair use in its reply. While nominative fair use may be

8    asserted as a defense, the defendant has the burden of proof. *See Mattel Inc. v. Walking Mt.*

9    *Prods.*, 353 F.3d 792, 810 (9th Cir. 2003) (stating a defendant must prove three elements to

10   show nominative fair use). The burden was not met here. Accordingly, Psystar's motion for

11   summary judgment on nominative fair use must be denied.

12   **6.    RELIEF.**

13        Psystar contends that Apple has waived damages on its non-copyright claims, such as its

14   breach-of-contract claim. Psystar further argues that if an injunction is granted, then it should

15   be limited to Mac OS X *Leopard* (and not include Mac OS X *Snow Leopard*, for example).

16   Apple neither filed a motion on its non-copyright claims nor for a permanent injunction.

17   Rather, Psystar has prematurely raised these points merely in anticipation of Apple doing so.

18   As such, this order will not address the relief, if any, that Apple may be entitled to at this

19   juncture.

20                                **CONCLUSION**

21        For the foregoing reasons, Apple's motion is **GRANTED** and Psystar's motion is

22   **DENIED.**

23        Apple has also asserted the following claims, which remain for trial:  (1) breach of

24   contract; (2) induced breach of contract, (3) trademark infringement; (4) trademark dilution; (5)

25   trade dress infringement; and (6) state unfair competition under California Business and

26   Professions Code § 17200; and (7) common law unfair competition.

27

28        ⁴ Psystar does not rely on a reverse-engineering defense under the DMCA, and thus this order does not
     address Apple's argument on this point.

1    With respect to relief, formal briefing is appropriate, so:

2         Apple's opening                November 23, 2009;

3         Psystar's opposition           November 30, 2009; and

4         Apple's reply                  December 7, 2009.

5    A hearing will be held on December 14, 2009, at 8 a.m.

6

7    **IT IS SO ORDERED.**

8

9    Dated:  November 13, 2009.

10                                        WILLIAM ALSUP
                                          UNITED STATES DISTRICT JUDGE

**United States District Court**
For the Northern District of California

16

# EXHIBIT 7

1   TOWNSEND AND TOWNSEND AND CREW LLP
    JAMES G. GILLILAND, JR. (State Bar No. 107988)
2   MEHRNAZ BOROUMAND SMITH (State Bar No. 197271)
    MEGAN M. CHUNG (State Bar No. 232044)
3   J. JEB B. OBLAK (State Bar No. 241384)
    Two Embarcadero Center, Eighth Floor
4   San Francisco, CA  94111
    Telephone:  (415) 576-0200
5   Facsimile:  (415) 576-0300
    Email: jggilliland@townsend.com
6        mboroumand@townsend.com
         mmchung@townsend.com
7       jboblak@townsend.com

8   Attorneys for Plaintiff and Counterdefendant
    APPLE INC.

9

10              UNITED STATES DISTRICT COURT

11          FOR THE NORTHERN DISTRICT OF CALIFORNIA

12              SAN FRANCISCO DIVISION

| | |
|---|---|
| APPLE INC., a California corporation, | Case No. CV 08-03251 WHA |
| Plaintiff, | **MEMORANDUM OF APPLE INC. IN SUPPORT OF ITS MOTION TO DISMISS OR ENJOIN PROSECUTION OF THE RECENTLY-FILED FLORIDA ACTION AND TO RE-OPEN DISCOVERY FOR LIMITED PURPOSES** |
| v. | |
| PSYSTAR CORPORATION, a Florida corporation, and DOES 1-10, inclusive, | |
| Defendants. | |
| AND RELATED COUNTERCLAIMS | Date:      September 24, 2009<br>Time:      8:00am<br>Courtroom:  9<br>Trial Date:  January 11, 2010 |

MEMORANDUM OF APPLE INC. IN SUPPORT OF ITS MOTION TO DISMISS OR ENJOIN PROSECUTION OF
THE RECENTLY-FILED FLORIDA ACTION AND TO RE-OPEN DISCOVERY FOR LIMITED PURPOSES
CASE NO. CV 08-03251 WHA

townsend.

# TABLE OF CONTENTS

Page

I.    INTRODUCTION ....................................................................................1

I.    STATEMENT OF FACTS .......................................................................2

    A.    The California Action Was Filed First and Puts at Issue All the
        Disputes Between Apple and Psystar.............................................2

    B.    The Florida Action Duplicates Already Pending Copyright,
        DMCA and Breach of Contract Claims, Defenses and
        Counterclaims ................................................................................4

II.   LEGAL ARGUMENT ..............................................................................7

    A.    This Court Has the Authority to Act in Response to the Filing
        of Duplicative Litigation................................................................7

    B.    All of the Claims in Dispute Are Presented in the First-Filed
        California Action ............................................................................8

        1.    Psystar's Antitrust Claims in the Florida Action
            Already Have Been Addressed and Dismissed by This
            Court..............................................................................9

            a)    Psystar's tying and exclusive dealing
                allegations merely restate claims that already
                were dismissed. .................................................10

            b)    Psystar's repackaged monopolization claim
                remains fatally flawed. ......................................11

            c)    Psystar's antitrust claims in Florida were
                compulsory counterclaims it was required to
                file in California. ..............................................13

            2.    Psystar's Other Claims In Florida Also Duplicate
            Existing Claims In The California Action ............................14

            3.    Psystar Concealed Its Efforts To Have Snow Leopard
            Run On Its Computers.......................................................15

    C.    Proposed Action Sought By Apple ................................................15

MEMORANDUM OF APPLE INC. IN SUPPORT OF ITS MOTION TO DISMISS OR ENJOIN PROSECUTION OF
THE RECENTLY-FILED FLORIDA ACTION AND TO RE-OPEN DISCOVERY FOR LIMITED PURPOSES
CASE NO. CV 08-03251 WHA

i

townsend.

# TABLE OF AUTHORITIES

Page

**CASES**

*Adams v. Calif. Dept. of Health Services,*
    487 F. 3d 684 (9th Cir. 2007)...................................................................... 8, 13

*Albright v. Gates,*
    362 F.2d 928 (9th Cir. 1966)........................................................................ 13

*Apple Inc. v. Psystar Corp.,*
    586 F. Supp. 2d 1190 (N.D. Cal. 2008) ................................................... passim

*Asset Allocation & Mgmt. Co. v. Western Employers Ins. Co.,*
    892 F.2d 566 (7th Cir. 1989)........................................................................ 7

*Baker v. Golden Seal Liquors, Inc.,*
    417 U.S. 467, 94 S. Ct. 2504 (1974)............................................................ 13

*Church of Scientology of Cal. v. United States Dep't of Army,*
    611 F.2d 738 (9th Cir. 1979)........................................................................ 9

*Crawford v. Bell,*
    599 F.2d 890 (9th Cir. 1979)........................................................................ 8

*Decker Coal Co. v. Commonwealth Edison Co.,*
    805 F.2d 834 (9th Cir. 1986)........................................................................ 7

*Del Mar Avionics v. Quinton Instruments Co.,*
    645 F.2d 832 (9th Cir. 1981)........................................................................ 8

*Fakespace Labs, Inc. v. Robinson,*
    No. C99-05258 WHA, 2000 WL 1721061 (N.D. Cal. Nov. 6, 2000) ................. 7

*Ferens v. John Deere Co.,*
    494 U.S. 516, 110 S.Ct. 1274, 108 L. Ed. 2d 443 (1990) .............................. 8

*First City Nat'l Bank & Trust Co. v. Simmons,*
    878 F.2d 76 (2d Cir. 1989)...................................................................... 7, 8, 9

*Illinois Tool Works v. Independent Ink, Inc.,*
    547 U.S. 28, 126 S.Ct. 1281, 164 L.Ed.2d 26 (2006) .............................. 12

*In re Crown Vantage, Inc.,*
    421 F.3d 963 (9th Cir. 2005)........................................................................ 13

*In re Lazar,*
    237 F.3d 967 (9th Cir. 2001).................................................................. 13, 15

MEMORANDUM OF APPLE INC. IN SUPPORT OF ITS MOTION TO DISMISS OR ENJOIN PROSECUTION OF
THE RECENTLY-FILED FLORIDA ACTION AND TO RE-OPEN DISCOVERY FOR LIMITED PURPOSES
CASE NO. CV 08-03251 WHA

townsend.

ii

*London v. Coopers & Lybrand,*
   644 F.2d 811 (9th Cir. 1981) ................................................................. 13, 14

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Haydu,*
   675 F.2d 1169 (11th Cir. 1982) ................................................................. 7, 9

*Northwest Airlines, Inc. v. Am. Airlines, Inc.,*
   989 F.2d 1002 (8th Cir. 1993) ................................................................. 7, 8

*Pacesetter Systems, Inc. v. Medtronic, Inc.,*
   678 F.2d 93 (9th Cir. 1982) ................................................................. 7, 8, 9

*Pochiro v. Prudential Ins. Co.,*
   827 F.2d 1246 (9th Cir. 1987) ................................................................. 13

*Psystar Corp. v. Apple Inc.,*
   No. 09-22535 CIV Hoeveler (hereafter "Florida Complaint") ................. 3, 5, 6

*SASCO v. Byers,*
   C 08-5641 JF, 2009 WL 1010513 (N.D. Cal. Apr. 14, 2009) ................. 9, 13, 15

*Seattle Totems Hockey Club, Inc. v. Nat'l Hockey League,*
   652 F.2d 852 (9th Cir. 1981) ................................................................. 7

*Sutter Corp. v. P&P Indus., Inc.,*
   125 F.3d 914 (5th Cir. 1997) ................................................................. 8

*United States v. E.I. duPont de Nemours & Co.,*
   351 U.S. 377 (1956) ................................................................. 12

**STATUTES**

15 U.S.C. § 1 ................................................................. 10

15 U.S.C. § 14 ................................................................. 10

15 U.S.C. § 2 ................................................................. 11

Federal Rule of Civil Procedure 13(a)(1) ................................................................. 13

Federal Rule of Civil Procedure 26(e) ................................................................. 15

Local Rule 3-13(b) and (d) ................................................................. 16

MEMORANDUM OF APPLE INC. IN SUPPORT OF ITS MOTION TO DISMISS OR ENJOIN PROSECUTION OF
THE RECENTLY-FILED FLORIDA ACTION AND TO RE-OPEN DISCOVERY FOR LIMITED PURPOSES
CASE NO. CV 08-03251 WHA

iii

townsend.

## I.    INTRODUCTION

On August 27, 2009, defendant Psystar Corporation ("Psystar") filed a new lawsuit against plaintiff Apple Inc. ("Apple") in the Southern District of Florida with allegations that are virtually identical to the issues that have been actively litigated in this case for more than a year.  By doing so, Psystar is brazenly attempting to avoid rulings made against it by this Court, and admissions it previously made to this Court.  Psystar's duplicative lawsuit was filed one day before Apple released to the public the newest version of its Macintosh operating system software, Mac OS® X ver.10.6 (called Snow Leopard).  Shortly thereafter Psystar revealed for the first time that it was offering to sell generic, non-Apple computers running Snow Leopard in direct violation of Apple's license restrictions and copyrights.

All of the allegations in Psystar's new Florida lawsuit are subsumed by the existing claims filed against Psystar in the case pending before this Court.  Specifically, Psystar's Florida action seeks a declaratory judgment concerning the enforceability of Apple's Software License Agreements and a determination of whether Psystar is violating federal copyright laws, including the Digital Millennium Copyright Act.  These precise issues have been pending before this Court since July, 2008, and will be resolved through trial within a few months.  In addition, the newly-filed Florida action asserts antitrust claims against Apple based upon theories that this Court previously considered and then dismissed.  *See Apple Inc. v. Psystar Corp.*, 586 F. Supp. 2d 1190 (N.D. Cal. 2008) (also available at Dkt. No. 33).

There is absolutely no valid reason for two actions to be pending 3,000 miles apart, in two different federal courts, raising the same issues.  Such blatant forum-shopping should not be countenanced within the federal court system.  To conserve judicial resources, avoid possibly conflicting results, and halt duplicative litigation, Apple seeks an Order dismissing or staying the Florida action and preventing Psystar from filing further lawsuits based on legal theories already at issue in, or already resolved by, this Court.  In addition, Apple requests that discovery in this case be re-opened for 45–60 days for very limited purposes so that all the disputes between the parties regarding the legality of Psystar's actions can be resolved in one forum, once and for all.

townsend.

MEMORANDUM OF APPLE INC. IN SUPPORT OF ITS MOTION TO DISMISS OR ENJOIN PROSECUTION OF
THE RECENTLY-FILED FLORIDA ACTION AND TO RE-OPEN DISCOVERY FOR LIMITED PURPOSES
CASE NO. CV 08-03251 WHA

1

1     **I.**     **STATEMENT OF FACTS**

2          **A.**    **The California Action Was Filed First and Puts at Issue All the Disputes Between Apple and Psystar**

3

4         On July 3, 2008, Apple filed the instant lawsuit against Psystar alleging copyright and

5  trademark violations, and breach of Apple's Software License Agreement.  Apple claims its rights

6  are being violated by Psystar's unauthorized use and sale of Apple's operating system software, on

7  non-Apple computers.  On August 28, 2008, Psystar answered and filed antitrust counterclaims

8  against Apple alleging unlawful tying of Apple's operating system software, Mac OS, to Apple's

9  hardware, illegal exclusive dealing, and monopolization.  (Psystar's Answer and Counterclaims,

10  Dkt. No. 12.)  In September of last year, Apple moved to dismiss all of Psystar's counterclaims.

11  After reviewing the parties' papers and hearing lengthy oral argument, this Court, in an extensive

12  and carefully reasoned opinion, dismissed Psystar's antitrust and unfair competition counterclaims

13  for failure to state a plausible claim.  *Apple Inc. v. Psystar Corp.*, 586 F. Supp. 2d at 1204 (also

14  available at Dkt. No. 33 at 17).[1]  The Court explicitly provided Psystar an opportunity to amend its

15  counterclaims, giving it a second chance to "plead its best case."  *Id.*  However, Psystar chose not

16  to amend its antitrust counterclaims, specifically informed the Court that it was not attempting to

17  restate those claims and asserted counterclaims under a copyright misuse theory instead.  (*See*

18  Psystar's Motion for Leave to Amend Counterclaim, Dkt. No. 40, at 9 n.1.)

19         On December 2, 2008, Apple amended its Complaint.  The allegations in the Amended

20  Complaint and the relief sought are not limited to Psystar's use or sale of a specific version of

21  Apple's operating system software.  (Am. Compl., Dkt. No. 38.)  Rather, the Amended Complaint

22  alleges, *inter alia*, infringement of the copyrights in Apple's Mac OS X software, irrespective of

23  the particular version of that software, and breach of the "applicable License Agreement[s]" that

24  govern the use of Mac OS X.  (*Id.* at 8-10, 12-14.)  The Amended Complaint also adds a claim for

25  violation of the Digital Millennium Copyright Act ("DMCA").  The DMCA claim asserts that

26

27      [1] Specifically, the Court held that Psystar's antitrust counterclaim "does not plausibly allege that Mac OS is an independent market" (*id.* at 1200) and "Psystar's claim that Mac OS-compatible computer hardware systems constitute a distinct submarket or aftermarket contravenes the pertinent legal standards" (*id.* at 1203).

28

townsend.

1    Apple's copyrighted work, Mac OS X, is protected by a technological protection measure, and that

2    Psystar unlawfully circumvented that protection by writing its own software code to decrypt

3    Apple's encrypted software. (*Id.* ¶¶ 46-49.)  In its prayer for relief, Apple seeks, among other

4    things, an injunction against <u>any</u> further copyright infringement by Psystar, "a preliminary and/or

5    permanent injunction against the sale or distribution of any software or device, . . . that allows for

6    the installation or running of Apple software on non-Apple computers," and an order "requiring

7    Psystar to recall all such products and software sold or distributed to the public as a result of

8    Psystar's circumvention of an access control measure and/or trafficking in circumvention

9    devices." (*Id.* ¶¶ 2, 4.)  Neither the allegations nor the relief sought in the Amended Complaint are

10   limited to a specific version of Apple's Mac OS operating system software.

11        More than nine months after this Court dismissed Psystar's antitrust claims, and even

12   though it specifically elected to not file amended antitrust allegations here, Psystar filed a brand

13   new lawsuit in the Southern District of Florida.  (*See* Original Compl., *Psystar Corp. v. Apple Inc.*,

14   No. 09-22535 CIV Hoeveler (hereafter "Florida Complaint"), attached as Exhibit 1 to Declaration

15   of Mehrnaz Boroumand Smith).  In its Florida Complaint, Psystar attempts to repackage and

16   reassert the same antitrust claims that this Court already dismissed.  Psystar once again alleges

17   that, "By tying its operating system to Apple-branded hardware, Apple restrains trade in personal

18   computers that run Mac OS X, collects monopoly rents on its Macintoshes, and monopolizes the

19   market for 'premium computers.'" (Florida Complaint ¶¶ 6, 23.)  In addition, Psystar seeks a

20   declaratory judgment or injunction that will allow it to use version 10.6 of Apple's operating

21   system software on Psystar's computers, contending that such actions do not violate the Copyright

22   Act or the DMCA or breach Apple's license agreements.  (Florida Complaint ¶¶ 4-5, 15-20, 29.)

23        Psystar attempts to justify filing these duplicative claims in a completely different forum

24   by knowingly misrepresenting that the California action does not cover Apple's latest version of

25   Mac OS X, Snow Leopard, and that Psystar's circumvention of the technological mechanism used

26   by Apple to restrict access to Mac OS X Snow Leopard is not part of the California litigation.

27   (Florida Complaint ¶ 13.)  That rationalization is groundless; these very issues already are pending

28   before this Court or already have been decided by this Court.

townsend.

**B.    The Florida Action Duplicates Already Pending Copyright, DMCA and Breach of Contract Claims, Defenses and Counterclaims**

Psystar baselessly claims that Apple's allegations in the California action do not cover Apple's version 10.6 of Mac OS X, known as Snow Leopard.  That is clearly wrong; Apple's Amended Complaint is <u>not</u> limited to any specific version of Mac OS X and Psystar knows it is not so limited.  Among other things, Apple alleges that:

> "[I]n October, 2008, Psystar announced that it is planning to sell in commerce additional computers, servers, laptops, and/or hard drives that are preinstalled with or which will run a modified, unauthorized, **version of Mac OS X operating system** . . . '"  (Background Allegations, ¶15.)

> \* \* \*

> "Apple has never authorized Psystar to install, use, or sell the **Mac OS software** on any non-Apple-labeled hardware."  (General Allegations, ¶24.)

> \* \* \*

> "Mac OS, **Mac OS X**, Mac OS X version 10.5, and Mac OS X Server, individual files constituting components of Mac OS, **Mac OS X**, Mac OS X version 10.5, and Mac OS X Server, as well as various files constituting components of other Apple software and firmware found on Apple-labeled computers are each original works of authorship created by Apple constituting copyrightable subject matter (hereafter, 'the Copyrighted Works')."  (First Claim For Relief, Copyright Infringement, ¶26.)

> \* \* \*

> "Defendant has admitted that Apple's **Mac OS X** normally 'will not operate on anything other than Apple-labeled computer hardware' but that Defendant has 'developed [its] own code that allows it to operate on a non-Apple-labeled computer system' and that such code overrides or gets around Apple's embedded codes."  (Third Claim For Relief, Violation of the DMCA, ¶46.)

> \* \* \*

> "Awarding Apple a preliminary and/or permanent injunction against the sale or distribution of any software or device . . . that allows for the installation or running of **Apple Software** on non-Apple computers. . . ."  (Prayer For Relief, ¶¶ 2, 4.)

(Emphasis added.)  These and other references in Apple's Complaint and Amended Complaint show that all versions of the Mac OS operating system software, including all versions of Mac OS X, as well as all of Psystar's activities related to all versions of Mac OS X, are included

townsend.

1    within the California action.

2        Likewise, Psystar's Answer and Counterclaim in this action, filed over a year ago,

3    encompass versions of Mac OS X beyond Leopard. Psystar refers to "Mac OS" throughout its

4    Answer and Counterclaim – without reference to a specific version number of Apple's operating

5    system. (*See* Psystar's Counterclaim, Dkt. No. 12.) Psystar defined "Mac OS" broadly to include

6    all versions of Mac OS X: "APPLE markets the Macintosh Computer and the OS X Operating

7    System (the 'Mac OS')." (*Id.* ¶13.) Psystar further alleged that Apple's purported anticompetitive

8    conduct began with the "release of Mac OS 8" and continued with "Mac OS 9—up to and

9    including Mac OS 9.2.2 on December 6, 2001" and "with respect to Mac OS X." (*Id.* at ¶¶52, 54,

10   55.) It is beyond disingenuous for Psystar to accuse Apple of anticompetitive conduct that

11   spanned more than a dozen years and three major releases of Apple's operating system software

12   (Mac OS 8, Mac OS 9 and Mac OS X) but now claim these allegations – while covering MAC OS

13   X versions 10.0 through 10.5 and their incremental variants – do not cover Mac OS X version

14   10.6.

15       Discovery already undertaken in this litigation by both Apple and Psystar plainly includes

16   versions of Mac OS X other than Leopard. Apple has repeatedly inquired about Psystar's use of

17   "the operating system Mac OS X, including all versions and updates thereof."[2]   Apple also has

18   inquired about Psystar's use of "APPLE SOFTWARE," which is defined to mean "any software

19   licensed by APPLE to third parties, including but not limited to versions of MAC OS X, any prior

20   versions of APPLE operating system software . . . ."[3]  Indeed, Apple's Interrogatory No. 1 asked

21   Psystar to specify *all* Apple software that can run on each Psystar product, including products that

22   Psystar was contemplating selling. (Boroumand Smith Decl. Ex. 4-5 (Apple's Interrogatory No. 1

23   and Psystar's responses respectively).) In its responses dated December 4, 2008, and March 6,

24   2009, Psystar stated that its computers can run "Mac OS X Tiger [10.4] and Leopard [10.5]." (*Id.*

25       [2] *See* Boroumand Smith Decl. Ex. 2 (definitions of "MAC OS X" and "APPLE SOFTWARE"
     used in Apple's discovery) and Ex. 3 (Apple's Request for Production Nos. 12, 17, 28 and 53).
26   Apple's First Set of Interrogatories (served on 11/04/08); Apple's First, Second and Third
     Requests for Production (served 11/04/08, 11/11/08 and 12/3/08, respectively); Apple's First,
27   Second and Third (served 11/04/08, 11/11/08 and 12/3/08, respectively).

28       [3] *Ibid.*

townsend.

1    at Ex. 5.)  Notably, Psystar did <u>not</u> say its computers could run Snow Leopard (10.6) or that it was

2    trying to cause version 10.6 to run on its computers.

3            Similarly, Psystar's own discovery sought broad information about "MAC OS," which

4    Psystar initially defined as "**all versions** and updates of the operating system Mac OS including,

5    without limitation, Mac OS X, Mac OS 9, and Mac OS 8" and subsequently defined as "**all**

6    **versions** and updates of the operating system Mac OS X."[4]  Indeed, both parties previously agreed

7    that Snow Leopard is a part of this case. ███████████████████████████████████

8    ████████████████████████████████████████████████████████████████

9    ████████████████████████████████████████████████████████████████

10   ████████████████████████████████████████████████████████████████

11   ████████████████████████████████████████████████████████████████

12   ████████████████████████████████████████████████████████████████

13   ████████████████████████████████████████████████████████████████

14   ███████████

15           After all this discovery was finished, and after Apple had served its expert reports

16   analyzing the operation of Psystar's computers, Psystar publicly announced for the first time that it

17   was offering for sale computers running Mac OS X ver. 10.6 (Snow Leopard).  And, at the same

18   time, Psystar filed its mirror-image lawsuit against Apple in Florida.

19           Since all versions of Mac OS X unlawfully copied by Psystar are part of this lawsuit, the

20   issues raised by Psystar in the Florida action duplicate those already at issue here.  In the present

21   action Apple specifically requests a preliminary and/or permanent injunction that prohibits further

22   infringement of its copyrights, prevents the sale or distribution of any device that allows

23   installation of Apple's software on non-Apple computers or that allows for the installation by

---

[4] *See, e.g.*, Boroumand Smith Decl. Ex. 2 at 2 (citing Psystar's definitions of "MAC OS" and "MAC OS X" in Psystar's First Set of Interrogatories, Requests for Admission and Requests for Production (served on 11/26/08) and Psystar's Second, Third and Fourth Requests for Admission (served on 3/10/09, 3/20/09, and 4/8/09, respectively) (emphasis added).

[5] "Beta" software is software that is still being tested before it is officially released to the public.  Apple made a beta version of Snow Leopard available to registered developers who signed a license agreement restricting its use so they could become familiar with the soon-to-be-released software.

townsend.

1    circumventing Apple's access control measures.  Psystar's later-filed complaint in Florida

2    specifically asks that court to <u>allow</u> the sale and distribution of such infringing computers.  The

3    waste of judicial resources and the risk of diametrically opposed judicial rulings are obvious and

4    should be prevented.

5    **II.    LEGAL ARGUMENT**

6         **A.    This Court Has the Authority to Act in Response to the Filing of Duplicative**
7                 **Litigation**

8         When two overlapping lawsuits are filed, the court in which the first action was filed has

9    the discretion, and the authority, to determine which lawsuit should proceed and where.  *Decker*

10   *Coal Co. v. Commonwealth Edison Co.*, 805 F.2d 834, 843 (9th Cir. 1986) (district court properly

11   denied defendant's motion to dismiss and transfer to the later-filed forum and properly granted the

12   plaintiff's motion to enjoin the second-filed action); *Pacesetter Systems, Inc. v. Medtronic, Inc.*,

13   678 F.2d 93, 95 (9th Cir. 1982) ("when two identical actions are filed in courts of concurrent

14   jurisdiction, the court which first acquired jurisdiction should try the lawsuit"); *cf. Fakespace*

15   *Labs, Inc. v. Robinson*, No. C99-05258 WHA, 2000 WL 1721061, at *2 (N.D. Cal. Nov. 6, 2000)

16   ("[T]he court in which the second suit is filed may either transfer, stay or dismiss the second suit.

17   This allows the court in which the action was first filed to decide whether to try the case.").[6]

18        When, as here, the district court has jurisdiction over all parties involved, "it may enjoin

19   later filed actions." *Decker Coal*, 805 F.2d at 843 (citing cases); *Seattle Totems Hockey Club, Inc.*

20   *v. Nat'l Hockey League*, 652 F.2d 852, 855-56 (9th Cir. 1981) (affirming district court's decision

21   to enjoin a subsequent lawsuit in Canada when the breach of contract claim asserted there should

22   have been asserted as a counterclaim in the first-filed action); *see also Asset Allocation & Mgmt.*

23   *Co. v. Western Employers Ins. Co.*, 892 F.2d 566, 572 (7th Cir. 1989) ("[T]here is overwhelming

24

25        [6] *See also First City Nat'l Bank & Trust Co. v. Simmons*, 878 F.2d 76, 79 (2d Cir. 1989)
     ("where there are two competing lawsuits, the first suit should have priority"); *Northwest Airlines,*
26   *Inc. v. Am. Airlines, Inc.*, 989 F.2d 1002, 1006 (8th Cir. 1993) (the first-to-file rule "gives priority,
     for purposes of choosing among possible venues when parallel litigation has been instituted in
27   separate courts, to the party who first establishes jurisdiction"); *Merrill Lynch, Pierce, Fenner &*
     *Smith, Inc. v. Haydu*, 675 F.2d 1169, 1174 (11th Cir. 1982) ("the court initially seized of a
28   controversy should be the one to decide the case").

townsend.

1    case authority that the first court has power, independently of the equitable doctrine that bars

2    vexatious litigation, to enjoin the defendant from bringing a separate suit against the plaintiff in

3    another court, thereby forcing the defendant either to litigate his claim as a counterclaim or to

4    abandon it") (citing cases).  "[T]he decision to enjoin rests in the sound discretion of the trial

5    judge, and will rarely be overturned." *Del Mar Avionics v. Quinton Instruments Co.,* 645 F.2d 832,

6    836 (9th Cir. 1981).

7         The Supreme Court has "made quite clear that '[t]o permit a situation in which two cases

8    involving precisely the same issues are simultaneously pending in different District Courts leads to

9    the wastefulness of time, energy and money.'" *Ferens v. John Deere Co.,* 494 U.S. 516, 531, 110

10   S.Ct. 1274, 108 L. Ed. 2d 443 (1990) (citations omitted).  Accordingly, the first-filed rule gives

11   priority to the first forum in order to conserve judicial resources and avoid conflicting rulings.  *See*

12   *e.g., First City Nat'l Bank & Trust Co.,* 878 F.2d at 80; *Northwest Airlines, Inc.,* 989 F.2d at 1006.

13        A district court may order that the second-filed action be stayed or dismissed when, as

14   here, it asserts the same claims against the same parties as a prior action.  *Adams v. Calif. Dept. of*

15   *Health Services,* 487 F. 3d 684, 692-93 (9th Cir. 2007) (both actions filed in the Central District of

16   California).  Similarly, in *Sutter Corp. v. P&P Indus., Inc.,* 125 F.3d 914 (5th Cir. 1997), the Fifth

17   Circuit Court of Appeals held that "the 'first to file rule' not only determines which court may

18   decide the merits of substantially similar cases, but also establishes which court may decide

19   whether the second suit filed must be dismissed, stayed or transferred and consolidated." *Id.* at

20   920 (internal citations omitted).  Moreover, the Ninth Circuit has stated that a district court has

21   inherent authority in the interest of judicial efficiency to dismiss duplicative actions which involve

22   similar factual allegations and legal claims.  *See Crawford v. Bell*, 599 F.2d 890, 892-93 (9th Cir.

23   1979).

24        **B.    All of the Claims in Dispute Are Presented in the First-Filed California Action**

25        "Normally sound judicial administration would indicate that when two identical actions are

26   filed in courts of concurrent jurisdiction, the court which first acquired jurisdiction should try the

27   lawsuit and no purpose would be served by proceeding with a second action." *Pacesetter Systems,*

28   *Inc. v. Medtronic, Inc.,* 678 F.2d 93, 95 (9th Cir. 1982).  This first-to-file rule "serves the purpose

townsend.

1    of promoting efficiency well and should not be disregarded lightly." *Id.* (quoting *Church of*

2    *Scientology of Cal. v. United States Dep't of Army*, 611 F.2d 738, 750 (9th Cir. 1979)); *see also*

3    *First City Nat'l Bank & Trust Co.*, 878 F.2d at 80; *Merrill Lynch*, 675 F.2d at 1174 (first-filed rule

4    applies "[i]n absence of compelling circumstances").

5            There is no doubt the lawsuit filed by Apple deserves priority.  Apple filed suit in this

6    Court more than a year before the Psystar filed suit in Florida.  The California action and Florida

7    action involve the exact same parties – Apple and Psystar.  The parties, and this Court, have spent

8    an enormous amount of time and effort to advance this case to its current stage.  And, despite

9    Psystar's efforts to manufacture artificial differences, the California action and Florida action

10   involve virtually identical legal and factual issues; far more similarity than the law requires.  "The

11   relevant lawsuits need only be substantially similar, rather than identical, to trigger the rule."

12   *SASCO v. Byers*, C 08-5641 JF, 2009 WL 1010513, at *4 (N.D. Cal. Apr. 14, 2009) (internal

13   citations omitted); *see also Alltrade*, 946 F.2d 622, 626-628 (9th Cir. 1991).  Consequently, this

14   Court should stop further proceedings in Florida.

### 1. Psystar's Antitrust Claims in the Florida Action Already Have Been Addressed and Dismissed by This Court

17           Psystar should not be allowed to re-assert in a new action the antitrust claims that this

18   Court dismissed and that Psystar chose not to amend.  (*See* Psystar's Motion for Leave to Amend

19   Counterclaim, Dkt. No. 40, at 9 n.1.)  When instructed by this Court to "plead its best case,"

20   Psystar clearly stated: "PsyStar does not re-plead its Sherman and Clayton Act antitrust claims

21   (and related state claims) in the context of the present motion and amended counterclaim."  Psystar

22   later emphasized this position: "**[N]o antitrust claim is presented** in Psystar's first amended

23   complaint.") (emphasis in original).  (Psystar's Reply Brief ISO Motion for Leave to Amend

24   Counterclaim, Dkt. No. 48, at 1.)  Yet, in complete disregard of this Court's prior order Psystar

25   has tried to revive its unfounded antitrust claims in Florida rather than amending them here.

26           Apple licenses version 10.6 of Mac OS X in the same manner it licenses version 10.5.

27   (*See* Boroumand Smith Decl. ¶9 and Exs. 12 and 13.)  Hence, the mere fact that Snow Leopard is

28   a new version (10.6) of the Mac OS X operating system does not raise any new antitrust issues.

townsend.

a)   **Psystar's tying and exclusive dealing allegations merely restate claims that already were dismissed.**

For all intents and purposes the antitrust allegations Psystar asserts in Florida are the same as the ones this Court already rejected.  Here, Psystar previously alleged a claim "brought pursuant to 15 U.S.C. § 1 (the Sherman Act) to seek redress for APPLE's illegal tying of the Mac OS [not limited to any specific version] to Apple-Labeled Computer Hardware Systems as those products and markets are defined below." (Psystar's Counterclaim, Dkt. No. 12, at ¶2.)[7]  In Florida, Psystar re-asserts the same tying claim: "Apple violated § 1 of the Sherman Act, 15 U.S.C. § 1, by tying and attempting to tie Mac OS X Snow Leopard to Macintosh computers . . . ." (Psystar's Florida Complaint ¶21).[8]

Similarly, Psystar makes the exact same "exclusive dealing" claim in the Florida action as it did in this action.  Here Psystar asserted a claim "pursuant to 15 U.S.C. § 14 (the Clayton Act) to seek redress for APPLE's illegal requirements of its customers to exclusively deal with APPLE as it pertains to the Mac OS [not limited to any specific version] and Apple-Labeled Computer Hardware Systems in domestic, interstate commerce." (Psystar's Counterclaim, Dkt. No. 12, ¶4.)[9] In Florida, Psystar reiterates the same allegations:  "[Apple's software license agreement] further constitutes an illegal exclusive-dealing arrangement under § 3 of the Clayton Act, 15 U.S.C. § 14, because it purports to condition sales of Mac OS X Snow Leopard on an agreement that the purchaser will not deal with those who compete with Apple in selling personal computers . . . ." (Psystar's Florida Complaint ¶21).[10]

---

[7] *See also* Psystar Counterclaim ¶¶63 and 86 ("PSYSTAR, on information and belief, alleges that APPLE has tied and will continue to tie the Mac OS to Apple-Labeled Computer Hardware Systems in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.") (emphasis added).

[8] *See also* Florida Complaint ¶6 ("Apple's conduct violates the Clayton and Sherman Acts in that Apple is . . . illegally tying Mac OS X to Macintoshes and thereby substantially decreasing competition in the market for hardware for premium personal computers . . . .").

[9] *See also* Psystar Counterclaim ¶69 ("PSYSTAR is informed and believes, and thereon alleges, that APPLE's conduct with respect to the Mac OS requires its end users, therefore, to deal exclusively with APPLE through the purchase and use of only Apple-Labeled Computer Hardware Systems.") and ¶ 107.

[10] *See also* Florida Complaint ¶6 ("Apple's conduct violates the Clayton and Sherman Acts in that Apple is . . . entering into illegal exclusive-dealing agreements that prevent buyers of Mac OS X from buying their hardware from competitors like Psystar.").

townsend.

1    This Court already dismissed these allegations as failing to state a claim on which relief

2    could be granted, 586 F. Supp. 2d at 1200, 1203 (also available at Dkt. No. 33 at 12, 17), and

3    Psystar chose not to replead them.  It should not be allowed to pursue those exact same claims

4    now in a different court.

5    **b)    Psystar's repackaged monopolization claim remains fatally flawed.**

6

7    In the Florida action Psystar has alleged that "Apple restrains trade in personal computers

8    that run Mac OS X, collects monopoly rents on Macintoshes, and monopolizes the market for

9    'premium computers.'"  (Florida Complaint ¶ 6.)  Psystar's allegation that Apple restrains trade in

10   "personal computers that run Mac OS X" is no different than Psystar's previous attempt to define

11   a relevant product market by a single brand – the supposed market for "Mac OS compatible

12   hardware."  This Court already ruled that Mac OS-compatible computer hardware systems do not

13   constitute a distinct submarket or aftermarket under applicable antitrust laws and dismissed these

14   claims.  *See* 586 F. Supp. 2d at 1203 ("Psystar's claim that Mac OS-compatible computer

15   hardware systems constitute a distinct submarket or aftermarket contravenes the pertinent legal

16   standards . . . .") (also available at Dkt. No. 33 at 17).

17   Psystar vainly attempts to re-package its previously-dismissed monopolization claim by re-

18   defining the relevant market.  But Psystar's new market definition is equally invalid.  Psystar

19   previously claimed that Apple had attempted to "maintain its monopoly and control prices in the

20   Apple-Labeled Computer Hardware Systems submarket and to destroy competition in the Mac OS

21   Capable Computer Hardware Systems market . . . (and submarkets)" (Psystar's Counterclaim,

22   Dkt. No. 12, ¶3.)[11]  Psystar now has alleged an equally unreal relevant market and implausible

23   claim: "Apple violated § 2 of the Sherman Act, 15 U.S.C. § 2, by monopolizing and attempting to

24   _____

25   [11] *See also* Psystar's Counterclaim, Dkt. No. 12, ¶ 17 ("For the purposes of the present
     Counterclaim, PSYSTAR is informed and believes, and thereon alleges, that there are two relevant

26   product markets.  The first product market is that of the Mac OS.  The second product market is
     that of computer hardware capable of executing the Mac OS ('Mac OS Capable Computer

27   Hardware Systems').  Within the Mac OS Capable Computer Hardware Systems market is a
     subsidiary market artificially created, dominated, and maintained by APPLE—the Apple-Labeled

28   Computer Hardware Systems submarket.  The relevant geographic market is, in both instances, the
     United States of America.")

townsend.

1    monopolize the market for premium personal computers, that is, personal computers priced above

2    $1,000. . . . Apple has the power to control prices and exclude competition from the market for

3    premium personal computers because it has the exclusive right to Mac OS X Snow Leopard and

4    uses that right to prevent competitors such as Psystar from selling competing personal computers

5    that run Mac OS X Snow Leopard." (Psystar's Florida Complaint ¶¶22, 23.)

6         Even though groundless, Psystar's new allegation that the relevant product market should

7    be defined as "the market for premium computers – computers priced over $1,000" could – and

8    should – have been raised in this California action. Since it was not, Psystar is barred from

9    litigating it in the Florida action. Nor is there any legal or factual basis for Psystar's "premium

10   computer" market definition. Psystar has not alleged, and cannot allege, that a $999 personal

11   computer is not reasonably interchangeable with a $1,001 personal computer. As this Court

12   already ruled in this case, relevant product markets are defined by "'reasonable interchangeability'

13   of use" – not by an arbitrary dollar figure or a single brand. 586 F. Supp. 2d at 1198-99 (also

14   available at Dkt. No. 33 at 9). Indeed, Psystar's market definitions in the Florida action contradict

15   its prior pleadings and cannot be made in good faith. In this action, Psystar previously alleged a

16   $1,099 Apple MacBook was a "counterpart" to a $674 Dell laptop. (*See* Psystar's Counterclaim,

17   Dkt. No. 12, ¶36.) Now, in direct contradiction of this prior allegation, according to Psystar's

18   new, contrived, market definition in Florida, these "counterpart" computers are in entirely separate

19   relevant product markets. Nothing could be further from reality. "The market is composed of

20   products that have reasonable interchangeability for the purpose for which they are produced —

21   *price, use and qualities considered.*" *Apple Inc. v. Psystar Corp., supra,* 586 F. Supp. 2d at 1199

22   (citing *United States v. E.I. duPont de Nemours & Co.,* 351 U.S. 377, 406 (1956)) (emphasis in

23   original) (also available at Dkt. No. 33 at 10).[12] Psystar's new monopolization theory is just as

24   flawed as its old one.

---

25   [12] Nor does it make any sense to allege monopolization of a market based upon the licensing of
     a new product – Snow Leopard – that was released to the public just two weeks ago. Psystar
26   cannot contend that Apple has any market power just because it has the copyright in Snow
     Leopard There is no presumption of market power by virtue of a patent or copyright. *Apple Inc.*
27   *v. Psystar Corp., supra,* 586 F. Supp. 2d at 1197 n.3 (citing *Illinois Tool Works v. Independent
     Ink, Inc.,* 547 U.S. 28, 126 S.Ct. 1281, 164 L.Ed.2d 26 (2006) (also available at Dkt. No. 33 at 9
28   n.3).

townsend.

**c)** **Psystar's antitrust claims in Florida were compulsory counterclaims it was required to file in California.**

Psystar's Florida claim undeniably is a compulsory counterclaim that it voluntarily dismissed when this Court gave Psystar the opportunity to amend its counterclaims nine months ago. Psystar previously admitted this, stating "[t]his Counterclaim is a compulsory counterclaim brought in accordance with Federal Rule of Civil Procedure 13(a)(1) in that the aforementioned causes of action arise out of the transaction or occurrence that is the subject matter of APPLE's claim and does not require adding another party over which the Court cannot acquire jurisdiction." (*See* Psystar's Counterclaim, Dkt. No. 12, at ¶12.). "Federal courts will not permit an action to be maintained where the claims asserted should have been brought as a compulsory counterclaim in an earlier action." *Baker v. Golden Seal Liquors, Inc.*, 417 U.S. 467, 469 n.1, 94 S. Ct. 2504 (1974); *SASCO, supra,* 2009 WL 1010513, at *4 (quoting *In re Crown Vantage, Inc.*, 421 F.3d 963, 973 n.7 (9th Cir. 2005)). A district court may dismiss litigation if its claims are "sufficiently related to subject matter of the original action," such that they are "barred as compulsory counterclaims." *Pochiro v. Prudential Ins. Co.*, 827 F.2d 1246, 1251 (9th Cir. 1987); *accord Albright v. Gates*, 362 F.2d 928, 929 (9th Cir. 1966); *see* Fed. R. Civ. P. 13(a). "A logical relationship exists when the counterclaim arises from the same aggregate set of operative facts as the initial claim, in that the same operative facts serve as the basis of both claims or the aggregate core of facts upon which the claim rests activates additional legal rights otherwise dormant in the defendant." *SASCO,* 2009 WL 1010513, at *4 (quoting *In re Lazar,* 237 F.3d 967, 979 (9th Cir. 2001)).

Moreover, when it dismissed Psystar's counterclaims, this Court instructed Psystar that if it did not successfully seek and obtain leave to file new counterclaims then "all inadequately pled claims will be dismissed without further leave to amend." 586 F. Supp. 2d at 1204 (also available at Dkt. No. 33 at 19). Psystar did not seek from this Court leave to amend its antitrust claims so it cannot now circumvent the Court's prior ruling by asserting them in a second lawsuit. *Adams, supra,* 487 F. 3d at 688, 692-693; *London v. Coopers & Lybrand*, 644 F.2d 811, 814 (9th Cir. 1981).

MEMORANDUM OF APPLE INC. IN SUPPORT OF ITS MOTION TO DISMISS OR ENJOIN PROSECUTION OF THE RECENTLY-FILED FLORIDA ACTION AND TO RE-OPEN DISCOVERY FOR LIMITED PURPOSES
CASE NO. CV 08-03251 WHA

13

townsend.

1  
2  
3  
4  
5  
6  
7  
8  
9  
10  
11  
12  
13  
14  
15  
16  
17  
18  
19  
20  
21  
22  
23  
24  
25  
26  
27  
28  

## 2.  Psystar's Other Claims In Florida Also Duplicate Existing Claims In The California Action

Psystar seeks declaratory relief that its activities "do not constitute copyright infringement," (Psystar's Florida Complaint ¶ 16) and "do not constitute a violation of the anti-circumvention provisions of the Digital Millennium Copyright Ac." (*id.* ¶ 17).  Psystar also seeks a ruling that Apple's Software License Agreement restricting the use of Apple's software is unenforceable.  (*Id.* ¶¶ 19-20.)  These are the exact same issues that have been pending before this Court for fourteen months.



Psystar adds a Lanham Act claim in the Florida action based entirely on the premise that Apple is stating, falsely, that Mac OS X can only be run lawfully on a Mac.  (Florida Complaint ¶¶ 26-27.)  Once again, of course, that is the exact issue presented in this lawsuit:  Apple believes it has the right to decide how to license its intellectual property and specifically has the right to not license its intellectual property to a direct competitor.  Any contention that Apple may not say this is entirely dependent on the outcome of this case.  If Psystar truly believed Apple's statements were a misrepresentation causing it any harm then Psystar should have asserted this claim as a

townsend.

1    mandatory counterclaim in this action — the assertion arises out of exactly the same nucleus of

2    operative facts as Apple's claims against Psystar.  *SASCO*, 2009 WL 1010513, at *5 (quoting *In re*

3    *Lazar*, 237 F.3d 967. 979 (9th Cir. 2001)).

### 3.    Psystar Concealed Its Efforts To Have Snow Leopard Run On Its Computers

5        Despite active discovery proceedings for more than one year, Psystar never disclosed its

6    intention or effort to run version 10.6 of Mac OS X on Psystar's computers. ████████████

7    ████████████████████████████████████████████████████████

8    ████████████████████████████████████████████████████████

9    ████████████████ █████████████████████████████████████████

10   ██████████████████████████████████████████████████████

11   ████████████████████████████████████████████████████████

12   ████████████████████████████████████████████████████████

13   Significantly, Psystar never disclosed during discovery any information about its plans to run

14   Snow Leopard on its computers or any communications with others about that version of

15   Mac OS X – all of which are responsive to numerous Apple document requests.  (*See, e.g.*,

16   Boroumand Smith Decl. ¶4, Ex. 3 (Apple's Request for Production Nos. 12, 17, 28 and 53).)

17       Instead of supplementing its interrogatory responses as required by Federal Rule of Civil

18   Procedure 26(e) to reveal that Psystar was taking actions to run Snow Leopard on its computers,

19   Psystar concealed its work.  Indeed, when asked by Apple's counsel as recently as August 19,

20   2009, whether Psystar was going to enable Snow Leopard to run on non-Apple computers,

21   Psystar's counsel declined to answer that question.  (*See* Boroumand Smith Decl. ¶7.)  And

22   Psystar never disclosed to Apple any computers running Snow Leopard or any source code for

23   software that would allow Psystar computers to run Snow Leopard.

### C.    Proposed Action Sought By Apple

25       Psystar deliberately concealed its intention to run Snow Leopard on its computers despite

26   being relevant to Apple's claims and responsive to many of Apple's discovery requests.  Then,

27   ────────────────

28       [13] Snow Leopard was released to the public on August 28, 2009.

townsend.

1   rather than litigate the legality of its conduct in this Court, where the issues already are pending,

2   Psystar has attempted an end-run around this Court's prior rulings by filing a duplicative and

3   baseless lawsuit 3,000 miles away.  Consequently, Apple requests that the Court issue an

4   "appropriate order" either directing Psystar to dismiss the Florida action outright or, at a

5   minimum, enjoining Psystar from pursuing the Florida action.  Local Rule 3-13(b) and (d).

6   Psystar also should be prohibited from filing any other similar actions outside of this Court.  Apple

7   further requests that the Court briefly re-open discovery for 45-60 days for very limited, narrowly-

8   tailored inquiry about how Psystar is causing Mac OS X ver. 10.6 to run on its computers.[14]  For

9   Apple's part, this would only require examination of Psystar's new source code and potentially

10  one deposition.  Apple's expert would then supplement his expert report to address Snow Leopard.

11  In turn, Apple would make an Apple witness available for deposition to testify about Apple's

12  technological protection measure in Snow Leopard and the extent, if any, it differs from

13  Leopard.[15]

14

15  DATED:  September 11, 2009          Respectfully submitted,

16                                      TOWNSEND AND TOWNSEND AND CREW LLP

17

18                                      By:  _____/s/ James G. Gilliland, Jr._____
                                             JAMES G. GILLILAND, JR.

19                                      Attorneys for Plaintiff and Counterdefendant

20                                      APPLE INC.

21

22

23

24

25

26  _____
    [14] If necessary, Apple would not oppose a continuance of the trial date for an equivalent period
27  of time so Psystar cannot assert any prejudice to it.

28      [15] Apple also seeks leave to supplement its Initial Disclosures as necessary, now that Psystar
    has announced it is selling computers running Snow Leopard.

townsend.